UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

AMCO INSURANCE COMPANY, AMERICAN
FAMILY LIFE ASSURANCE COMPANY OF
COLUMBUS, AMERICO FINANCIAL LIFE
AND ANNUITY INSURANCE COMPANY,
ATHENE ANNUITY AND LIFE COMPANY,
BANK OF UTICA INVESTMENT
SUBSIDIARY, LTD., BEAUMONT HEALTH,
BIO-RAD LABORATORIES, INC.,
CONTINENTAL CASUALTY COMPANY,
CRESTBROOK INSURANCE COMPANY,
DEDHAM INSTITUTION FOR SAVINGS,
EPHRATA NATIONAL BANK, ERIE FAMILY
LIFE INSURANCE COMPANY, FEDERATED
LIFE INSURANCE COMPANY, GLACIER
BANK, GREAT SOUTHERN LIFE INSURANCE
COMPANY, HEALTH CARE SERVICE
CORPORATION, METROPOLITAN LIFE
INSURANCE COMPANY, MUTUAL OF
AMERICA LIFE INSURANCE COMPANY,
NATIONWIDE LIFE AND ANNUITY
INSURANCE COMPANY, NATIONWIDE LIFE
INSURANCE COMPANY, NATIONWIDE
MUTUAL INSURANCE COMPANY, THE
NORTHWESTERN MUTUAL LIFE
INSURANCE COMPANY, OHIO NATIONAL
LIFE ASSURANCE CORPORATION, THE
OHIO NATIONAL LIFE INSURANCE
COMPANY, SCOTTSDALE INSURANCE
COMPANY, SCOTTSDALE SURPLUS LINES
INSURANCE COMPANY, TAUCK, INC.,
THRIVENT FINANCIAL FOR LUTHERANS,
VETERINARY PET INSURANCE COMPANY,
VICTORIA FIRE & CASUALTY COMPANY,
and WAUKESHA STATE BANK,

                     Plaintiffs,

      v.

COBANK, ACB,

                     Defendant.

No. 16-cv-4422 (LTS)

**SECOND AMENDED
COMPLAINT**

**<u>JURY TRIAL DEMANDED</u>**

Plaintiffs AMCO Insurance Company, American Family Life Assurance Company of Columbus, Americo Financial Life and Annuity Insurance Company, Athene Annuity and Life Company, Bank of Utica Investment Subsidiary, Ltd., Beaumont Health, Bio-Rad Laboratories, Inc., Continental Casualty Company, Crestbrook Insurance Company, Dedham Institution for Savings, Ephrata National Bank, Erie Family Life Insurance Company, Federated Life Insurance Company, Glacier Bank, Great Southern Life Insurance Company, Health Care Service Corporation, Metropolitan Life Insurance Company, Mutual of America Life Insurance Company, Nationwide Life and Annuity Insurance Company, Nationwide Life Insurance Company, Nationwide Mutual Insurance Company, The Northwestern Mutual Life Insurance Company, Ohio National Life Assurance Corporation, The Ohio National Life Insurance Company, Scottsdale Insurance Company, Scottsdale Surplus Lines Insurance Company, Tauck, Inc., Thrivent Financial for Lutherans, Veterinary Pet Insurance Company, Victoria Fire & Casualty Company, and Waukesha State Bank (collectively, the "**Plaintiffs**") allege the following upon personal knowledge as to their own acts, and upon information and belief based upon the investigation conducted by counsel as to all other matters.

## I.      INTRODUCTION AND NATURE OF THE CONSOLIDATED ACTION

1.      This is an action against CoBank, ACB ("**CoBank**", the "**Bank**", or "**Defendant**") brought by Plaintiffs in their individual capacities as holders of 7.875% Subordinated Notes due 2018 (CUSIP 19075QAB8) (the "**Notes**") issued by CoBank. The Notes were issued on April 18, 2008, pursuant to the terms of a Fiscal Agency Agreement between CoBank and The Bank of New York Trust Company, N.A., as Fiscal Agent (the "**Fiscal Agency Agreement**", attached hereto as Exhibit 1) and the terms of each Note, the form of which was attached thereto (the "**Form of Security**").

2

2.     CoBank is a Farm Credit System bank and is subject to regulation by the Farm Credit Administration (the "**FCA**").

3.     CoBank issued the Notes during the early months of a years-long economic recession. At the time, U.S. credit markets were tightening, affecting the conditions applicable to new issues of corporate debt, such as the Notes. Indeed, not only did CoBank offer the Notes with a substantial interest rate; in addition, CoBank issued the Notes subject to significant limitations on its ability to conduct an early redemption.

4.     Specifically, the Form of Security provides CoBank with a very limited contractual right to redeem the Notes prior to their maturity. The limited nature of that redemption right protects investors, such as the Plaintiffs, against prepayment of their Notes—which would deprive them of interest on the Notes—except in a single, specified circumstance. Under the Form of Security, CoBank may only conduct a "Par Call Redemption" following a "Regulatory Event," as defined in the Form of Security.

5.     The Form of Security defines a "Regulatory Event" as

the receipt by [CoBank] of a notification from the Farm Credit Administration, or other primary regulator at the time, to the effect that, whether as a result of a change in applicable law or regulation or otherwise, none of the [Notes] shall any longer be eligible for (i) inclusion in [CoBank's] permanent capital or total surplus for purposes of the FCA Regulations or any comparable regulatory capital requirements under any successor regulations or (ii) exclusion from total liabilities for purposes of calculating [CoBank's] net collateral ratio or any comparable regulatory capital requirements under any successor regulations. A Regulatory Event shall not include a 20% per annum reduction in treatment of the [Notes] as permanent capital and total surplus during the five year period immediately prior to the Maturity Date.

Form of Security, ¶ 6(a).

6.     The Form of Security establishes that following a "Regulatory Event" CoBank may redeem the Notes on any interest payment date—that is, either April 15 or October 15—at a redemption price of 100% of the principal amount of the Notes to be redeemed, plus accrued and

unpaid interest. A Par Call Redemption deprives the holders of Notes of interest that would accrue after the date of the Par Call Redemption through the date of maturity.

7.    This present action arises from CoBank's decision on or about March 11, 2016, to make a Par Call Redemption of the Notes based on its erroneous contention that a "Regulatory Event" had occurred.

8.    CoBank's stated rationale for its authority to conduct a Par Call Redemption is based solely upon its receipt of a March 10, 2016 "Fact Sheet on Tier 1/Tier 2 Regulatory Capital Framework Final Rulemaking" (the "**Fact Sheet**", attached hereto as Exhibit 2) issued by the FCA, which stated that the FCA's board adopted a new final rule, subject to publication in the Federal Register and stated effectiveness of January 1, 2017 (the "**Final Rule**"), that "will add a new part 628 to FCA's regulations and amend part 615 and other FCA regulations to modify the regulatory capital requirements for Farm Credit System (System) banks and associations (institutions)."

9.    The Fact Sheet provided a "Summary of Final Rule," which it described as "replac[ing] existing core surplus and total surplus requirements with common equity tier 1 (CET1), tier 1, and total capital (tier 1 plus tier 2) risk-based capital ratio requirements." The Final Rule "also adds a tier 1 leverage ratio for all [Farm Credit] System institutions, which replaces the existing net collateral ratio for [Farm Credit] System banks."

10.    Based on this Fact Sheet, CoBank purports to have issued a notice of the Par Call Redemption (the "**Par Call Notice**", attached hereto as Exhibit 3) declaring that a "Regulatory Event" had occurred.

11.    CoBank further purports to have issued notice to The Bank of New York Mellon Trust Company, N.A., as Fiscal Agent, of CoBank's intention to redeem the Notes on April 15, 2016 (the "**Fiscal Agent Notice**", attached hereto as Exhibit 4), which appended an officer's certificate dated March 11, 2016. In the "Officer's Certificate," CoBank's Chief Financial Officer, David P. Burlage ("**Burlage**") certified on behalf of CoBank that all requirements for CoBank to conduct a Par Call Redemption had been satisfied.

12.    On April 15, 2016, CoBank consummated the Par Call Redemption of the Notes. This breached the Form of Security for three reasons.

