UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
AMCO INSURANCE COMPANY, *et al.*,          :
                                           :
                      Plaintiffs,          :
                                           :
            - against -                    :          No. 16-cv-4422 (LTS)(HBP)
                                           :
COBANK, ACB,                               :
                                           :
                      Defendant.           :
-------------------------------------------------------------X

## MEMORANDUM OF LAW IN SUPPORT OF
## COBANK'S MOTION FOR SUMMARY JUDGMENT

Shawn Patrick Regan
Joseph J. Saltarelli
Peter Mustalish
Jennifer Bloom
Silvia N. Ostrower
HUNTON & WILLIAMS LLP
200 Park Avenue, 52nd Floor
New York, New York 10166
(212) 309-1000

*Attorneys for Defendant*
*CoBank, ACB*

## **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ..................................................................................................1

STATEMENT OF UNDISPUTED FACTS ...............................................................................3

I.  BACKGROUND ...............................................................................................................3

    A.  CoBank and The Farm Credit System ...................................................................3

    B.  The Farm Credit Administration.............................................................................3

II.  THE FCA'S REGULATORY CAPITAL RULES
    & THE REGULATORY EVENT DEFINITION..............................................................4

    A.  FCA's Adoption of the Net Collateral Ratio .........................................................4

    B.  CoBank's 2007 Notes ............................................................................................5

    C.  FCA's 2007 Advance Notices of Proposed Rulemaking........................................5

    D.  FCA Requests Changes to CoBank's "Regulatory Event" Definition ...................6

    E.  The 2008 Notes ......................................................................................................7

    F.  FCA's 2010 ANPR & 2014 Proposed Rule...........................................................9

III.  THE REGULATORY EVENT & REDEMPTION .........................................................10

    A.  Adoption of the New Rules & Receipt of Notification..........................................10

    B.  Subordinated Debt Under the NCR vs. Under the T1LR ......................................11

    C.  CoBank's Redemption of the 2008 Notes ...........................................................12

ARGUMENT............................................................................................................................13

Standard of Review & Applicable Law ....................................................................................13

I.  SUMMARY JUDGMENT IS WARRANTED FOR COBANK BECAUSE
    NO REASONABLE JURY COULD CONCLUDE THAT A
    "REGULATORY EVENT" DID NOT OCCUR............................................................14

    A.  CoBank Received "Notification" From the FCA of Its Adoption of New
        Regulations Governing System Banks' Capital Requirements. ............................14

    B.  The "Regulatory Event" Trigger Was "Receipt of Notification...", Not
        "Effective Date of the New Rule." ........................................................................15

    C.  The FCA's Notification Was to the Effect That, Under the Final Rule,
        None of the 2008 Notes Shall Any Longer Be Eligible for Exclusion from
        Total Liabilities for Purposes of Calculating CoBank's NCR or the T1LR,
        a Comparable Regulatory Capital Requirement. ...................................................15

    D.  The NCR and the T1LR are "Comparable" Regulatory Capital
        Requirements. ......................................................................................................16

i

1.      The T1LR and the NCR are "comparable" because each is the sole non-risk-weighted leverage ratio intended by the FCA to measure and constrain leverage. ...................................................................16

2.      The fact that the FCA expressly indicated the NCR would be "replaced by" the T1LR, while other existing ratios would be replaced by other specified ratios, reflects that the T1LR is the ratio under the successor regulations that is "comparable" to the NCR. ..........18

3.      The origin of the term "comparable regulatory capital requirements" reinforces that the NCR and the T1LR are comparable............................18

II.     PLAINTIFFS' CLAIM FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING SHOULD BE DISMISSED AS A MATTER OF LAW. ..........................................................................................20

CONCLUSION.................................................................................................................21

## TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ................................................................................13

*In re Avon Sec. Litig.*,
    2004 WL 3761563 (S.D.N.Y. Mar. 29, 2004) ........................................20

*Big Apple Car, Inc. v. City of New York*,
    204 A.D.2d 109, 611 N.Y.S.2d 533 (1st Dep't 1994) ...........................21

*Caldarola v. Calabrese*,
    298 F.3d 156 (2d Cir. 2002) ...................................................................13

*CDO Plus Master Fund Ltd. v. Wachovia Bank, N.A.*,
    2010 WL 3239416 (S.D.N.Y., Aug. 16, 2010) .......................................13

*Harris v. Provident Life & Accident Ins. Co.*,
    310 F.3d 73 (2d Cir. 2002) .....................................................................20

*Holtz v. Rockefeller & Co.*,
    258 F.3d 62 (2d Cir. 2001) .....................................................................13

*ICD Holdings S.A. v. Frankel*,
    976 F. Supp. 234 (S.D.N.Y. 1997) .........................................................20

*James L. Turkle Trust v. Wells Fargo & Co.*,
    2012 WL 2568208 (N.D. Cal. July 2, 2012) ..........................................15

*Jeffreys v. City of New York*,
    426 F.3d 549 (2d Cir. 2005) ...................................................................13

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ................................................................................13

*Moran v. Erk*,
    901 N.E.2d 187, 11 N.Y.3d 452 (2008) .................................................21

*MS Fed. Acquisition, LLC v. U.S. Bank Nat'l Ass'n*,
    2015 WL 4461740 (S.D.N.Y. July 21, 2015) ...................................20, 21

*Roswell Capital Partners LLC v. Alternative Constr. Techs.*,
    2009 WL 222348 (S.D.N.Y. Jan. 30, 2009) ...........................................13

**Statutes**

Farm Credit Act of 1971 ..................................................................... *passim*

**Other Authorities**

Fed. R. Civ. P. 56......................................................................................................1, 13

Local Rule 56.1.............................................................................................................3

Merriam Webster Dictionary (2018)......................................................................15

Defendant CoBank, ACB ("CoBank") respectfully submits this Memorandum of Law in Support of its Motion for Summary Judgment, pursuant to Fed. R. Civ. P. 56.