13.    **First**, as of April 15, 2016, there had been no change to the regulation constituting a "Regulatory Event." CoBank did not receive any notification from the FCA "to the effect that, . . . as a result of a change in applicable law . . . , none of the [Notes] shall any longer be eligible" for treatment specified in the Regulatory Event definition because the Fact Sheet did not constitute such a notification. The Final Rule, approved by the FCA's board, was not effective as of the date of the Fact Sheet's issuance. Rather, it is only effective after the later of (i) thirty days after the actual new regulation is published in the Federal Register, as provided by statute, and (ii) January 1, 2017, the stated effective date of the Final Rule, as described by the Fact Sheet. Whether the Final Rule ultimately will be instituted as described by the Fact Sheet was impossible to know as of March 15, 2016, and as of April 15, 2016. Moreover, the summary disclosure of the FCA board's approval of the Final Rule is devoid of the detail and specificity that would be found in a final rule or regulation and that is necessary to comply with the provisions of an eventual new regulation.

14.    **Second**, even if the Par Call Redemption was timely and the Fact Sheet constituted effective notification, the Final Rule, as generally described by the Fact Sheet, does

not trigger a Regulatory Event because it does not impose a "comparable regulatory capital requirement." The Final Rule, which purports to "modernize" the capital requirements applicable to CoBank, is not comparable to the current regulatory requirement as measured in the definition of a "Regulatory Event". The current regulatory regime applicable to the definition of "Regulatory Event" requires CoBank to meet a certain "net collateral ratio," defined as assets divided by the difference between total liabilities minus subordinated debt. *See* 12 C.F.R. § 615.5301(c)-(d). By contrast, the Final Rule imposes three ratio requirements whereby certain categories of capital—specifically, common equity tier 1 capital ("**CET1 capital**"), "Tier 1 capital," and "total capital"[1]—each must have a specific minimum ratio to the institution's total assets. Though both the current "net collateral ratio" requirement and the capital ratios included in the Final Rule are generally intended to measure the financial health of the regulated institutions, they impose different, non-comparable requirements. The Final Rule's modernization of the capital ratios has no effect on the status of the Notes and thus does not constitute a Regulatory Event.

15.    **Third**, even if comparable, CoBank is incorrect that the Notes are no longer eligible to be excluded "from total liabilities for purposes of calculating the Bank's net collateral ratio or any comparable regulatory capital requirements under" the Final Rule, as described by the Fact Sheet. The Fact Sheet merely states that the Final Rule "adds a tier 1 leverage ratio for all System institutions, which replaces the existing net collateral ratio for System banks," and that the tier 1 leverage ratio is defined as "tier 1 divided by total assets." The Notes, as subordinated debt, do not now, and never have, constituted tier 1 capital. The Final Rule does not change the status of the Notes. The Notes remain excluded from tier 1 capital under the new

---

[1] Although each of these terms is used in the Fact Sheet, the Fact Sheet is devoid of a precise definition of these terms.

regulation, as generally described by the Fact Sheet, and thus the Notes would be excluded from the new "Tier 1 Leverage Ratio" test because that test measures tier 1 capital divided by total assets. Therefore, the replacement of an existing net collateral ratio regime for a regulatory capital regime that measures tier 1 leverage ratio would not cause a Regulatory Event to occur.

16.     As a result of the untimely and impermissible Par Call Redemption, Defendant breached the terms of the Form of Security. Plaintiffs seek damages against Defendant for breach of contract and other appropriate relief.

## II.     JURISDICTION AND VENUE

17.     CoBank is an institution of the federal Farm Credit System, as defined in 12 U.S.C. § 2002. For purposes of federal diversity jurisdiction, each institution of the Farm Credit System is, under 12 U.S.C. § 2258, deemed to be a citizen of the state in which its principal office is located. The principal office of CoBank is located in the State of Colorado. Plaintiffs are citizens of states other than Colorado, and no Plaintiff has its principal place of business in Colorado.

18.     The amount in controversy in this action, exclusive of interest and costs, exceeds $75,000.

19.     Subject matter jurisdiction is therefore proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. §§ 1332(a)(1) and (c)(1).

20.     This Court has personal jurisdiction over Defendant under N.Y. C.P.L.R. § 302(a) because Defendant maintains sufficient minimum contacts in this jurisdiction, transacting business including the marketing and sale of the Notes and the redemption thereof. Indeed, the Form of Security states that "[i]n order to provide for the payment of the principal of and the interest on the [Notes], as the same shall become due, [CoBank] does hereby agree to pay to the Fiscal Agent at its corporate trust office in The City of New York," the amount of principal and

interest due on the Notes. Form of Security, ¶ 10. Additionally, the Fiscal Agency Agreement is "governed by, and interpreted in accordance with, the laws of the State of New York," while the Form of Security is "governed by, and shall be construed in accordance with, the laws of the State of New York." *See* Fiscal Agency Agreement, § 11; Form of Security, ¶ 15. Venue is therefore proper in this judicial district under 28 U.S.C. § 1391.

## III.    PARTIES

21.    Plaintiff AMCO Insurance Company ("**AMCO**") is incorporated in Iowa. AMCO acquired Notes prior to the announcement of the Par Call Redemption and continued to hold Notes through the date of consummation of the Par Call Redemption. As of April 15, 2016, AMCO was the beneficial owner of $4,000,000 of Notes.

22.    Plaintiff American Family Life Assurance Company of Columbus ("**American Family**") is incorporated in Nebraska. American Family acquired Notes prior to the announcement of the Par Call Redemption and continued to hold Notes through the date of consummation of the Par Call Redemption. As of April 15, 2016, American Family was the beneficial owner of $25,000,000 of Notes.

23.    Plaintiff Americo Financial Life and Annuity Insurance Company ("**Americo Financial**") is domiciled in Texas. Americo Financial acquired Notes prior to the announcement of the Par Call Redemption and continued to hold Notes through the date of consummation of the Par Call Redemption. As of April 15, 2016, Americo Financial was the beneficial owner of $5,000,000 of Notes.

24.    Plaintiff Athene Annuity and Life Company ("**Athene**") is incorporated in Iowa. Athene acquired Notes prior to the announcement of the Par Call Redemption and continued to hold Notes through the date of consummation of the Par Call Redemption. As of April 15, 2016, Athene was the beneficial owner of $15,000,000 of Notes.

25.     Plaintiff Bank of Utica Investment Subsidiary, Ltd. ("**Utica**") is incorporated in New York. Utica acquired Notes prior to the announcement of the Par Call Redemption and continued to hold Notes through the date of consummation of the Par Call Redemption. As of April 15, 2016, Utica was the beneficial owner of $3,811,000 of Notes.

26.     Plaintiff Beaumont Health ("**Beaumont**") is a Michigan corporation on whose behalf Longfellow Investment Management Co. LLC ("**Longfellow**") invests in securities. On behalf of Beaumont, Longfellow acquired Notes prior to the announcement of the Par Call Redemption and continued to hold Notes on behalf of Beaumont through the date of consummation of the Par Call Redemption. As of April 15, 2016, Beaumont was the beneficial owner of $600,000 of Notes.

27.     Plaintiff Bio-Rad Laboratories, Inc. ("**Bio-Rad**") is a Delaware corporation on whose behalf Longfellow invests in securities. On behalf of Bio-Rad, Longfellow acquired Notes prior to the announcement of the Par Call Redemption and continued to hold Notes on behalf of Bio-Rad through the date of consummation of the Par Call Redemption. As of April 15, 2016, Bio-Rad was the beneficial owner of $225,000 of Notes.

28.     Plaintiff Continental Casualty Company ("**CCC**") is incorporated in Illinois. CCC acquired Notes prior to the announcement of the Par Call Redemption and continued to hold Notes through the date of consummation of the Par Call Redemption. As of April 15, 2016, CCC was the beneficial owner of $15,000,000 of Notes.

29.     Plaintiff Crestbrook Insurance Company ("**Crestbrook**") is incorporated in Ohio. Crestbrook acquired Notes prior to the announcement of the Par Call Redemption and continued to hold Notes through the date of consummation of the Par Call Redemption. As of April 15, 2016, Crestbrook was the beneficial owner of $1,000,000 of Notes.