## PRELIMINARY STATEMENT

This is a breach-of-contract suit arising from CoBank's redemption of its Series 2008 7.875% subordinated notes (CUSIP 19075QAB8) (the "2008 Notes"), issued pursuant to a Fiscal Agency Agreement between CoBank and The Bank of New York Trust Company, N.A. as Fiscal Agent, including an attached Form of Security (the "Agreement").

CoBank redeemed the 2008 Notes on April 15, 2016, after its primary regulator, the Farm Credit Administration (the "FCA"), announced adoption of new regulatory capital rules. There is no dispute that CoBank had the option to redeem the 2008 Notes upon the occurrence of a "Regulatory Event." There is also no dispute as to the material facts surrounding the FCA rules (which are largely a matter of public record). The only question is whether there is factual evidence from which a jury reasonably could conclude CoBank's redemption breached the Agreement. For the reasons set forth below, no reasonable jury could find CoBank breached the Agreement. A Regulatory Event plainly occurred and CoBank is entitled to summary judgment.

CoBank issued the 2008 Notes "to increase its regulatory capital ratios pursuant to FCA Regulations ...." Hence, before issuing the 2008 Notes, CoBank sought from the FCA a key determination: that the 2008 Notes could "be excluded from liabilities for purposes of calculating CoBank's Net Collateral Ratio" (the "NCR"), the sole non-risk-weighted leverage ratio in the FCA's regulatory capital framework. The FCA confirmed CoBank could exclude the 2008 Notes obligation from its calculation of Total Liabilities (the NCR denominator), while also including the 2008 Notes issuance proceeds within its calculation of Net Collateral (the NCR numerator), the result of which was a higher ratio, *i.e.*, to "increase its [NCR]."

1

The FCA also noted, however, that its "regulatory capital treatment of subordinated debt could change in the future if we revise our regulations … or we change our opinion of the loss-absorbing characteristics of subordinated debt." CoBank therefore reserved the option to redeem the 2008 Notes upon "receipt … of a notification from the FCA… to the effect that, … as a result of a change in applicable … regulation…, none of the Securities shall any longer be eligible for … exclusion from total liabilities for purposes of calculating the Bank's net collateral ratio or any comparable regulatory capital requirements under any successor regulations."

On March 10, 2016, the FCA Board announced its adoption of new regulatory capital rules, implementing a "Tier 1 / Tier 2 Regulatory Capital Framework." CoBank had closely monitored the lengthy rulemaking process and received immediate notification of the FCA's action. Through a news release and fact sheet, the FCA summarized the changes and made clear that, *inter alia,* the new framework replaced the NCR with a Tier 1 Leverage Ratio ("T1LR"), just as contemplated in a lengthy, comprehensive Proposed Rule issued two years earlier.

Under the new rules, the 2008 Notes shall no longer be "eligible for exclusion from total liabilities for purposes of calculating CoBank's [NCR]," nor are they "eligible for exclusion from total liabilities for purposes of calculating … [the] comparable regulatory capital requirements under [the] successor regulation", *i.e.*, the T1LR. CoBank thus was entitled to redeem.

Indeed, CoBank's redemption was wholly consistent with its stated purpose of the 2008 Notes — to *increase* CoBank's regulatory capital ratios. Under the predecessor rules, the 2008 Notes had the effect of *increasing* CoBank's leverage ratio (the NCR). But under the new rules, the 2008 Notes would have the effect of *decreasing* CoBank's leverage ratio (the T1LR).

Based on these undisputed facts, summary judgment is warranted in favor of CoBank.

## STATEMENT OF UNDISPUTED FACTS

### I.   BACKGROUND

#### A.   CoBank and The Farm Credit System

CoBank is a national cooperative bank and a member of the Farm Credit System (the "System"). Created by Congress in 1916, the System's mandate is to ensure credit remains available, in good times and bad, for American agribusinesses and rural power, water and communications providers. (CoBank's Local Rule 56.1 Statement of Material Facts in Support of its Motion for Summary Judgment, dated March 13, 2018 ("SOF") ¶ 1.) The System is the nation's oldest government-sponsored enterprise and the largest agricultural lender in the United States. (SOF ¶ 2.)

In contrast to other federal government-sponsored lending enterprises, Congress structured the System as a network of borrower-owned cooperative institutions to ensure that farmer- and rancher-borrowers participate in management, control and ownership of the institutions and that, as a result, the System institutions remain focused on serving the needs of their borrower-members and the broad national interest in a dependable and affordable food supply for the nation. (SOF ¶ 3.) The System includes four banks: CoBank; AgriBank, FCB; AgFirst Farm Credit Bank; and Farm Credit Bank of Texas. (SOF ¶ 4.)

#### B.   The Farm Credit Administration

The FCA, an independent executive branch agency of the United States government, is responsible, under the Farm Credit Act of 1971, as amended (the "Farm Credit Act"), for regulating and supervising System institutions to ensure they remain safe and sound. (SOF ¶ 5.) Broadly speaking, the FCA fulfills its mission by promulgating regulations for System institutions, and examining System institutions to ensure compliance with the Farm Credit Act, FCA regulations, and safe and sound banking practices. (SOF ¶ 6.) All FCA policies, regulatory

3

agendas, changes in regulations, charters and enforcement activities must be approved by a full-time, three-person board (the "FCA Board") whose members are appointed by the President with the advice and consent of the Senate.  (SOF ¶ 7.)