30.     Plaintiff Dedham Institution for Savings ("**Dedham**") is a savings bank, organized under the laws of Massachusetts, on whose behalf Longfellow invests in securities. On behalf of Dedham, Longfellow acquired Notes prior to the announcement of the Par Call Redemption and continued to hold Notes on behalf of Dedham through the date of consummation of the Par Call Redemption. As of April 15, 2016, Dedham was the beneficial owner of $1,250,000 of Notes.

31.     Plaintiff Ephrata National Bank ("**Ephrata**") is a Pennsylvania business corporation. Ephrata acquired Notes prior to the announcement of the Par Call Redemption and continued to hold Notes through the date of consummation of the Par Call Redemption. As of April 15, 2016, Ephrata was the beneficial owner of $4,375,000 of Notes.

32.     Plaintiff Erie Family Life Insurance Company ("**Erie**") is a Pennsylvania business corporation. Erie acquired Notes prior to the announcement of the Par Call Redemption and continued to hold Notes through the date of consummation of the Par Call Redemption. As of April 15, 2016, Erie was the beneficial owner of $3,000,000 of Notes.

33.     Plaintiff Federated Life Insurance Company ("**Federated**") is incorporated in Minnesota. Federated acquired Notes prior to the announcement of the Par Call Redemption and continued to hold Notes through the date of consummation of the Par Call Redemption. As of April 15, 2016, Federated was the beneficial owner of $3,240,000 of Notes.

34.     Plaintiff Glacier Bank is organized under the laws of Montana. Glacier Bank acquired Notes prior to the announcement of the Par Call Redemption and continued to hold Notes through the date of consummation of the Par Call Redemption. As of April 15, 2016, Glacier Bank was the beneficial owner of $2,000,000 of Notes.

35.     Plaintiff Great Southern Life Insurance Company ("**Great Southern Life**") is domiciled in Texas. Great Southern Life acquired Notes prior to the announcement of the Par Call Redemption and continued to hold Notes through the date of consummation of the Par Call Redemption. As of April 15, 2016, Great Southern Life was the beneficial owner of $3,000,000 of Notes.

36.     Plaintiff Health Care Service Corporation ("**HCSC**") is a mutual legal reserve company, incorporated under the laws of Illinois, on whose behalf Longfellow invests in securities. On behalf of HCSC, Longfellow acquired Notes prior to the announcement of the Par Call Redemption and continued to hold Notes on behalf of HCSC through the date of consummation of the Par Call Redemption. As of April 15, 2016, HCSC was the beneficial owner $1,400,000 of Notes.

37.     Plaintiff Metropolitan Life Insurance Company ("**MetLife**") is a life insurance company incorporated in New York. MetLife acquired Notes prior to the announcement of the Par Call Redemption and continued to hold Notes through the date of consummation of the Par Call Redemption. As of April 15, 2016, MetLife was the beneficial owner of $100,000 of Notes.

38.     Plaintiff Mutual of America Life Insurance Company ("**Mutual of America**") is a mutual life insurance company organized under the Insurance Law of New York. Mutual of America acquired Notes prior to the announcement of the Par Call Redemption and continued to hold Notes through the date of consummation of the Par Call Redemption. As of April 15, 2016, Mutual of America was the beneficial owner of $15,050,000 of Notes.

39.     Plaintiff Nationwide Life and Annuity Insurance Company ("**NLAIC**") is incorporated in Ohio. NLAIC acquired Notes prior to the announcement of the Par Call

Redemption and continued to hold Notes through the date of consummation of the Par Call Redemption. As of April 15, 2016, NLAIC was the beneficial owner of $18,750,000 of Notes.

40.     Plaintiff Nationwide Life Insurance Company ("**Nationwide Life**") is incorporated in Ohio. Nationwide Life acquired Notes prior to the announcement of the Par Call Redemption and continued to hold Notes through the date of consummation of the Par Call Redemption. As of April 15, 2016, Nationwide Life was the beneficial owner of $62,200,000 of Notes.

41.     Plaintiff Nationwide Mutual Insurance Company ("**Nationwide Mutual**") is incorporated in Ohio. Nationwide Mutual acquired Notes prior to the announcement of the Par Call Redemption and continued to hold Notes through the date of consummation of the Par Call Redemption. As of April 15, 2016, Nationwide Mutual was the beneficial owner of $14,020,000 of Notes.

42.     Plaintiff The Northwestern Mutual Life Insurance Company ("**Northwestern Mutual**") is incorporated in Wisconsin. Northwestern Mutual acquired Notes prior to the announcement of the Par Call Redemption and continued to hold Notes through the date of consummation of the Par Call Redemption. As of April 15, 2016, Northwestern Mutual was the beneficial owner of $15,000,000 of Notes.

43.     Plaintiff Ohio National Life Assurance Corporation ("**ONLAC**") is incorporated in Ohio. ONLAC acquired Notes prior to the announcement of the Par Call Redemption and continued to hold Notes through the date of consummation of the Par Call Redemption. As of April 15, 2016, ONLAC was the beneficial owner of $2,750,000 of Notes.

44.     Plaintiff The Ohio National Life Insurance Company ("**ONLIC**") is incorporated in Ohio. ONLIC acquired Notes prior to the announcement of the Par Call Redemption and

continued to hold Notes through the date of consummation of the Par Call Redemption. As of April 15, 2016, ONLIC was the beneficial owner of $5,000,000 of Notes.

45.     Plaintiff Scottsdale Insurance Company ("**Scottsdale**") is incorporated in Ohio. Scottsdale acquired Notes prior to the announcement of the Par Call Redemption and continued to hold Notes through the date of consummation of the Par Call Redemption. As of April 15, 2016, Scottsdale was the beneficial owner of $1,045,000 of Notes.

46.     Plaintiff Scottsdale Surplus Lines Insurance Company ("**Scottsdale Surplus**") is incorporated in Arizona. Scottsdale Surplus acquired Notes prior to the announcement of the Par Call Redemption and continued to hold Notes through the date of consummation of the Par Call Redemption. As of April 15, 2016, Scottsdale Surplus was the beneficial owner of $400,000 of Notes.

47.     Plaintiff Tauck, Inc. ("**Tauck**") is a New Jersey corporation on whose behalf Longfellow invests in securities. On behalf of Tauck, Longfellow acquired Notes prior to the announcement of the Par Call Redemption and continued to hold Notes on behalf of Tauck through the date of consummation of the Par Call Redemption. As of April 15, 2016, Tauck was the beneficial owner of $115,000 of Notes.

48.     Plaintiff Thrivent Financial for Lutherans ("**Thrivent**") is incorporated in Wisconsin as a fraternal benefit society. Thrivent acquired Notes prior to the announcement of the Par Call Redemption and continued to hold Notes through the date of consummation of the Par Call Redemption. As of April 15, 2016, Thrivent was the beneficial owner of $17,000,000 of Notes.

49.     Plaintiff Veterinary Pet Insurance Company ("**Veterinary**") is incorporated in Ohio. Veterinary acquired Notes prior to the announcement of the Par Call Redemption and

continued to hold Notes through the date of consummation of the Par Call Redemption. As of April 15, 2016, Veterinary was the beneficial owner of $1,500,000 of Notes.

50.    Plaintiff Victoria Fire & Casualty Company ("**Victoria**") is incorporated in Ohio. Victoria acquired Notes prior to the announcement of the Par Call Redemption and continued to hold Notes through the date of consummation of the Par Call Redemption. As of April 15, 2016, Victoria was the beneficial owner of $1,250,000 of Notes.

51.    Plaintiff Waukesha State Bank ("**Waukesha**") is a State of Wisconsin chartered bank. Waukesha acquired Notes prior to the announcement of the Par Call Redemption and continued to hold Notes through the date of consummation of the Par Call Redemption. As of April 15, 2016, Waukesha was the beneficial owner of $1,000,000 of Notes.

52.    Plaintiffs collectively beneficially owned $243,081,000 of Notes as of April 15, 2016.

53.    Defendant CoBank is an institution of the federal Farm Credit System, as defined in 12 U.S.C. § 2002. The principal office of CoBank is located in the State of Colorado. CoBank issued, and later redeemed, the Notes.