## II.   THE FCA'S REGULATORY CAPITAL RULES & THE REGULATORY EVENT DEFINITION

### A.   FCA's Adoption of the Net Collateral Ratio

In 1985, Congress amended the Farm Credit Act "to require the FCA to cause System institutions to achieve and maintain adequate capital by establishing minimum levels of capital for such System institutions and by using such other methods as the [FCA] deems appropriate." (SOF ¶ 8.)  Over ensuing years, the FCA adopted various regulatory capital rules.  (SOF ¶ 9.)

On July 27, 1995, the FCA issued a Proposed Rule to amend the System's capital rules by, among other things, adding a non-risk-weighted[1] leverage ratio, the NCR, for all System banks.[2]  (SOF ¶ 10.)  In August 1996, after receiving comments on the Proposed Rule, the FCA published a Reproposed Rule, which stated:

> The reproposed rule's net collateral requirement … is similar to the leverage ratios required by other regulators.

(SOF ¶ 11.)

In January 1997, the FCA adopted a Final Rule which, *inter alia*, established the NCR as a regulatory capital requirement for System banks.  (SOF ¶ 12.)

---

[1] Risk-weighted ratios value assets at a percentage of their face value to account for their perceived risk. Non-risk-weighted ratios do not do so.  *See* RJN Ex. 1, at 38524 (discussing that non-risk-weighted ratios "address risks other than credit risk, [and] provide a more stringent test of capital adequacy").  *See also* RJN Ex. 10 § 628.10 (identifying "methodologies for determining risk-weighted assets for purposes of the … risk-based capital requirement for all System institutions"); RJN Ex. 9 at 49788 (describing CET1 capital ratio, Tier 1 capital ratio, Total Capital ratio and Permanent Capital ratio as using "risk-weighted assets" and the T1LR as non-risk-weighted).
[2] The NCR was calculated by dividing Net Collateral by Total Liabilities (NCR = Net Collateral / Total Liabilities).  (SOF ¶ 13.)

### B.   CoBank's 2007 Notes

In Spring 2007, CoBank submitted to the FCA a 

(SOF ¶ 14.)

On May 30, 2007, the FCA confirmed CoBank could

(SOF ¶ 15.) The FCA also stated:

(*Id.*)

Consistent with the terms of the draft offering circular reviewed by the FCA, the fiscal agency agreement pursuant to which the 2007 Notes were issued gave CoBank the option to redeem those notes upon the occurrence of a "Regulatory Event," defined in relevant part as:

> [R]eceipt by the Bank of a notification from the Farm Credit Administration, or other primary regulator at the time, to the effect that, whether as a result of a change in applicable law or regulation or otherwise, none of the Securities shall any longer be eligible for … (ii) exclusion from total liabilities for purposes of calculating the Bank's net collateral ratio.

(SOF ¶ 17.)

### C.   FCA's 2007 Advance Notices of Proposed Rulemaking

On June 21, 2007, less than a month after CoBank issued its 2007 Notes, the FCA issued an Advance Notice of Proposed Rulemaking ("ANPR"), in which the FCA sought public comments regarding "changes, if any, that should be made to the existing regulatory minimum

NCR requirement applicable to System banks that would make it *more* comparable to the Tier 1 ratio used by other Federal financial regulatory agencies."[3]  (SOF ¶¶ 16, 18 (emphasis added).)

On October 31, 2007, the FCA issued a revised ANPR, again seeking public comments on "changes, if any, that should be made to the existing regulatory minimum NCR requirement applicable to System banks that would make it *more* comparable to the Tier 1 ratio used by other Federal financial regulatory agencies."  (SOF ¶ 19 (emphasis added).)

### D.     FCA Requests Changes to CoBank's "Regulatory Event" Definition

Five weeks later, on December 3, 2007, CoBank submitted to the FCA a Summary of Preliminary Terms of a Series C Preferred Stock offering (the "Term Sheet") (SOF ¶ 21),



(*Id.*) ██████████████████████ (SOF ¶ 22.) █████████████████████

---

[3] As the FCA noted, the Office of the Comptroller of the Currency, Federal Reserve System, Federal Deposit Insurance Corporation, and Office of Thrift Supervision supplemented their risk-based capital rules with a Tier 1 leverage ratio for banks under their supervision.  (RJN Ex. 4 at 34192 n.3, 34197.)

(SOF ¶ 23.)[4]

### E.    The 2008 Notes

In March 2008, CoBank submitted to the FCA a

(SOF ¶ 24.)

(SOF ¶ 25.)

(SOF ¶ 26.)

(SOF ¶ 27.)

(*Id.*)



---

[4]

(SOF ¶ 23.)

On April 18, 2008, CoBank issued the 2008 Notes pursuant to the Agreement.  (SOF

¶ 28.)  The Agreement permitted CoBank to redeem the 2008 Notes[5] upon occurrence of a

"Regulatory Event," defined in relevant part as:

> … [R]eceipt by the Bank of a notification from the Farm Credit
> Administration, or other primary regulator at the time, to the effect
> that, whether as a result of a change in applicable law or regulation
> or otherwise, none of the Securities shall any longer be eligible for
> … (ii) exclusion from total liabilities for purposes of calculating the
> Bank's net collateral ratio or any comparable regulatory capital
> requirements under any successor regulations.