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    BACKGROUND ON COBANK AND ITS INDEBTEDNESS

54.    CoBank is an agricultural credit bank and is one of the four banks of the Farm Credit System (the "**System**"), a federally chartered network of borrower-owned lending institutions comprised of cooperatives and related service organizations.

55.    CoBank provides domestic and international financial services and lease financing and related solutions to farmer cooperatives, communications companies, energy and water systems, farmer-owned financial institutions and other related businesses that serve rural America.

56.    CoBank is federally chartered under the Farm Credit Act of 1971, as amended (12 U.S.C. §§ 2001-2279cc) (the "**Farm Credit Act**"), and is subject to examination and safety and soundness regulation by an independent federal agency, the FCA.

57.    CoBank is cooperatively owned by its U.S. customers, who consist of approximately 2,200 agricultural cooperatives, rural communications companies, rural energy and water systems, and farmer-owned financial institutions.

58.    CoBank raises a substantial majority of its funds for its lending and leasing activities and operations through the issuance of debt securities, including bonds, medium-term notes, and discount notes, by the System's Federal Farm Credit Banks Funding Corporation (the "**Funding Corporation**"). These "Systemwide Debt Securities" are the joint and several obligations of Farm Credit System banks, including CoBank.

59.    The Notes, however, were not issued by the Funding Corporation. Rather, they were issued by CoBank and remain CoBank's sole obligation and not the obligation of any other System institution.

60.    CoBank issued the Notes on April 18, 2008, during the early months of a years-long economic recession. The tightening of credit markets affected the terms applicable to new issues of corporate debt, such as the Notes. Indeed, not only did CoBank offer the Notes with a substantial interest rate; in addition, CoBank issued the Notes subject to significant limitations on its ability to conduct an early redemption.

61.    As of December 31, 2015, CoBank was primarily liable for $104.8 billion of such "Systemwide" debt securities, such as bonds, medium-term notes and discount notes. CoBank 2015 Annual Report (attached hereto as Exhibit 5), p. 86.

62.     As of December 31, 2015, CoBank had subordinated debt outstanding of $904.7 million. CoBank 2015 Annual Report, p. 87.

63.     CoBank's subordinated debt is comprised of (i) the Notes and (ii) the "Series 2007A Subordinated Notes." CoBank 2015 Annual Report, p. 88.

64.     The Notes were issued on April 15, 2008, and are scheduled to mature on April 16, 2018. Form of Security, ¶ 1; CoBank 2015 Annual Report, p. 88.

65.     When the Notes were issued, CoBank said it would use the "net proceeds from the sale of the Notes to increase its regulatory capital ratios pursuant to FCA Regulations and for general corporation purposes." CoBank, Offering Circular for the issuance of $500 million principal amount of Notes, dated April 14, 2008, at 6.

66.     The outstanding principal amount of the Notes as of December 31, 2015, was $404,685,000. CoBank 2015 Annual Report, p. 88.

67.     CoBank paid semi-annual cash interest payments to the holders of Notes on April 15 and October 15 of each year. CoBank 2015 Annual Report, p. 88.

68.     CoBank's Series 2007A unsecured subordinated notes (the "**Series 2007A Subordinated Notes**"), bearing interest at a rate of the 3-month USD LIBOR (London Interbank Offered Rate) + 0.60 percent, were issued on June 15, 2007 in the amount of $500 million. CoBank 2015 Annual Report, p. 88. CoBank makes quarterly interest payments on March 15, June 15, September 15 and December 15 of each year on the Series 2007A Subordinated Notes, which are scheduled to mature on June 15, 2022. *Id*.

69.     Like the Notes, the Series 2007A Subordinated Notes may be redeemed, at CoBank's sole option, on an interest payment date following the occurrence of a "Regulatory Event," as such term is defined in a substantially similar fashion as by the Form of Security for

the Notes. CoBank, however, did not redeem, nor announce its intent to redeem, the Series 2007A Subordinated Notes upon the FCA's publication of the Fact Sheet summarizing the Final Rule.

70.    On April 8, 2016, CoBank issued $375 million of Series I non-cumulative perpetual preferred stock. CoBank used the net proceeds from the Series I preferred stock issuance to increase its regulatory capital pursuant to current FCA regulations and for general corporate purposes. Dividends on Series I preferred stock, if declared by CoBank's Board of Directors, are non-cumulative and are payable semi-annually at a fixed annual rate equal to 6.25 percent from the date of issuance up to, but excluding, October 1, 2026.

**B.    OVERVIEW OF FCA REGULATIONS AND HOW REGULATIONS ARE ADOPTED**

71.    The FCA describes its regulatory mandate as

[to] develop[] regulations (rules) to implement the Farm Credit Act and other relevant laws, to help the Farm Credit System fulfill its public mission, and to ensure that the [System] operates safely and soundly. . . . Like all Federal regulations, FCA regulations have the force and effect of law.

*See* http://www.fca.gov/law/fca_regs.html.

72.    According to the FCA,

Ordinarily, regulations are enacted according to the following process:

    1.    FCA staff prepares a proposed rule and submits it to the FCA Board.

    2.    If the Board approves it, the proposed rule is sent to Congress for a 30-day review.

    3.    When the review period expires, a notice of proposed rulemaking is then published in the Federal Register, which is the official publication for rules and notices of Federal agencies. This notice explains the proposed rule and invites the public to comment within a specific period (usually between 30 and 90 days).

    4.    The Agency reviews the comments it receives.

5.    FCA officials then determine whether to (a) adopt the proposed regulation as final, (b) amend the proposed regulation before enacting it as final, or (c) withdraw the rule altogether.

6.    If the Board approves a final rule, it is published in the Federal Register. Unless FCA prescribes a later effective date, the final rule usually takes effect after 30 days during which either body of Congress is in session. FCA places a notice in the Federal Register to inform the public of the regulation's effective date.

*Id.*

73.    By statute, "no final regulation of the Farm Credit Administration shall become effective prior to the expiration of thirty calendar days after it is published in the Federal Register during which either or both Houses of the Congress are in session." 12 U.S.C. § 2252(c)(1). While there is an exception to this requirement for emergency situations, 12 U.S.C. § 2252(c)(2), the FCA regulation at issue in this action was not prompted by any emergency. Moreover, the FCA has not issued the notifications it is required to issue when invoking that emergency provision. *Id.*

74.    Thus, by statute the Final Rule cannot become effective prior to thirty calendar days, during which either or both Houses of Congress are in session, after it is published in the Federal Register. By the terms of the Final Rule itself, it is not effective until January 1, 2017. Therefore, the Final Rule cannot take effect until the later of these two dates.

C.    THE FCA'S PROPOSED CHANGES TO THE SYSTEM'S CAPITALIZATION REGULATIONS

75.    On May 8, 2014, the FCA approved a proposed rule to modify the regulatory capital requirements for System associations and banks, including CoBank (the "**Proposed Rule**"). The stated objectives of the Proposed Rule were:

a.    To modernize capital requirements while ensuring that institutions continue to hold sufficient regulatory capital to fulfill their mission as members of a government-sponsored enterprise;

    b.  To ensure that the System's capital requirements are comparable to the Basel III framework and the standardized approach that the federal banking regulatory agencies have adopted, but also to ensure that the rules recognize the cooperative structure and the organization of the System;

    c.  To make System regulatory capital requirements more transparent; and

    d.  To meet certain requirements of the Dodd-Frank Act.

76.    In notes accompanying the Proposed Rule, the FCA stated that "[w]e have analyzed every System institution's call report data, and we project that all System institutions would meet all other proposed minimum amounts for the CET1, tier 1 and total capital risk-based ratios if those requirements were in effect today." Regulatory Capital Rules: Regulatory Capital, Implementation of Tier 1/Tier 2 Framework, 79 Fed. Reg. 52,814, 52,860 (Sept. 4, 2014) (available at https://www.gpo.gov/fdsys/pkg/FR-2014-09-04/pdf/2014-19179.pdf).

77.    The notes to the Proposed Rule further stated:

All System institutions would meet the 5.0 minimum tier 1 leverage ratio . . . if the proposed requirement were effective today. Our analysis indicates that the leverage ratio would not be a constraining ratio for System associations because of their strong capital levels. The leverage ratio for associations would be very similar to their tier 1 capital risk-based ratio because most of their assets are risk weighted at 100 percent.