(SOF ¶ 30.)

Through certain underwriters, CoBank conducted an offering of the 2008 Notes, which

included distribution of an offering circular (the "2008 Notes Offering Circular") to potential

investors.  (SOF ¶ 32.)  The 2008 Notes Offering Circular stated that "[e]ach purchaser of the

[2008] Notes [was] deemed to have acknowledged, represented and agreed … [that] … [the]

Offering Circular has been delivered to it and upon which it is relying in making its investment

decision with respect to the [2008] Notes." (SOF ¶ 33.)[6]

The 2008 Notes Offering Circular stated that CoBank is "subject to regulation under the

Farm Credit Act," including "requirements to maintain regulatory capital at or above minimum

levels for our permanent capital ratio, total surplus ratio, core surplus ratio and net collateral

ratio." (SOF ¶ 34.)  As Plaintiffs' Complaint acknowledges, the 2008 Notes Offering Circular

also stated that "CoBank will use the net proceeds from the sale of the [2008] Notes to increase

its regulatory capital ratios pursuant to FCA Regulations ...."  (SOF ¶ 35.)  It also disclosed that

CoBank may redeem the 2008 Notes upon the occurrence of a Regulatory Event and included

---

[5] The 2008 Notes were redeemable in whole, at par, on an interest payment date and with certain notice. (*See* Declaration of Shawn Patrick Regan, dated March 13, 2018 ("Regan Decl.") Ex. 14 at A-9, § 6(a).) Plaintiffs do not appear to, nor could they reasonably, dispute that CoBank complied with these terms. *See also infra* part III. C. (referring to compliance with such terms).

[6] The Agreement required a similar acknowledgement from all Accredited Investors that obtained the Securities as a result of a subsequent transfer or exchange.  (Regan Decl. Ex. 14 at 5, A-20-21.)

the definition of Regulatory Event in multiple places, including on the cover page and in the Summary, the Risk Factors, and Description of the Notes sections.  (*Id.* ¶ 36.)

**F.      FCA's 2010 ANPR & 2014 Proposed Rule**

In July 2010, the FCA published another ANPR, which stated that the FCA was "considering the promulgation of Tier 1 and Tier 2 capital standards for Farm Credit System (FCS or System) institutions."  (SOF ¶ 37.)

Four years later, on September 4, 2014, the FCA published in the Federal Register a Proposed Rule (the "Proposed Rule") that would, *inter alia,* "revise [the] regulatory capital requirements for … System institutions to include … a tier 1 leverage requirement (replacing a net collateral requirement for System banks)."  (SOF ¶ 38.)

The Proposed Rule stated that "[t]he FCA is proposing a tier 1 leverage ratio … [that] would replace the net collateral ratio requirement for System banks."  (SOF ¶ 40.)  Under the terms of the Proposed Rule, in calculating CoBank's leverage ratio (the T1LR), the proceeds of the 2008 Notes would be *included* in the denominator (Total Assets) and would *not be included* in the numerator (Tier 1 Capital).[7]  (SOF ¶¶ 42, 43.)  In sum, whereas the 2008 Notes had the effect of *increasing* CoBank's leverage ratio under the NCR, the 2008 Notes would have the effect of *decreasing* CoBank's leverage ratio under the proposed T1LR.

The FCA received approximately 2,400 public comments on the Proposed Rule, including a letter from the Farm Credit Council, which reflected comments developed by the System's capital workgroup after soliciting input from all System institutions, including CoBank.  (SOF ¶ 44.)  The FCA described that public comment letter as "comprehensive and detailed, covering most or all of the numerous regulatory philosophy, policy and technical issues directly

---

[7] CoBank's 2008 Notes did not qualify as Tier 1 Capital under the Proposed Rule because they were subordinated debt instruments, which were classified as Tier 2 Capital.  (SOF ¶ 42; Regan Decl. Ex. 26 ¶ 157.)

and indirectly addressed in the proposed rule." (SOF ¶ 45.)

On February 11, 2016, the FCA Board approved its Unified Agenda of Federal Regulatory and Deregulatory Actions and the Spring 2016 Regulatory Projects Plan, identifying seven rulemaking items it would consider during calendar year 2016, the first of which was adoption of a Final Rule on capital requirements ("Capital – Basel III"). (SOF ¶ 46.) On March 1, 2016, the FCA announced that its agenda for the March 10, 2016 Board meeting would include the Tier 1 / Tier 2 Regulatory Capital Framework final rule. (SOF ¶ 47.)

## III.   THE REGULATORY EVENT & REDEMPTION

### A.   Adoption of the New Rules & Receipt of Notification

On March 10, 2016, the FCA Board "adopted the Tier 1 / Tier 2 Regulatory Capital Framework final rule" (the "Final Rule"), modifying the regulatory capital requirements for System institutions. (SOF ¶ 48.) The FCA also immediately issued a news release ("News Release"), stating that the Board had adopted the Final Rule, and a "Fact Sheet on Tier 1 / Tier 2 Regulatory Capital Framework Final Rulemaking" ("Fact Sheet"), which summarized the rule and explained, in relevant part, that (i) "the final rule replaces existing … core surplus and total surplus requirements with common equity tier 1 (CET1), tier 1, and total capital (tier 1 plus tier 2) risk-based capital ratio requirements"; and (ii) "the final rule also adds a tier 1 leverage ratio [(the "T1LR")] for all System institutions, which replaces the existing net collateral ratio for System banks." (SOF ¶ 49.) CoBank received the News Release and the Fact Sheet by email from the FCA on March 10, 2016. (SOF ¶ 51.) Both also were publicly available on the FCA's website. (SOF ¶ 50.) Later that day, CoBank's Chief Financial Officer, David Burlage, reported to CoBank's Chief Executive Officer, Robert Engel, that Mr. Burlage had ███████████

███████████████████████████████████████████████

███████████████████████████████ (SOF ¶ 52.)