*Id*.

78.    The notes to the Proposed Rule also indicated:

In the event that some System institutions do not meet the tier 1 and tier 2 capital standards when the rules become effective, we are proposing to permit them to comply by submitting a capital restoration plan. The plan, which the institution would be required to submit within 20 days of the quarter end during which the new capital standards become effective, would describe how the institution proposes to achieve and maintain compliance with the new requirements, demonstrating progress towards meeting that goal. If the FCA did not approve the plan, the institution would have to revise and re-submit the plan.

*Id*.

79.     The initial public comment period for the proposed rule ended on February 16, 2015.

80.     The FCA reopened the comment period from June 26, 2015, to July 10, 2015.

81.     In CoBank's 2015 Annual Report, CoBank stated that, "[w]hile uncertainty exists as to the final form of the proposed rule, based on our preliminary assessment, we do not believe the new rule will impose any significant constraints on our business strategies or growth prospects." CoBank 2015 Annual Report, p. 56.

82.     On March 10, 2016, the FCA issued the Fact Sheet.

83.     The Fact Sheet stated that the

FCA's objectives in adopting this final rule are as follows:

   a. To modernize capital requirements while ensuring that System institutions continue to hold sufficient regulatory capital to fulfill the System's mission as a government-sponsored enterprise.

   b. To ensure that the System's capital requirements are comparable to the Basel III framework and the standardized approach that the federal banking regulatory agencies have adopted, but also to ensure that the rules recognize the cooperative structure and the organization of the System.

   c. To make System regulatory capital requirements more transparent.

   d. To meet the requirements of section 939A of the Dodd-Frank Wall Street Reform and Consumer Protection Act.

Fact Sheet, at 1.

84.     The Fact Sheet summarized the Final Rule as follows:

The final rule replaces existing core surplus and total surplus requirements with common equity tier 1 (CET1), tier 1, and total capital (tier 1 plus tier 2) risk-based capital ratio requirements. The final rule also adds a tier 1 leverage ratio for all System institutions, which replaces the existing net collateral ratio for System banks.

Fact Sheet, at 1.

85.    The Fact Sheet stated that "[t]he final rule will become effective on Jan. 1, 2017." Fact Sheet, at 2.

86.    The Fact Sheet disclosed that the new Part 628 to the FCA's regulations will provide as follows:

**§ 628.10 – Minimum Capital Requirements**: This provision sets the following minimum risk-based requirements:

- A CET1 capital ratio of 4.5 percent.

- A tier 1 capital ratio (CET1 capital plus additional tier 1 capital) of 6 percent.

- A total capital ratio (tier 1 plus tier 2) of 8 percent.

This provision also sets a minimum tier 1 leverage ratio (tier 1 divided by total assets) of 4 percent, of which at least 1.5 percent must consist of unallocated retained earnings (URE) and URE equivalents, which are nonqualified allocated equities with certain characteristics of URE.

Fact Sheet, at 2 (emphasis in original).

87.    The Fact Sheet disclosed that the new Part 628 to the FCA's regulations will provide as follows:

**§ 628.20 – Capital Components and Eligibility Criteria for Regulatory Capital Instruments:** This provision sets forth the criteria an institution must meet to be able to include capital instruments in CET1 capital, additional tier 1 capital, and tier 2 capital. The criteria are as follows:

- **CET1 Capital** consists of unallocated retained earnings plus common cooperative equities (purchased member stock, purchased participation certificates, and allocated equities). These equities are unchanged from the proposed rule except as specified below and must meet the following criteria (among others):

    o  Equities are perpetual and represent claims in liquidation subordinated to all preferred stock, subordinated debt, and liabilities of the institution.

    o  Equities subject to redemption or revolvement are not retired for at least 7 years after issuance. This is a change from the proposed rule's minimum redemption or revolvement period of 10 years. An exception to this minimum period is that an institution may redeem a member-

borrower's statutory minimum stock requirement (the lesser of $1,000 or 2 percent of the loan) when the loan is repaid.

o   Equities can be redeemed or revolved only with FCA prior approval (unless it is the statutory minimum borrower stock requirement or unless the distribution meets "safe harbor" standards described below).

o   A System institution must adopt a capitalization bylaw or annual board resolution providing it will seek prior FCA approval before redeeming or revolving any equities (other than the statutory minimum borrower stock) it includes in CET1 before the end of the 7-year period. This is a change from the proposed rule, which required a capitalization bylaw and did not permit compliance through an annual board resolution.

- **Additional Tier 1 Capital** consists of equities other than common cooperative equities that meet most of the CET1 criteria but represent a claim that ranks senior to all common cooperative equities in a receivership, liquidation, or similar proceeding. Additional Tier 1 capital consists primarily of noncumulative perpetual preferred stock that has been issued primarily by System banks to investors outside of the System.

- **Tier 2 Capital** consists of equities, which may be either common cooperative equities or equities held by third parties, that do not meet the tier 1 capital criteria, as well as qualifying subordinated debt and limited-life preferred stock. These equities are unchanged from the proposed rule except as specified below and must meet the following criteria:

  o   The instruments are perpetual or have an original maturity of at least 5 years.

  o   Instruments subject to redemption or revolvement are not retired for at least 5 years after issuance.

  o   The instruments may not be redeemed or revolved prior to maturity or the end of the stated revolvement period without FCA prior approval.

  o   A System institution must adopt a capitalization bylaw or annual board resolution providing it will seek prior FCA approval before retiring any instruments it includes in tier 2 before the end of the 5-year period. This is a change from the proposed rule, which required a capitalization bylaw and did not permit compliance through an annual board resolution.

Fact Sheet, at 2-3 (emphasis in original).

88.     The Fact Sheet disclosed that, on top of the tier 1 leverage ratio, a System bank would need to comply with a "leverage capital cushion (leverage buffer)" in order to pay "discretionary senior executive bonuses . . . without prior FCA approval."

89.     The Fact Sheet disclosed that the new Part 628 to the FCA's regulations will provide as follows:

> **§ 628.11 – Capital Buffer Amounts**: This provision establishes a capital cushion (capital conservation buffer) of 2.5 percent above the risk-based CET1, tier 1, and total capital requirements. This provision also establishes a leverage capital cushion (leverage buffer) of 1 percent above the tier 1 leverage ratio requirements. If capital ratios fall below these buffer amounts, capital distributions (equity redemptions, dividends, and patronage) and discretionary senior executive bonuses are restricted or prohibited without prior FCA approval.

Fact Sheet, at 2 (emphasis in original).

90.     The Fact Sheet disclosed that the new Part 628 to the FCA's regulations will provide:

> **§ 628.301 – Initial Compliance and Reporting Requirements:** This provision would require a System institution not meeting all minimum regulatory capital requirements on the effective date of the rule to notify FCA of its noncompliance and to submit a capital restoration plan. If FCA approves the plan and the institution complies with the plan, FCA would consider the institution to be in compliance with the regulatory capital requirements.

Fact Sheet, at 5 (emphasis in original).

91.     The Fact Sheet did not contain specific reference to the Notes.

92.     On March 10, 2016, the FCA also issued a news release (the "**News Release**", attached hereto as Exhibit 6) stating that "[t]he Farm Credit Administration Board today adopted the Tier 1/Tier 2 Regulatory Capital Framework final rule, which modifies the regulatory capital requirements for Farm Credit System (System) banks and associations."

93.    The News Release stated that:

[o]ne of the primary objectives of the final capital rule is to modernize the System's capital requirements while ensuring that its banks and associations continue to hold sufficient regulatory capital to fulfill the System's mission as a government-sponsored enterprise.

FCA approved the proposed rule on May 8, 2014. The proposed rule was open for comment for a total of 180 days, during which FCA received more than 2,400 comment letters, including approximately 1,800 comment letters sent by the members of one association. The final rule reflects a number of changes in response to the comment letters.

94.    The News Release also stated that "[t]he final rule takes effect on Jan. 1, 2017, and System banks and associations must start reporting based on the final rule beginning with the quarter ending March 31, 2017."