### B.    Subordinated Debt Under the NCR vs. Under the T1LR

The NCR and the T1LR are both non-risk-weighted leverage ratios, designed to constrain the buildup of leverage in the System.  (SOF ¶¶ 54, 55.)  The T1LR is the only non-risk-weighted ratio in the Tier 1 / Tier 2 Regulatory Capital Framework; and the NCR was the only non-risk-weighted ratio in the predecessor regulatory capital framework.  (SOF ¶¶ 56, 57.)  But, as a subordinated debt instrument, treatment of the 2008 Notes is materially different under each.

Under the predecessor rules, in calculating CoBank's leverage ratio (the NCR), the 2008 Notes obligation was *excluded from the ratio denominator* (Total Liabilities), while proceeds from the issuance of the 2008 Notes were *included in the ratio numerator* (Net Collateral).[8] (SOF ¶ 58.)  The 2008 Notes thus had the beneficial effect of *increasing* CoBank's leverage ratio (the NCR), which was the stated purpose of the 2008 Notes.  (SOF ¶¶ 35, 58 (explaining CoBank issued the 2008 Notes "to increase its regulatory capital ratios …").)[9]

In contrast, under the Final Rule, none of the 2008 Notes shall any longer be excluded from Total Liabilities for purposes of calculating CoBank's Net Collateral Ratio or the comparable ratio (the T1LR).  Rather, in calculating T1LR, the proceeds of the 2008 Notes issuance would be *included in the ratio denominator* (Total Assets), while the 2008 Notes obligation would *not be included in the ratio numerator* (Tier 1 Capital).[10]  (SOF ¶ 59.)  The 2008 Notes would have the adverse effect of *decreasing* CoBank's leverage ratio (the T1LR), counter to their purpose.  (SOF ¶¶ 35, 59.)

---

[8] *See supra* n. 2 (noting the NCR was calculated as Net Collateral divided by Total Liabilities).

[9] As the FCA has explained, achieving "a higher leverage ratio" means there is a "higher capital level[] to absorb losses and protect outside investors …." (RJN Ex. 9 at 49733 (noting "[a] higher leverage ratio" requires a bank "have sufficient amounts of capital at the height of the credit cycle so that [it] can continue to lend during a downturn, and thus, fulfill [its] mission").)  The fact that maintaining a *higher* leverage ratio is desirable is similarly reflected in the fact that the FCA mandated CoBank maintain a *minimum* NCR of 104% (*see* Regan Decl. Ex. 26 at ¶ 145; Regan Decl. Ex. 15 at 17) and mandates a *minimum* T1LR of 4%.  (*See* RJN Ex. 9 at 49722; RJN Ex. 8 at 49739 ("we are adopting a 4-percent minimum leverage ratio").)

[10] The leverage ratio is calculated under the T1LR through dividing Tier 1 Capital by Total Assets (T1LR = Tier 1 Capital / Total Assets).  (RJN Ex. 9 at 49788 (§ 628.10); *see also* SOF ¶ 41.)

C.  **CoBank's Redemption of the 2008 Notes**

On March 11, 2016, CoBank issued a Notice of Redemption to Fiscal Agent ("Notice of

Redemption"), which stated:

> [P]ursuant to the provisions of the Fiscal Agency Agreement …
> CoBank intends to redeem on April 15, 2016 (the "Redemption
> Date"), all of the 7.875% Subordinated Notes due 2018 (the
> "Notes") outstanding on the Redemption Date [ ] at a price per Note
> equal to 100% of the outstanding principal amount of such Note,
> plus accrued and unpaid interest to, but excluding, the Redemption
> Date (the "Redemption Price").  The Notes are being redeemed by
> CoBank pursuant to Section 5 of the [Fiscal Agency] Agreement.

(SOF ¶ 60.)

Attached to the Notice of Redemption was an executed Officer's Certificate stating that

███████████████████████████████████████████████████

██████████████████████████████████████  (SOF ¶ 61.)  Exhibit B of the Officer's

Certificate was the form of notice to be delivered to holders of the 2008 Notes on March 11,

2016, which stated:

> [P]ursuant to the provisions of Section 5 of the Fiscal Agency
> Agreement . . . CoBank has called for redemption on April 15, 2016
> [ ], all of the outstanding principal amount of the [ ] Notes at a
> redemption price equal to 100% of the principal amount plus accrued
> and unpaid interest to, but excluding, the Redemption Date.

(SOF ¶ 62.)

CoBank redeemed the 2008 Notes on April 15, 2016.  (SOF ¶ 63.)  Each Plaintiff claims

to have been, as of April 15, 2016, a beneficial owner of the Notes.  (SOF ¶ 64.)