95.    As of March 11, 2016, the Final Rule had not been published in the Federal Register.

96.    As of April 15, 2016, the Final Rule had not been published in the Federal Register.

97.    On July 28, 2016, the Final Rule was published in the Federal Register.

98.    Thus, as of the date of this Complaint, the FCA's pre-Fact Sheet regulatory capital requirements remain in full force and effect.

### D.    KEY PROVISIONS OF THE FISCAL AGENCY AGREEMENT AND FORM OF SECURITY

99.    Paragraph 6 of the Form of Security provides:

(a) The [Notes] are redeemable in whole, at the option of the Bank on any Interest Payment Date following a Regulatory Event at a Redemption Price equal to 100% of the principal amount of the [Notes] to be redeemed, plus any accrued and unpaid interest to, but excluding the Redemption Date.

"Regulatory Event" means the receipt by the Bank of a notification from the Farm Credit Administration, or other primary regulator at the time, to the effect that, whether as a result of a change in applicable law or regulation or otherwise, none of the [Notes] shall any longer be eligible for (i) inclusion in the Bank's permanent capital or total surplus for purposes of the FCA Regulations or any

comparable regulatory capital requirements under any successor regulations or (ii) exclusion from total liabilities for purposes of calculating the Bank's net collateral ratio or any comparable regulatory capital requirements under any successor regulations. A Regulatory Event shall not include a 20% per annum reduction in treatment of the [Notes] as permanent capital and total surplus during the five year period immediately prior to the Maturity Date.

(b) The [Notes] are not entitled to the benefit of any sinking fund.

Form of Security (attached as Exhibit A to the Fiscal Agency Agreement), ¶ 6.

100.    Section 5 of the Fiscal Agency Agreement provides:

The [Notes] shall be redeemable in accordance with their terms as set forth in the [Notes] and in accordance with this Section.

(a) Election to Redeem: Notice to Fiscal Agent.

The Election of the Bank to redeem any [Notes] shall be evidenced by a Board Resolution. The Bank shall, at least 45 days prior to the Redemption Date fixed by the Bank (unless a shorter notice shall be satisfactory to the Fiscal Agent), notify the Fiscal Agent in writing of such Redemption Date and of the principal amount of such [Notes] to be redeemed. In the case of any redemption pursuant to paragraph 6(b) of the [Notes], the Bank shall also furnish the Fiscal Agent with an Officer's Certificate evidencing receipt of notice from its regulator regarding the occurrence of a Regulatory Event at least 45 days prior to the related Redemption Date (unless a shorter period shall be satisfactory to the Fiscal Agent).

Fiscal Agency Agreement, § 5(a).

101.    Section 5 of the Fiscal Agency Agreement further provides:

(c) Notice of Redemption.

Notice of redemption shall be given in writing and mailed, first-class postage prepaid to the Holders of [Notes] to be redeemed not less than 30 nor more than 60 days prior to the Redemption Date.

Fiscal Agency Agreement, § 5(c).

102.    Paragraph 3 of the Form of Security provides:

A Minimum Regulatory Capital Ratio is any of the following requirements, to the extent applicable to the Bank at a particular time:

(i)     Net Collateral Ratio: The ratio of the Bank's collateral as defined by the FCA Regulations (12 C.F.R. 615.5050) less an amount equal to affiliated Agricultural Credit Association investments in the Bank not counted as

permanent capital, except that eligible investments described in the FCA Regulations (12 C.F.R. 615.5140) are to be valued at their amortized cost, divided by the Bank's total liabilities less certain derivative amounts, adjusted to exclude subordinated debt (subject to certain limitations) and liabilities related to the adoption of Statement of Financial Accounting Standards No. 158.

(ii)   Permanent Capital Ratio: The ratio of the Bank's 3-month average permanent capital, adjusted to include subordinated debt (subject to certain limitations), as defined by the FCA Regulations (12 C.F.R. 615.5201) divided by the Bank's 3-month average risk-adjusted assets as defined by the FCA Regulations (12 C.F.R. 615.5210).

(iii)  Core Surplus Ratio: The ratio of the Bank's 3-month average core surplus, as defined by the FCA Regulations (12 C.F.R. 615.5301) divided by the Bank's 3-month average risk-adjusted assets as defined by the FCA Regulations (12 C.F.R. 615.5210). Beginning January 1, 2008, core surplus will include a significant portion of common stock and participation certificates as a result of a favorable FCA determination granted in March 2008 on a temporary basis.

(iv)   Total Surplus Ratio: The ratio of the Bank's 3-month average total surplus, adjusted to include subordinated debt (subject to certain limitations), as defined by the FCA Regulations (12 C.F.R. 615.5301) divided by the Bank's 3-month average risk-adjusted assets as defined by the FCA Regulations (12 C.F.R. 615.5210).

(v)    Any other "minimum regulatory capital ratio" requirement imposed on the Bank by any future law, regulation or otherwise that requires the Bank to maintain a minimum ratio of specified items, such as regulatory capital stock, retained earnings and the [Notes] to total assets or some subset thereof that constitutes a minimum capital requirement as the case may be under the then-applicable FCA Regulations.

Form of Security (attached as Exhibit A to the Fiscal Agency Agreement), ¶ 3.

103.   Paragraph 11 of the Form of Security provides:

The Fiscal Agency Agreement and the terms and conditions of the [Notes] may be modified or amended by the Bank and the Fiscal Agent, without the consent of the Holders of any [Notes], for the purpose of (a) adding to the covenants of the Bank for the benefit of the Holders, (b) surrendering any right or power conferred upon the Bank, … (e) any matter that the Bank and the Fiscal Agent may mutually deemed necessary or desirable and that shall not adversely affect the interests of the Holders of the [Notes] in any material respect, to all of which the Holder of this [Note] shall, by acceptance hereof, consent.

Form of Security (attached as Exhibit A to the Fiscal Agency Agreement), ¶ 11.

104.    Paragraph 13 of the Form of Security provides:

All notices to Holders will be delivered by or on behalf of the Bank in writing to
each Holder of the [Notes] by first class mail, provided that if at the time of any
such notice any [Notes] are represented by a Global Security, such notice in
respect of such [Notes] shall be delivered to DTC in the manner permitted by
DTC's procedures and shall be deemed to have been given three Business Days
after delivery to DTC. If at the time of any such notice any [Notes] are
represented by a Certificated Security, such notice in respect of such [Notes] shall
be delivered to the Holders thereof and in such case shall be deemed to have been
given three Business Days after the mailing of such notice by first class mail.

Form of Security (attached as Exhibit A to the Fiscal Agency Agreement), ¶ 13.

105.    Paragraph 15 of the Form of Security provides:

This Security shall be governed by, and shall be construed in accordance with, the
laws of the State of New York.

Form of Security (attached as Exhibit A to the Fiscal Agency Agreement), ¶ 15.

106.    Section 6 of the Fiscal Agency Agreement provides:

(b) <u>Remedies Upon Breach of Other Obligations</u>. In the event that the Bank fails
to perform any of its other obligations under this Agreement or the [Notes], each
Holder of the [Notes] may pursue any available remedy to enforce the
performance of any provision of this Agreement or the [Notes]; . . . A delay or
omission by any Holder in exercising any right or remedy accruing as a result of
the Bank's failure to perform its obligations under this Agreement or the [Notes]
and the continuation thereof shall not impair such right or remedy or constitute a
waiver of or acquiescence in such non-performance by the Bank. . . .

. . .

(e) <u>Delay or Omission Not Waiver</u>. No delay or omission of any Holder to
exercise any right or remedy accruing pursuant to this Article shall impair any
such right or remedy or constitute a waiver thereof or an acquiescence therein.
Every right and remedy given by this Article or by law to the Holders may be
exercised from time to time, and as often as may be deemed expedient by the
Holders."

Fiscal Agency Agreement, §§ 6(b), (e).

107.    All Plaintiffs' Notes are represented by a Global Security, substantially similar to

the Form of Security.

108.    The Notes were tier 2 capital upon issuance.

109.    The Notes were tier 2 capital on April 15, 2016, immediately prior to the consummation of the Par Call Redemption.