## **ARGUMENT**

Standard of Review & Applicable Law

Summary judgment must be granted where the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Although the moving party bears the burden of establishing there is no genuine issue of material fact, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986), the Second Circuit has emphasized that the non-movant cannot withstand summary judgment based on "conclusory allegations or unsubstantiated speculation." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005). "The party against whom summary judgment is sought … 'must do more than simply show that there is some metaphysical doubt as to the material facts…. [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial.'" *CDO Plus Master Fund Ltd. v. Wachovia Bank, N.A.*, 2010 WL 3239416, at *3 (S.D.N.Y., Aug. 16, 2010) (citing *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). A fact is material only "if it might affect the outcome of the suit under the governing law," and an issue of fact is "genuine" only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001) (quoting *Anderson*, 477 U.S. at 248).

To sustain a claim for breach of contract, Plaintiffs must show: "(1) the existence of an agreement; (2) adequate performance of the contract by the plaintiff; (3) breach of contract by the defendant; and (4) damages." *Roswell Capital Partners LLC v. Alternative Constr. Techs.*, 2009 WL 222348, at *8 (S.D.N.Y. Jan. 30, 2009) (citing cases).[11]

---

[11] The parties are contemporaneously filing separate briefs concerning damages. *See* ECF No. 96.

**I.     SUMMARY JUDGMENT IS WARRANTED FOR COBANK BECAUSE NO REASONABLE JURY COULD CONCLUDE THAT A "REGULATORY EVENT" DID NOT OCCUR.**

The 2008 Notes define "Regulatory Event" as:

… [R]eceipt by the Bank of a notification from the Farm Credit Administration, or other primary regulator at the time, to the effect that, whether as a result of a change in applicable law or regulation or otherwise, none of the Securities shall any longer be eligible for … (ii) exclusion from total liabilities for purposes of calculating the Bank's net collateral ratio or any comparable regulatory capital requirements under any successor regulations.

(SOF ¶ 30.)

**A.     CoBank Received "Notification" From the FCA of Its Adoption of New Regulations Governing System Banks' Capital Requirements.**

The Regulatory Event provision requires "receipt" by CoBank of "a notification…."  The provision does not require that the "notification" take any specific form or be delivered by any particular means.

On March 10, 2016, the FCA Board publicly "adopted the Tier 1/Tier 2 Regulatory Capital Framework final rule."  (SOF ¶ 48.)  The FCA immediately announced this change via a News Release and Fact Sheet regarding the Final Rule.  (SOF ¶ 49.)  The News Release and Fact Sheet were publicly available on the FCA's website and distributed by the FCA.  (SOF ¶ 50.)  CoBank received the News Release and Fact Sheet from the FCA by email on March 10, 2016.  (SOF ¶ 51.)  That day, CoBank's Chief Financial Officer, David Burlage, reported to CoBank's CEO, Robert Engel, that ███████████████████████████████████████ ██████████████████████████████████████  (SOF ¶ 52.)

There can be no dispute that on March 10, 2016, CoBank received a notification from the FCA of the adoption of the Final Rule.

14

**B.      The "Regulatory Event" Trigger Was "Receipt of Notification…",
Not "Effective Date of the New Rule."**

Plaintiffs claim that a Regulatory Event did not occur on March 10, 2016, because the

Final Rule would not become effective until January 1, 2017.  (*See* Regan Decl. Ex. 26 ¶ 150.)

But neither the Regulatory Event provision, nor the evidence adduced in this case, supports their

position.  The Regulatory Event provision does not speak to "effectiveness" of a rule change – it

merely states that the notification must be to the effect that, as a result of a regulatory change,

"none of the [2008] Notes shall any longer be eligible for" exclusion from Total Liabilities for

purposes of CoBank's compliance with its capital requirements.

"Shall" is forward-looking, "used to express … futurity" and "used to express what is

inevitable or seems likely to happen in the future." *See* MERRIAM WEBSTER DICTIONARY (2018)

*available at*: https://www.merriam-webster.com/dictionary/shall.  There is no evidentiary or

other basis to conclude that it means a Regulatory Event occurs only upon the effective date of a

new regulation. *Accord James L. Turkle Trust v. Wells Fargo & Co.*, 2012 WL 2568208 at **1,

*4 (N.D. Cal. July 2, 2012) (under New York law, granting defendant's dispositive motion and

rejecting plaintiff's argument that a "capital treatment event clause should be read to allow

redemption only if such event has taken effect" because redemption clause did not include "such

a temporal limitation"), *aff'd* 602 Fed. Appx. 360 (9th Cir. 2015).

**C.      The FCA's Notification Was to the Effect That, Under the Final Rule,
None of the 2008 Notes Shall Any Longer Be Eligible for Exclusion
from Total Liabilities for Purposes of Calculating CoBank's NCR or
the T1LR, a Comparable Regulatory Capital Requirement.**

Plaintiffs' Complaint asserts that a Regulatory Event did not occur on March 10, 2016, on

the ground that "the Fact Sheet did not contain specific references to the [2008] Notes." (Regan

Decl. Ex. 26 ¶ 148.)  But that theory too is belied by the plain words of the Regulatory Event

provision, which require only receipt of notification "to the effect that …" under the new rules

15

certain conditions would no longer be extant.  The Agreement does not require that the notification received by CoBank take any specific form, nor does it require that the notification expressly reference the 2008 Notes.  It is the "effect" of the changes announced in the notification that is relevant.  And here, the effect of the changes adopted by the FCA Board was that, under the Final Rule, none of the 2008 Notes shall any longer be eligible for exclusion from Total Liabilities for purposes of calculating CoBank's NCR.  Nor would the 2008 Notes be "eligible for exclusion from Total Liabilities for purposes of calculating" the T1LR, the System's new non-risk-weighted leverage ratio under the successor regulations.  As such, Plaintiffs' argument lacks merit.