**E.    COBANK HAS NOT ATTEMPTED TO REDEEM ITS SERIES 2007A SUBORDINATED NOTES, EVEN THOUGH THEY ARE SUBJECT TO SUBSTANTIALLY IDENTICAL REDEMPTION PROVISIONS UPON A REGULATORY EVENT**

110.    According to CoBank, the Series 2007A Subordinated Notes

may be redeemed, in whole, at [CoBank's] option at any time upon the occurrence of a regulatory event, whereby through a change in law or regulation the subordinated debt is no longer eligible for (i) inclusion in our permanent capital or total surplus or any comparable regulatory capital requirements under any successor regulations or (ii) exclusion from total liabilities for purposes of calculating our net collateral ratio or any comparable regulatory capital requirements under any successor regulations.

CoBank 2015 Annual Report, p. 88.

111.    Thus, the Series 2007A Subordinated Notes could be redeemed at CoBank's option upon the occurrence of a "regulatory event," defined in substantially similar fashion as in the Form of Security of the Notes. Once it takes effect, the Final Rule, as described by the Fact Sheet, thus should apply equally to both the Notes and the Series 2007A Subordinated Notes.

112.    CoBank also stated that any redemption of the Series 2007A Subordinated Notes "will be at a redemption price of 100 percent of the principal amount, plus any accrued but unpaid interest to the date of redemption." *Id*.

113.    The relevant language regarding the right to redeem the Notes and the Series 2007A Subordinated Notes—the latter as described in CoBank's 2015 Annual Report—is identical. The Final Rule thus will apply equally to both the Notes and the Series 2007A Subordinated Notes.

114.    As compared to the Notes, which bear interest at 7.875%, the Series 2007A Subordinated Notes bear interest at LIBOR plus 0.60 percent. During all of March and April 2016, the Series 2007A Subordinated Notes accrued interest at a lower rate than the Notes.

115.    For regulatory purposes under current FCA regulations, the Series 2007A Subordinated Notes and the Notes have the same treatment.

116.    CoBank allegedly issued a statement on March 11, 2016, that it would redeem the Notes on the next interest payment date under the Notes—April 15, 2016. CoBank did not issue a statement or form of notice on March 11, 2016, or on any subsequent date prior to the filing of this Complaint, that it would redeem the Series 2007A Subordinated Notes on the next interest payment date under those notes—June 15, 2016.

117.    Thus, even though the Series 2007A Subordinated Notes were issued by the same issuer as the Notes, have the same subordinated debt/regulatory status as the Notes, and have the same "Regulatory Event" provision as the Notes, in March and April 2016 they bore a lower interest rate than the Notes, and CoBank did not redeem the Series 2007A Subordinated Notes on the then-next interest payment date following the release of the Fact Sheet.

### F.    COBANK'S INVALID PAR CALL REDEMPTION

118.    On March 11, 2016, CoBank purportedly issued the "Par Call Notice" stating that

> pursuant to the provisions of Section 5 of the Fiscal Agency Agreement . . . CoBank has called for redemption on April 15, 2016 (the "Redemption Date"), all of the outstanding principal amount of the [] Notes at a redemption price equal to 100% of the principal amount plus accrued and unpaid interest to, but excluding the Redemption Date (the "Redemption Price").

Par Call Notice, at 1.

119.    The Par Call Notice did not specify the basis for the Par Call Redemption.

120.    The Par Call Notice was not delivered to DTC in the manner permitted by DTC's procedures on March 11, 2016, as required by Paragraph 13 of the Form of Security.

121.    On March 15, 2016, some Plaintiffs received what purported to be a notice of official corporate action (a "Corporate Action Notice") from the securities brokerages holding the Notes on behalf of the Plaintiffs. These Corporate Action Notices indicated that CoBank intended to call the Notes on April 15, 2016, at par, and that the redemption would be mandatory.

122.    On April 15, 2016, CoBank conducted the Par Call Redemption, calling the entire outstanding principal amount of the Notes.

123.    CoBank submitted its Par Call Notice notwithstanding the fact that a "Regulatory Event" (as defined in the Form of Security) had not occurred.

124.    CoBank did not need to redeem the Notes in order to satisfy CoBank's "total capital (tier 1 plus tier 2) risk-based capital ratio requirement[]," if such a regulation were even applicable, as of April 15, 2016.

125.    CoBank did not need to redeem the Notes in order to satisfy CoBank's "tier 1 leverage ratio," if such a regulation were even applicable, as of April 15, 2016.

126.    Prior to the Par Call Redemption, certain Plaintiffs wrote to CoBank concerning CoBank's decision to redeem the Notes.

127.    On April 21, 2016, in response to those communications, Burlage sent letters to several Plaintiffs, including one letter to Mutual of America (the "**CoBank Response Letter**", attached hereto as Exhibit 7).

128.    In the CoBank Response Letter, Burlage stated that a "Regulatory Event occurred on March 10, 2016, when [CoBank] received notification from the FCA that it had adopted, as a final rule, the Tier 1/Tier 2 Regulatory Capital Framework." CoBank Response Letter, p. 2.

129.    According to the CoBank Response Letter, the "Fact Sheet makes clear at page 1[ that] it is only the 'tier 1 leverage ratio' (not Tier 2 or both collectively)[] that 'replaces the existing net collateral ratio' regime." CoBank Response Letter, p. 2.

130.    Burlage alleges that

> In contrast to the net collateral ratio regime, in the new Tier 1 leverage ratio there is no language that deems the Notes "eligible for exclusion from the Bank's total liabilities for purposes of calculating . . . [CoBank's] regulatory capital requirements." Moreover, this is not merely a function of different nomenclature between the regimes (i.e., that the new regime does not speak to liabilities). The new rules reflect a sea-change, substantive difference in that subordinated debt no longer receives favorable regulatory capital treatment to allow CoBank to lever against the Note proceeds as capital. Thus, both the terms of the Regulatory Event Redemption right, and the purposes it was designated to preserve, are squarely implicated by this regulatory change.

CoBank Response Letter, p. 2.

131.    The CoBank Response Letter did not address the fact that the Final Rule had not been published in the Federal Register, and thus cannot take effect as a matter of statutory law, and is by its own terms until January 1, 2017.

132.    In its financial statements for the first quarter of 2016, CoBank explicitly recognized that it would not be subject to the Final Rule until 2017. In those financial statements, CoBank stated that "a portion of our common stock is included in core surplus, subject to certain conditions. This inclusion will continue for the remainder of 2016, at which time new capital regulations will be effective," referring to the Final Rule. CoBank, 2016 Quarterly Report for the Quarter ended March 31, 2016 (attached hereto as Exhibit 8), at 12.

133.    In the CoBank Response Letter, CoBank made the untenable claim that "in the new Tier 1 leverage ratio there is no language that deems the Notes 'eligible for exclusion from the Bank's total liabilities for purposes of calculation . . . [of CoBank's] regulatory capital requirements.'" Without analysis of the definitive text of the impending regulation, a

characterization of the Final Rule based on the Fact Sheet's "Summary of Final Rule" cannot be substantiated. The Fact Sheet does not provide the necessary detail and specificity—such as would be found in a final rule or regulation—to conclude that the Final Rule will contain "no language" deeming the Notes eligible for exclusion from CoBank's liabilities with respect to regulatory capital requirements, or more generally to determine exactly how the Notes will be treated under the Final Rule.

134.    The Final Rule, as described by the Fact Sheet, does not constitute a "comparable regulatory capital requirement[]" that could trigger the "Regulatory Event" clause of the Form of Security. The CoBank Response Letter indicates that CoBank partially concedes this. In the letter, Co-Bank stated that the Final Rule marks a "sea-change, substantive difference" in the regulatory treatment of subordinated debt. Moreover, CoBank's assertion that a Regulatory Event occurred ignores the basic fact that, even after the effectiveness of the Final Rule, as described by the Fact Sheet, the Notes are to be excluded from total liabilities for the purpose of calculation the Bank's tier 1 leverage ratio, as such ratio is to be defined in section 628.10 as "tier 1 divided by total assets."

135.    CoBank's financial statements for the first quarter of 2016, authored after the Fact Sheet was issued and after the Par Call Notice was purportedly issued, did not apply the Final Rule.

136.    CoBank strategically overlooks that the proceeds of the Notes remain eligible to be included in "total assets," free for CoBank to leverage against until the stated maturity date of the Notes—April 16, 2018.