Moreover, CoBank's redemption was consistent with the fact that the purpose of the 2008 Notes was "to increase its regulatory capital ratios pursuant to FCA Regulations ...."  (SOF ¶ 35.)  Under the predecessor rules, the 2008 Notes had the effect of *increasing* CoBank's leverage ratio (the NCR), but under the new rules the 2008 Notes would have the effect of *decreasing* CoBank's leverage ratio (the T1LR), counter to the stated purpose of the 2008 Notes.  (*Id.* ¶¶ 35, 58-59.)

### D.     The NCR and the T1LR are "Comparable" Regulatory Capital Requirements.

1.     The T1LR and the NCR are "comparable" because each is the sole non-risk-weighted leverage ratio intended by the FCA to measure and constrain leverage.

The NCR and T1LR are comparable regulatory capital ratios in the most salient respect – each is the sole non-risk-weighted leverage ratio within its regime.  In 1996, when developing the NCR, the FCA described it as "similar to the leverage ratios required by other regulators."  (SOF ¶ 11.)  In responding to the October 2007 ANPR, the Federal Farm Credit Banks Funding Corporation explained "[t]he current Net Collateral Ratio (NCR) for System banks is similar to the Tier 1 leverage ratio ...."  (SOF ¶ 20.)  In its July 8, 2010 ANPR, the FCA described the

16

NCR as "a type of leverage ratio" and that it "functions as a leverage ratio." (SOF ¶ 37.) As the

FCA noted in the Proposed Rule, "a leverage ratio constrains the buildup of leverage in the

System, which the risk-based regime [(*i.e.*, the various other ratios)] is not designed to do."

(SOF ¶ 39.)  Under the predecessor regulatory capital rules, the NCR was the only regulatory

capital ratio that was not risk-weighted.  (SOF ¶ 56.)  The Proposed Rule made this clear:

> "The FCA currently has *three risk-based minimum capital standards*: (1) [a] 3.5-percent core surplus ratio (CSR); (2) a 7-percent total surplus ratio (TSR); and (3) a 7-percent permanent capital ratio (PCR). Congress added a definition of ''permanent capital'' to the Farm Credit Act in 1988 and required the FCA to adopt risk-based permanent capital standards for System institutions. The FCA adopted permanent capital regulations in 1988 and, in 1997, added core surplus and total surplus capital standards for banks and associations, *as well as a non-risk based net collateral ratio (NCR)* for banks."

(RJN Ex. 7 at 52820-21 (emphasis added).)  Other FCA statements also reflect this distinction:

> "**A leverage ratio** constrains the buildup of leverage in the System, which the risk-based regime is not designed to do. It **reinforces the risk-based requirements with a non-risk-based backstop**—that is, if the computation of the risk-weighted assets does not accurately reflect the true underlying risk inherent in a System institution, the leverage ratio serves as a floor that prevents the institution from decreasing its capital below a certain percentage of total assets."

(*Id.* (emphasis added).)  And, under the successor regulations (the Final Rule), the T1LR is the

only regulatory capital ratio that is a non-risk-weighted leverage ratio.  (*See* RJN Ex. 9 at 49722,

49738-39 (§628.10).)

In sum, the irrefutable facts conclusively show the T1LR is the comparable regulatory

capital requirement *vis-à-vis* the NCR because each is the sole non-risk-weighted ratio under its

respective framework and "constrains the buildup of leverage in the System, which the risk-

based regime is not designed to do."  (RJN Ex. 7 at 52821.)

17

2.      The fact that the FCA expressly indicated the NCR would be "replaced by" the T1LR, while other existing ratios would be replaced by other specified ratios, reflects that the T1LR is the ratio under the successor regulations that is "comparable" to the NCR.

It is beyond dispute that the Final Rule is a successor regulation to the FCA's regulatory capital rules that were in place through December 31, 2016.  (SOF ¶ 53.)

And, in announcing its adoption of the Final Rule, the FCA explained: "The final rule replaces existing core surplus and total surplus requirements with common equity tier 1 (CET1), tier 1, and total capital (tier 1 plus tier 2) risk-based capital ratio requirements.  The final rule also adds a **tier 1 leverage ratio** for all System institutions, **which replaces the existing net collateral ratio** for System banks."  (SOF ¶ 49 (emphasis added).)

The chart below summarizes the changes from the predecessor to successor regulations:

| Predecessor Regulations | | Successor Regulations |
|---|---|---|
| Core Surplus Ratio | → replaced by → | CET1 Capital Ratio |
| | | Tier 1 Capital Ratio |
| Total Surplus Ratio | | Total Capital Ratio |
| **Net Collateral Ratio (NCR)** | → **replaced by** → | **Tier 1 Leverage Ratio (T1LR)** |
| Permanent Capital Ratio | = | Permanent Capital Ratio |

The FCA's categorization thus reflects that, among the ratios established in the successor regulations (*i.e.*, the Final Rule), the T1LR is the ratio that is "comparable" to the NCR.

3.      The origin of the term "comparable regulatory capital requirements" reinforces that the NCR and the T1LR are comparable.

The chronology of events surrounding the development and addition of the clause "comparable regulatory capital requirements under any successor regulations" into the Regulatory Event definition reinforces the fact that the ratios are "comparable."