137.    The CoBank Response Letter indicates that CoBank did not redeem the Notes because it was necessary to meet regulatory capital requirements. Rather, CoBank expressed the

belief that redemption was appropriate because the Notes are "no longer [eligible to] receive[] favorable regulatory capital treatment" to allow CoBank to lever against the Notes proceeds as capital. Yet the Form of Security for the Notes did not give CoBank that right.

138.    CoBank's senior executives were incented to take steps to ensure that CoBank maintained adequate capital buffer amounts and leverage buffers above the applicable risk-based CET1, tier 1, and total capital requirements and tier 1 leverage ratio requirements in the proposed regulations and thus preserve such senior executive ability to receive bonuses absent FCA approval. If CoBank failed to meet or exceed the capital conservation buffer or leverage buffer, its senior executives could be prohibited from receiving discretionary bonuses without obtaining the prior approval of the FCA.

### G.    COBANK IS WELL CAPITALIZED UNDER THE EXISTING REGULATORY CAPITAL REGIME

139.    In CoBank's 2015 Annual Report, it described its financial position as

strong as of December 31, 2015, reflecting solid levels of capital and liquidity. [CoBank's] shareholders' equity increased to $7.8 billion at year-end 2015, compared to $7.4 billion at year-end 2014. [CoBank's] permanent capital and core surplus ratios were 14.95 percent and 10.29 percent, respectively, as of December 31, 2015, compared to the regulatory minimum requirements of 7.00 and 3.50 percent, respectively. As of year-end 2015, [CoBank] held $27.6 billion in investments and cash, primarily as a liquidity reserve, and [CoBank's] days liquidity was 199 days.

CoBank 2015 Annual Report, p. 30.

140.    CoBank declared in a statement accompanying those financial statements that "Capital levels for CoBank remained well in excess of regulatory minimums," CoBank Quarterly Report for the Quarter Ended March 31, 2016, at 1 (attached hereto as Exhibit 8).

141.    "As of March 31, 2016, . . . the bank's permanent capital ratio was 14.8 percent, compared with the 7.0 percent minimum established by the [FCA]." *Id,* at 1, 12.

142.    CoBank's total surplus ratio, core surplus ratio, and net collateral ratio were also in excess of regulatory minimums as of March 31, 2016. *Id*. at 12.

143.    CoBank's total surplus ratio was 13.82% as of March 31, 2016, almost double the FCA's current regulatory minimum of 7.00%. *Id*. at 12.

144.    CoBank's core surplus ratio was 10.11% as of March 31, 2016, almost double the FCA's current regulatory minimum of 5.59%. *Id*. at 12.

145.    CoBank's net collateral ratio was 106.92% as of March 31, 2016, well in excess of the FCA's current regulatory minimum of 104%, applicable when an issuer has subordinated debt outstanding. *Id*. at 12.

<u>**COUNT ONE**</u>
**Breach of Contract, Form of Note, Paragraph 6(a)**

146.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

147.    The Form of Security was at all relevant times a valid and enforceable contract.

148.    The Fact Sheet did not contain specific reference to the Notes, failing to satisfy the notice requirement contained in Paragraph 6 of the Form of Security.

149.    The receipt of the Fact Sheet on March 10, 2016, was not a notification from the FCA to the effect that, as a result of a change in applicable law or regulation or otherwise, none of the Notes shall any longer be eligible for treatment as permanent capital.

150.    There was no change in the applicable regulation because the Final Rule, as summarized by the Fact Sheet, is by its own terms not effective until at least January 1, 2017, or later, and because, as of the date of the Par Call Notice and Par Call Redemption, the FCA's Final Rule was not published in the Federal Register.

151.    By the FCA's own guidelines and by statute, the failure to publish the Final Rule in the Federal Register prevented the Final Rule from having effect.

152.    Paragraph 6(a) of the Form of Security does not require the Par Call Redemption in advance of the effective date of the "change in applicable law or regulation" triggering a Regulatory Event.

153.    Only following the occurrence of that Regulatory Event does CoBank have the option to redeem the Notes on an interest payment date.

154.    The FCA news release issued on March 10 says that System institutions must start reporting based on the Final Rule beginning with the quarter ending March 31, 2017.

155.    The Fact Sheet does not provide the specificity necessary to determine precisely how the Notes would be affected by the Final Rule, if it becomes effective.

156.    The Final Rule does not constitute a "comparable regulatory capital requirement[]" that would trigger the "Regulatory Event Redemption" clause because it is not sufficiently comparable to the current regulatory regime.

157.    The Notes are tier 2 capital and thus remain eligible for inclusion in permanent capital, total assets, or total surplus for FCA regulations or comparable regulatory capital requirements.

158.    The Fact Sheet does not indicate that the Final Rule will change the permanent capital ratio.

159.    Paragraph 6(a) of the Form of Security states that a Regulatory Event occurs if the Notes are no longer being excluded from total liabilities for the purposes of calculating the net collateral ratio or comparable regulatory requirements.

35

160.    Net collateral ratio is defined under Paragraph 3 of the Form of Security to exclude subordinated debt from the calculation of total assets.

161.    The Notes remain excluded from total liabilities for the purposes of calculating the net collateral ratio or any comparable regulatory capital requirements under any successor regulation.

162.    The Notes are excluded from CET1 Capital and Additional Tier 1 Capital under proposed §628.20 (as proposed in the Final Rule) and so are excluded from the new "Tier 1 Leverage Ratio."

163.    As a result of Defendant's breach of the Form of Security, Plaintiffs have suffered damages in an amount to be determined at trial.

**<u>COUNT TWO</u>**
**Breach of the Implied Covenant of Good Faith and Fair Dealing**

164.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

165.    The Form of Security evidenced by the executed Global Security was at all relevant times a valid and enforceable contract.

166.    Like all contracts under New York law, the Form of Security incorporates an implied covenant of good faith and fair dealing.

167.    Defendant's course of conduct violated the implied covenant of good faith and fair dealing and public policy because Defendant issued a Par Call Notice and consummated the Par Call Redemption in order to serve its economic and corporate financing interests rather than its regulatory obligations.

168.    Defendant prematurely embraced the Fact Sheet as an opportunity to rid itself of indebtedness evidenced by the Notes, which its Chief Financial Officer, David Burlage, characterized as no longer being "attractive" as a capital-raising vehicle.

169.    In fact, just a week before the consummation of the Par Call Redemption, CoBank issued $375 million of Series I non-cumulative perpetual preferred stock, with a discretionary dividend payable semi-annually at a fixed annual rate equal to 6.25 percent from the date of issuance up to, but excluding, October 1, 2026.

170.    Conveniently, CoBank then redeemed the Notes, while leaving the LIBOR plus 0.60 percent interest rate Series 2007A Subordinated Notes outstanding. CoBank did this even though the Series 2007A Subordinated Notes and the Notes have the same regulatory status and treatment under current regulations.

171.    Defendant's actions deprived Plaintiffs of the benefit of their bargain under the Form of Security evidenced by the Global Security. Indeed, Defendant's actions will deprive Plaintiffs of the ultimate benefit of the Form of Security—the right to receive interest payments until the stated maturity of the Notes in 2018.

172.    No reasonable person would have anticipated Defendant's course of conduct, which was inconsistent with the justified expectations of Plaintiffs.

173.    Defendant thereby breached the implied covenant of good faith and fair dealing. Plaintiffs have suffered damages as a result of Defendant's breach of the implied covenant and will continue to be damaged in the future.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A.    Awarding Plaintiffs damages, in an amount to be determined at trial;

B.    Awarding Plaintiffs reasonable costs and attorneys' fees; and

C.     Awarding such other relief in Plaintiffs' favor as the Court may deem just and

proper.

**JURY DEMAND**

Plaintiffs hereby demand a trial by jury.

Dated: August 26, 2016

**GRANT & EISENHOFER P.A.**

By: */s/ Gordon Z. Novod*
Jay W. Eisenhofer
Gordon Z. Novod
Caitlin Moyna
485 Lexington Avenue, 29th Floor
New York, New York 10017
Tel:  646-722-8500
Fax:  646-722-8501
jeisenhofer@gelaw.com
gnovod@gelaw.com
cmoyna@gelaw.com

*Attorneys for Plaintiffs*