18

CoBank's 2007 Notes did not include the phrase "comparable regulatory capital requirements under any successor regulations." (*See* SOF ¶ 17.)  Shortly after the 2007 Notes were issued, the FCA issued two ANPRs seeking comments on the possibility of making the NCR "more" comparable to a Tier 1 leverage ratio.  (SOF ¶¶ 18, 19.)  Shortly thereafter, in December 2007, the FCA, plainly aware of its own regulatory agenda, reviewed and commented on ████████████████████████████████████████████████████████████ ███████████████████████████████████████████ (SOF ¶¶ 21, 23.) A few months later, CoBank ███████████████████████████████████████ ██████████████████████████████████████████ (SOF ¶¶ 24, 25.)  The sequence is shown here:

**June 2007**
CoBank Issues 2007 Notes. No "comparable" language in "Regulatory Event" definition.

**December 2007**
FCA suggests CoBank add "or any comparable regulatory capital requirements" term to "Regulatory Event" definition.

**March 2016**
FCA replaces existing leverage ratio (the NCR) with new leverage ratio (T1LR).

**June & Oct. 2007**
ANPRs reveal FCA considering possible changes to its leverage ratio.

**April 2008**
CoBank issues 2008 Notes with "or any comparable regulatory capital requirements" term in definition.

The takeaway is clear: while the FCA was contemplating making its leverage ratio "more" comparable to a Tier 1 leverage ratio, the FCA requested that CoBank supplement its definition of Regulatory Event to encompass not only a change under the NCR but also a change in regulatory capital treatment under "any comparable regulatory capital requirements under any successor regulations."  And, when adopting the Final Rule, the FCA then specified that, among the various ratios being adopted, it was the NCR that was "replace[d]" by the T1LR.  Given

19

these indisputable facts, no jury could reasonably conclude that the NCR and T1LR are not comparable regulatory capital requirements within the meaning of the Regulatory Event provision of the 2008 Notes.

## II.   PLAINTIFFS' CLAIM FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING SHOULD BE DISMISSED AS A MATTER OF LAW.

A cause of action for breach of the implied duty of good faith and fair dealing must be dismissed as "duplicative" of a breach of contract claim when 'both claims arise from the same facts and seek the identical damages for each alleged breach.'" *MS Fed. Acquisition, LLC v. U.S. Bank Nat'l Ass'n*, 2015 WL 4461740, at *7 (S.D.N.Y. July 21, 2015) (internal citation omitted); *see also ICD Holdings S.A. v. Frankel*, 976 F. Supp. 234, 243-44 (S.D.N.Y. 1997) ("A claim for breach of the implied covenant 'will be dismissed as redundant where the conduct allegedly violating the implied covenant is also the predicate for breach of covenant of an express provision of the underlying contract.'"); *accord Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 80 (2d Cir. 2002) (quoting *ICD Holdings*, 976 F. Supp. at 243-244).

Here, Plaintiffs' claim for breach of the implied duty of good faith and fair dealing arises from the same set of facts and raises the same legal issue as their breach of contract claim: whether CoBank's redemption of the 2008 Notes was permitted under the Regulatory Event provision. A smattering of conclusory assertions that CoBank participated in a lengthy public rulemaking process, or that redeeming the 2008 Notes furthered CoBank's economic interests (a wholly unremarkable assertion in any event), does not give rise to an independent claim for breach of some implied covenant. *In re Avon Sec. Litig.*, 2004 WL 3761563, at *11 (S.D.N.Y. Mar. 29, 2004) ("[T]he implied covenant does not extend so far as to undermine a party's 'general right to act on its own interests in a way that may incidentally lessen' the other party's anticipated fruits from the contract."). The New York Court of Appeals has made clear that an

20

implied covenant of good faith and fair dealing is not breached when a party acts pursuant to "the plain language of the contract." *Moran v. Erk*, 901 N.E.2d 187, 190, 11 N.Y.3d 452, 457 (2008). A party to a contract has an "unqualified right" to act pursuant to an express contractual provision "without court inquiry into whether the [action] was activated by an ulterior motive." *Big Apple Car, Inc. v. City of New York*, 204 A.D.2d 109, 111, 611 N.Y.S.2d 533, 534 (1st Dep't 1994) (citation omitted).

Moreover, Plaintiffs seek identical damages, namely lost interest payments, for both their breach of contract and good-faith claims. The case law requires that Plaintiffs allege some additional harm to have been suffered as a result of any breach of the implied covenant of good faith and fair dealing. *MS Fed. Acquisition*, 2015 WL 4461740, at *7. None is alleged here.

Plaintiffs' claim for breach of the implied duty of good faith and fair dealing is wholly duplicative of their claim for breach of contract and should be dismissed as a matter of law.

## CONCLUSION

For the foregoing reasons, CoBank's motion for summary judgment should be granted, and the Complaint should be dismissed in its entirety, with prejudice.

Dated: New York, New York
       March 13, 2018

Respectfully submitted,

By: /s/ Shawn Patrick Regan
    Shawn Patrick Regan
    Joseph J. Saltarelli
    Peter Mustalish
    Jennifer Bloom
    Silvia N. Ostrower
    HUNTON & WILLIAMS LLP
    200 Park Avenue, 52nd Floor
    New York, New York 10166
    (212) 309-1000

*Attorneys for Defendant CoBank, ACB*

21

<u>**CERTIFICATE OF SERVICE**</u>

   I hereby certify that on March 13, 2018, I served the foregoing on all counsel of record registered with the Court's ECF system, by electronic service via the Court's ECF transmission facilities, and by electronic mail.

       <u>/s/ Shawn Patrick Regan</u>
       Shawn Patrick  Regan