UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

AMCO INSURANCE COMPANY, *et al.*,

               Plaintiffs,

          v.

COBANK, ACB,

            Defendant.

No. 16-cv-4422-LTS-HBP

---

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'[1]
MOTION FOR SUMMARY JUDGMENT AS TO LIABILITY**

---

[1]   Plaintiffs are AMCO Insurance Company, American Family Life Assurance Company of Columbus, Americo Financial Life and Annuity Insurance Company, Athene Annuity and Life Company, Bank of Utica Investment Subsidiary, Ltd., Beaumont Health, Bio-Rad Laboratories, Inc., Continental Casualty Company, Crestbrook Insurance Company, Dedham Institution for Savings, Ephrata National Bank, Erie Family Life Insurance Company, Federated Life Insurance Company, Great Southern Life Insurance Company, Health Care Service Corporation, Metropolitan Life Insurance Company, Mutual of America Life Insurance Company, Nationwide Life and Annuity Insurance Company, Nationwide Life Insurance Company, Nationwide Mutual Insurance Company, The Northwestern Mutual Life Insurance Company, Ohio National Life Assurance Corporation, The Ohio National Life Insurance Company, Scottsdale Insurance Company, Scottsdale Surplus Lines Insurance Company, Tauck, Inc., Thrivent Financial for Lutherans, Veterinary Pet Insurance Company, Victoria Fire & Casualty Company, and Waukesha State Bank.

## <u>TABLE OF CONTENTS</u>

**Page(s)**

PRELIMINARY STATEMENT ................................................................................. 1

SUMMARY STATEMENT OF UNDISPUTED FACTS .......................................... 5

I.   IN 1997, FOLLOWING TWO YEARS OF PUBLIC COMMENT,
     THE FCA ANNOUNCED THE FINAL RULE IMPLEMENTING
     A NET COLLATERAL RATIO CAPITAL REQUIREMENT ........................ 5

II.  THE FCA'S ANNOUNCEMENT OF NEW REGULATORY CAPITAL
     REQUIREMENTS FOR SYSTEM INSTITUTIONS IN 2007 ........................ 6

III. COBANK'S NOTES ISSUANCE AND PROCUREMENT OF SPECIAL
     TREATMENT FOR THE NOTES UNDER THE NCR REGIME ................... 7

IV.  THE NEGOTIATION AND DRAFTING OF THE NOTES ........................... 8

V.   COBANK'S CAMPAIGN TO INFLUENCE THE REGULATORY
     TREATMENT OF THE NOTES ................................................................... 9

VI.  THE 2014 PROPOSED RULE ...................................................................... 10

VII. THE FCA'S ANNOUNCEMENT OF THE FINAL RULE ......................... 10

VIII. THE DIFFERENT PURPOSES OF THE T1LR AND THE NCR ............... 11

IX.  COBANK'S REDEMPTION OF THE NOTES ........................................... 12

ARGUMENT .......................................................................................................... 13

I.   LEGAL STANDARD FOR SUMMARY JUDGMENT ............................... 13

II.  COBANK'S REDEMPTION CONSTITUTED A BREACH OF CONTRACT ............ 14

     A.   Governing Law and Contract Interpretation Thereunder ..................... 14

     B.   Under the Contract's Plain Terms, No Regulatory Event
          Occurred ................................................................................................. 15

          1.   The Final Rule Does Not Provide the Regulatory Treatment
               Necessary to Trigger a Regulatory Event ................................. 15

          2.   The T1LR Is Not Comparable to the NCR, and Thus Cannot
               Trigger a Regulatory Event ...................................................... 16

          3.   Even if the New Regulations Could Trigger a Regulatory Event,
               the Redemption Was Premature and Constitutes a Breach of
               Contract ..................................................................................... 20

               a.   The T1LR Was Not "Applicable" to CoBank as of the
                    Date of Redemption .......................................................... 21

               b.   The Word "Shall" Is Properly Read to Represent a
                    Mandatory Obligation ....................................................... 21

i

III.   COBANK VIOLATED THE IMPLIED COVENANT OF GOOD FAITH
       AND FAIR DEALING BY LOBBYING FOR A REGULATORY CHANGE
       ON WHICH TO PREMISE THE REDEMPTION ........................................................... 24

       A.    APPLICABLE LAW ................................................................................ 24

       B.    COBANK'S LOBBYING VIOLATED THE IMPLIED COVENANT OF GOOD
             FAITH AND FAIR DEALING .................................................................... 24

CONCLUSION ......................................................................................................... 27

# TABLE OF AUTHORITIES

Page(s)

CASES

*Albany Savings Bank, FSB v. Halpin*,
    117 F.3d 669 (2d Cir. 1997)..................................................................................15

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)............................................................................................13

*Empresas Cablevision, S.A.B. de C.V. v. JPMorgan Chase Bank, N.A.*,
    680 F. Supp. 2d 625 (S.D.N.Y. 2010)..................................................................24

*Faulkner v. Nat'l Geographic Soc.*,
    452 F.Supp.2d 369 (S.D.N.Y. 2006)....................................................................15

*Finest Invs. v. Sec. Trust Co. of Rochester*,
    96 A.D.2d 227, 468 N.Y.S.2d 256 (App. Div. 1983)............................................22

*Greenfield v. Phillies Records, Inc.*,
    98 N.Y.2d 562 (N.Y. 2002)..................................................................................14

*Imation Corp. v. Koninklijke Philips Elecs. N.V.*,
    586 F.3d 980 (Fed. Cir. 2009)..............................................................................22

*J. M. Rodriguez & Co., Inc., v. Moore-McCormack Lines*,
    32 N.Y.2d 425, 299 N.E.2d 243, 345 N.Y.S.2d 993 (1973)..................................20

*JA Apparel Corp. v. Abboud*,
    568 F.3d 390 (2d Cir. 2009)................................................................................14

*Jacobson v. Sassower*,
    66 N.Y.2d 991 (N.Y. 1985) ...........................................................................15, 20

*JPMorgan Chase Bank, N.A. v. IDW Group, LLC*,
    2009 WL 321222 (S.D.N.Y. Feb. 9, 2009)...........................................................24

*LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*,
    424 F.3d 195 (2d Cir. 2005).................................................................................21

*Law Debenture Trust Co. of NY v. Maverick Tube Corp.*,
    595 F.3d 458 (2d Cir. 2010).................................................................................14

*M/A-Com Security Corp. v. Galesi*,
    904 F.2d 134 (2d Cir.1990)..................................................................................24

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986).................................................................................................13

*N.Y. Skyline, Inc. v. Empire State Bldg. Co. L.L.C.*,
    542 B.R. 321 (S.D.N.Y. 2015).................................................................................14

*Nycal Corp. v. Inoco PLC*,
    988 F. Supp. 296 (S.D.N.Y. 1997), aff'd, 166 F.3d 1201 (2d Cir. 1998)...................14, 20, 23

*Orange and Rockland Util. v New England Petroleum Corp.*,
    400 N.Y.S.2d 79 (N.Y. App. Div. 1st Dep't 1977) ................................................20

*Rivera v. Rochester Genesee Reg'l Transp. Auth.*,
    743 F.3d 11 (2d Cir. 2014).......................................................................................13

*Southern Pac. Co. et al. v. Darnelltaenzer Lumber Co., et al.*,
    245 U.S. 531, 38 S. Ct. 186 (1918).........................................................................20

*Stroll v. Epstein*,
    818 F. Supp. 640 (S.D.N.Y. 1993)..........................................................................14

*W.W.W. Assoc's, Inc. v. Giancontieri*,
    77 N.Y.2d 157 (N.Y. 1990) .....................................................................................14

*Windsor v. United States*,
    699 F.3d 169 (2d Cir. 2012).....................................................................................13

## OTHER AUTHORITIES

Fed. R. Civ. P. 56...........................................................................................................1, 11

12 C.F.R. § 615.5050 (2016) ..........................................................................................19

Black's Law Dictionary ...................................................................................................22

Plaintiffs respectfully submit this memorandum of law in support of their motion pursuant to Federal Rule of Civil 56 for summary judgment against Defendant CoBank, ACB ("CoBank"). Based on the undisputed material facts,[2] Plaintiffs are entitled to summary judgment as to liability on Counts I and II of their Second Amended Complaint.

## PRELIMINARY STATEMENT

In April 2008, in the midst of the subprime mortgage crisis, CoBank issued subordinated notes due April 2018 with an annual interest rate of 7.875% (the "Notes"). Eight years later, for no reason other than to avoid what it considered, at that time, to be expensive interest payments, CoBank redeemed the Notes on April 15, 2016 (the "Redemption") after invoking a limited redemption right in the form of security (the "Security") for the Notes. The Security, however, permitted redemption only following the occurrence of a "Regulatory Event," as defined therein. The undisputed facts demonstrate that no Regulatory Event occurred prior to the Redemption. Plaintiffs are thus entitled to summary judgment as to CoBank's liability on Count I.

A Regulatory Event occurs only if "none of the Notes shall any longer be eligible for . . . exclusion from total liabilities for purposes of calculating [CoBank's] net collateral ratio or any comparable regulatory capital requirements under any successor regulations."[3] As of the date of the Redemption, a Regulatory Event had not occurred. From the Notes' issuance through the Redemption, CoBank's net collateral ratio was defined as (i) total eligible collateral, divided by (ii) total liabilities less subordinated debt. SUMF, ¶¶ 144-51, 323. Because the Notes were subordinated debt, the Notes were excluded from liabilities when calculating the NCR.

---

[2]   Filed contemporaneously herewith is Plaintiffs' Statement of Undisputed Material Facts ("SUMF"). Capitalized terms not otherwise defined herein have the meaning ascribed to them as in the SUMF.

[3]   While there are two disjunctive prongs in the Regulatory Event definition, CoBank has not invoked (nor could it) the other prong, concerning the calculation of "permanent capital and "total surplus."

On March 10, 2016, the Farm Credit Administration ("FCA") published a "News Release" and a "Fact Sheet,"[4] which announced that the FCA planned to adopt new regulations that, *when they became effective*, would *replace* the net collateral ratio with a "tier 1 leverage ratio" (the "T1LR"). Under the final rule (as set forth in the Fact Sheet, and effective January 1, 2017), the T1LR was defined as (i) tier 1 capital divided by (ii) total assets. SUMF, ¶ 252.

The Notes' redemption was a breach of contract for at least the following reasons. <u>First</u>, the new regulations do not constitute a Regulatory Event under the language of the Security. The Final Rule did not change the status of the Notes. When CoBank issued the Notes in 2008, the Notes were "eligible for … exclusion from total liabilities" by CoBank in the net collateral ratio ("<u>NCR</u>"). Neither the Fact Sheet, nor the News Release, nor the Final Rule itself (which was not even available on the date of the Redemption) deprives CoBank of that explicit treatment in the new T1LR. This is because the tier 1 capital component of the T1LR does not include the Notes. Thus, the Notes are ***excluded*** from the T1LR calculation.

<u>Second</u>, the T1LR is not "comparable" to the NCR. While they are both leverage ratios that safeguard the "safety and soundness" of System institutions, and the Fact Sheet says one "replaces" the other,[5] their similarities end there. As CoBank admits, the new capital requirements (including the T1LR) represent a regulatory "sea-change." Yet, this "sea-change" manifests in the ratios' differing (i) purposes, (ii) intended audiences, (iii) quality of components, (iv) time periods of measurement, and (v) abilities to be modified.

To begin, the purposes of the two ratios are different. The FCA in the 1990s recognized that because System banks issued joint and several debt securities, there was a "market

---

4    The FCA issues fact sheets "[w]hen a rule is particularly complex," and "[t]he fact sheet provides greater detail about the rulemaking action than the news release does." https://www.fca.gov/news/rulemakingfactsheets.html.

5    While replacement may imply that the T1LR is the successor to the NCR (*see* SUMF, ¶ 411), it does not imply comparability, a requirement to redeem the Notes.

perception of the System as a single entity seeking funding." SUMF, ¶ 134. Thus the NCR's purpose was to provide a picture of *System-wide* health, to ensure access to capital markets. SUMF ¶¶ 137, 140. This driving purpose was unique to System banks like CoBank and had no applicability to commercial banks generally. The T1LR, in contrast, was adopted to constrain the buildup of leverage by an *individual* institution within the commercial banking sector.

Further, the two ratios target different audiences. In 1997, when the NCR was adopted, CoBank's exposure to investors was largely through joint and several Systemwide debt securities. By 2016, however, CoBank and other System banks expanded their capital offerings beyond Systemwide debt. The FCA thus sought to enact regulations that more closely approximated those that apply to commercial banks, allowing capital markets investors and rating agencies to more easily compare individual System institutions to commercial banks. Even CoBank's Chief Financial Officer, David Burlage, acknowledged the different purposes and intended audiences of the NCR and T1LR when he wrote in 2012 that "[m]uch time is spent today educating investors and rating agency analysts about our unique capital ratios," *i.e.*, the NCR. This admission underscores the NCR's lack of comparability with the T1LR.

Moreover, the quality of components in the two ratios differs. The NCR's numerator is limited to net loans, cash and investments. The T1LR ignores whether assets are pledged or encumbered and fails to account for the quality of the available collateral. The T1LR's numerator also focuses on capital (not assets), and differentiates higher from lower quality capital to illuminate first loss capital of each institution.

Additionally, the NCR and T1LR have differing time elements. While System banks are required to maintain a minimum NCR at all times, the NCR is reported at the end of each month,

presenting a "snapshot" of the bank's collateral as of a particular moment in time. The T1LR, on the other hand, measures the average of total assets for a quarterly period.

Finally, as demonstrated in CoBank's case, the FCA modified the NCR for particular System banks. In contrast, one driving factor to adopt the T1LR was the desire to provide standardized and transparent regulatory capital rules, and thus no modifications have been made. These five factors militate against a finding of comparability between the NCR and T1LR.

Third, put simply, CoBank "jumped the gun." A "Regulatory Event" requires a change to an "applicable" regulation, and the regulation that "applied" on April 15, 2016 was the NCR. The T1LR did not become effective until January 1, 2017, *more than eight months after the Redemption*. A Regulatory Event occurs when none of the Notes "shall any longer be eligible for . . . exclusion from total liabilities." It is undisputed that the Notes were eligible for exclusion from total liabilities on April 15, 2016 – the Redemption Date. Contrary to CoBank's supposed belief, "shall" reflects a mandatory obligation rather than a reflection of futurity. Even if the meaning of "shall" were ambiguous, which it is not, that ambiguity should be construed against CoBank as the drafter of the Security. Thus, even if the Court concludes that a Regulatory Event did occur, such Regulatory Event did not occur until January 1, 2017, more than seven months *after* the Redemption. Since a breach of contract is determined as of the date of the wrongful action, the early Redemption breached the contract.

Plaintiffs are also entitled to summary judgment on Count II, breach of the implied covenant of good faith and fair dealing.[6] The new regulations did not arise spontaneously. Instead, CoBank, through its highest-ranking employees and their active participation in industry groups, labored to undermine the contract's limited redemption provision. Since 2008, CoBank

---

[6]   While evaluation of a good faith and fair dealing claim is ordinarily fact intensive, the facts supporting Plaintiffs' claim are not the subject of a genuine dispute. Therefore, upon evaluating these undisputed facts, the Court may find that CoBank is liable as a matter of law for breach of the implied covenant of good faith and fair dealing.

met with other System members and with the FCA staff to discuss regulatory capital changes. These meetings included open discussion of whether adopting a T1LR could constitute a "Regulatory Event" permitting the Notes' redemption, as well as attendant litigation risks. Thus, even though the FCA granted CoBank's petition to exclude the Notes from total liabilities in calculating the **NCR**, CoBank never sought a similar accommodation for the Notes under the **T1LR**, either because it did not think the ratios were comparable (and thus, there was no Regulatory Event), or because it wanted to defeat the benefit of the bargain, and allow the Notes' redemption. CoBank's active lobbying for a regulatory change that would allow CoBank to back out of its contractual obligations breached the implied covenant of good faith and fair dealing.

## SUMMARY STATEMENT OF UNDISPUTED FACTS[7]

### I.   IN 1997, FOLLOWING TWO YEARS OF PUBLIC COMMENT, THE FCA ANNOUNCED THE FINAL RULE IMPLEMENTING A NET COLLATERAL RATIO CAPITAL REQUIREMENT

CoBank is a member of the System and is regulated by the FCA. SUMF, ¶¶ 1, 2. The FCA proposed the adoption of the NCR in 1995, concluding that it would generate an additional level of protection for borrowers, shareholders and investors in the System's debt instruments. SUMF, ¶ 135. The FCA believed that "A Sufficient Level of Eligible Collateral Is Needed To Protect Investors in the System's Debt Instruments." SUMF, ¶ 136. The FCA noted that "[d]uring the 1980s, the collateral positions of the Farm Credit banks were a critical measure of survival" and that "Farm Credit banks have long used a collateral ratio as a principal indicator of financial strength." SUMF, ¶ 133. The FCA was concerned that "[a] bank failure within the System would have grave consequences not only for that bank and its affiliated associations, but also for the other System banks because of joint and several liability and the market perception of the System as a single entity seeking funding." SUMF, ¶ 135. The FCA "concluded that a

---

[7]   Plaintiffs' SUMF, filed contemporaneously herewith, is a more complete statement of all material undisputed facts.

minimum net collateral standard is key to ensuring the building of capital at the bank *to protect investors in System securities* and *to ensure an early warning mechanism for market access to funding*, which is a critical safety and soundness issue." SUMF, ¶ 137 (emphasis added).

The FCA added that it "strongly believes that the [NCR] is a critical measure of financial health and provides an early measure of a bank's ability to obtain funds from the market place. Severe safety and soundness concerns arise if sufficient collateral is not available for banks to offer investors who purchase System debt instruments." SUMF, ¶ 140. The FCA desired System banks to "maintain sufficient collateral for continued access to capital markets.…" SUMF, ¶ 141. The NCR was ultimately adopted to address these goals. SUMF, ¶ 143.

## II.   THE FCA'S ANNOUNCEMENT OF NEW REGULATORY CAPITAL REQUIREMENTS FOR SYSTEM INSTITUTIONS IN 2007

In 2007, the calendar year prior to the issuance of the Notes, the FCA released two Advance Notices of Proposed Rulemaking ("ANPR"), stating that it was considering whether to supplement its existing risk-based capital rules with a minimum capital leverage ratio requirement. SUMF, ¶¶ 152-53, 156-57 (the "2007 ANPRs"). The 2007 ANPRs observed that other Federal financial regulatory agencies had already added a T1LR. SUMF, ¶¶ 154, 158. The 2007 ANPRs solicited public comment as to whether the FCA's capital rules should include a minimum capital leverage ratio and whether the then-existing NCR should be replaced with a ratio like a tier 1 leverage ratio mandated by the other Federal financial regulatory agencies. SUMF, ¶ 160. The FCA noted that the NCR "does not differentiate higher quality capital from lower quality capital." SUMF, ¶¶ 154, 158. The FCA observed that the T1LR "consists of only the most reliable and permanent forms of capital such as common stock, non-cumulative perpetual preferred stock, and retained earnings." SUMF, ¶¶ 155, 159.

III.   **COBANK'S NOTES ISSUANCE AND PROCUREMENT OF SPECIAL**
       **TREATMENT FOR THE NOTES UNDER THE NCR REGIME**

On April 18, 2008, CoBank issued the Notes in the amount of $500 million. SUMF, ¶ 77.

The Notes were governed by the terms set forth in the Security and by a Fiscal Agency

Agreement between CoBank and The Bank of New York Trust Company, N.A. ("BNY"), as

fiscal agent. Each agreement is governed by, and is to be construed in accordance with, New

York law. SUMF, ¶¶ 78-80.

The Security permits redemption "on any Interest Payment Date following a Regulatory

Event at a Redemption Price equal to 100% of the principal amount of the [Notes] to be

redeemed." SUMF, ¶ 81. The Security defines a "Regulatory Event" as follows:

> "Regulatory Event" means the receipt by [CoBank] of a notification from the [FCA],
> or other primary regulator at the time, to the effect that, *whether as a result of a*
> *change in applicable law or regulation or otherwise, none of the [Notes] shall any*
> *longer be eligible for* (i) inclusion in [CoBank's] permanent capital or total surplus
> for purposes of the FCA Regulations or any comparable regulatory capital
> requirements under any successor regulations or *(ii) exclusion from total liabilities*
> *for purposes of calculating [CoBank's] net collateral ratio or any comparable*
> *regulatory capital requirements under any successor regulations.* A Regulatory
> Event shall not include a 20% per annum reduction in treatment of the [Notes] as
> permanent capital and total surplus during the five year period immediately prior to
> the Maturity Date.

SUMF, ¶ 81 (emphasis added).

When the Notes were issued, FCA regulations defined the NCR as "a bank's net

collateral, divided by the bank's total liabilities." SUMF, ¶ 323. CoBank, however, the year prior

petitioned to exclude subordinated debt from its "total liabilities" when calculating its NCR.

SUMF, ¶¶ 43-44. CoBank again petitioned to receive the same regulatory treatment of the Notes,

which the FCA also granted. SUMF, ¶¶ 66-71. In doing so, the FCA required that the amount of

Notes "include[d] in Permanent Capital and Total Surplus must be reduced by 20 percent … at

the beginning of each of the last 5 years of the maturity date of the instrument," and provided

7

that "[w]hen calculating its [NCR], CoBank may exclude from Total Liabilities all subordinated debt that is included in Total Surplus." SUMF, ¶ 70. Thus, as of the date of the Redemption, CoBank was permitted to treat only 20% of the Notes outstanding as permanent capital and total surplus, ████████████████████████████████████ SUMF, ¶¶ 70, 72-73, 81, 276, 285.

## IV.  THE NEGOTIATION AND DRAFTING OF THE NOTES

The Notes were issued following drafting and negotiation by and among CoBank, BNY, and the Notes' initial purchasers.[8] Discovery yielded *no evidence* that any CoBank employee or CoBank's counsel had specific discussions or negotiations with, and no comments were received from the initial purchasers, BNY, or potential investors, or their counsel, concerning the "Regulatory Event" definition. SUMF, ¶¶ 93-105, 107-09.

Most of the "Regulatory Event" text originated in CoBank's 2007 subordinated notes. SUMF, ¶¶ 48, 81. As with the Notes, discovery yielded *no evidence* of any negotiations or discussions between or among CoBank, BNY (the 2007 notes' fiscal agent), the initial purchasers[9] or potential investors regarding the 2007 notes' regulatory event definition. SUMF, ¶¶ 53-55, 57-64. The "comparable regulatory capital requirements under any successor regulations" language (the "Comparability Text") was prompted by a call from an FCA attorney to a CoBank attorney in late 2007, who suggested that CoBank modify the "Regulatory Event" definition for a contemplated *preferred stock issuance* (*i.e.*, not the Notes) in light of the 2007 ANPRs. SUMF, ¶ 65. That phrase carried through to the Notes' "Regulatory Event" definition, SUMF, ¶¶ 81, 85, even though the FCA was not a party to the Fiscal Agency Agreement with CoBank.

---

8  The initial purchasers of the Notes were Lehman Brothers Inc. and Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill"). SUMF ¶¶ 86, 88.

9  The initial purchasers of CoBank's 2007 notes were Bear, Stearns and Lehman Brothers Inc. SUMF, ¶ 49.

CoBank did not disclose to the initial purchasers, BNY, or potential investors: (i) that the Comparability Text was suggested by the FCA because of possible regulatory changes already in the works; (ii) how the possible changes disclosed by the 2007 ANPRs could impact the Notes; (iii) that the exclusion of the Notes from total liabilities in CoBank's NCR calculation resulted from special dispensation granted by the FCA; or (iv) its current position that (A) a T1LR is "comparable" to the NCR; or (B) absent the favorable capital treatment the FCA extended to the Notes, CoBank would not have issued the Notes. SUMF, ¶¶ 75, 103, 109, 112-117, 122-124.

## V. COBANK'S CAMPAIGN TO INFLUENCE THE REGULATORY TREATMENT OF THE NOTES

In December 2008, through its fiscal agent, the System stated that it "wishes to be measured in a manner parallel to that of commercial banks. Accordingly, a Tier 1 unweighted leverage ratio under a Basel II Standardized Approach is appropriate for all System institutions." SUMF, ¶ 167. CoBank endorsed this position, and the FCA acknowledged the System's position that it favored replacement of the NCR with a tier 1 non-risk based leverage ratio. SUMF, ¶ 172. CoBank worked with industry associations and workgroups like the System Capital Workgroup to advance CoBank's goal of being measured like commercial banks, even if it meant sacrificing the Notes' capital treatment. SUMF, ¶¶ 174-215. CoBank's Chief Executive Officer, Robert Engel lobbied the FCA in support thereof. SUMF, ¶¶ 233-35. CoBank continued to lobby the FCA following announcement of the Proposed Rule in 2014. SUMF, ¶¶ 216, 225-243. Yet, despite numerous opportunities to raise the importance of the Notes' regulatory capital treatment under the April 2008 Letter, CoBank never asked the FCA to make a similar accommodation under any new regulations. SUMF, ¶¶ 174-184, 198-210, 212, 226-243. This is because CoBank's lobbying efforts were never intended to gain favorable capital treatment of the Notes. Indeed, by the time the new regulations were enacted, CoBank enjoyed such favorable capital

treatment for only a fraction of the outstanding Notes, even under the NCR regime, per the terms of the Notes. Instead, CoBank's lobbying efforts were designed to allow CoBank to save money by exercising its Redemption rights.

## VI.   THE 2014 PROPOSED RULE

On May 8, 2014, the FCA's board announced that it "approved a proposed rule to modify the regulatory capital requirements for [system] banks and associations." SUMF, ¶¶ 216-17. The 2014 Proposed Rule proposed to eliminate the NCR and to implement a Tier 1/Tier 2 regulatory capital framework including a T1LR for all System institutions. SUMF, ¶ 218. The FCA's objectives for the 2014 Proposed Rule included the modernization of capital requirements, ensuring "that the System's capital requirements are comparable to the Basel III framework and the standardized approach that the Federal banking regulatory agencies have adopted…" and "mak[ing] System regulatory capital requirements more transparent," a goal previously expressed by the FCA. SUMF, ¶¶ 173, 219.

## VII.   THE FCA'S ANNOUNCEMENT OF THE FINAL RULE

On March 10, 2016, the FCA's board disclosed that it adopted a final rule, slated to become effective on January 1, 2017, which would "modify the regulatory capital requirements for [System] banks." SUMF, ¶¶ 244-46, 256-57. The FCA's objectives in adopting the final rule included "moderniz[ing] capital requirements," "ensur[ing] that the System's capital requirements are comparable to the Basel III framework and the standardized approach that the federal banking regulatory agencies have adopted," and making "System regulatory capital requirements more transparent." SUMF, ¶ 247. The Fact Sheet did not set forth the entirety of the final rule. Rather, the Fact Sheet provided a summary of the Final Rule, which it described as follows: "*The final rule also adds a tier 1 leverage ratio for all System institutions, which replaces the existing net collateral ratio for System banks.*" SUMF, ¶ 248 (emphasis added).

The Fact Sheet, as CoBank admits, *did not* refer to the Notes, leaving the effect of the final rule on their treatment unaddressed. SUMF, ¶¶ 254-55. The Fact Sheet *did not* indicate a change in the definition of NCR during the time intervening between its issuance and the effective date of the new regulations on January 1, 2017. SUMF, ¶¶ 246, 258. CoBank and its senior leadership acknowledge that CoBank continued to be subject to the then-existing regulations (including the NCR) until December 31, 2016, and CoBank's financial statements for the first quarter of 2016, authored *after* the Fact Sheet was issued, complied with the then-existing regulations (*i.e.*, the NCR), rather than the new regulations (*i.e.*, the T1LR). SUMF, ¶¶ 299, 317-18. On July 28, 2016, *months after the Redemption*, the Final Rule was finally published in the Federal Register, effective January 1, 2017. SUMF, ¶ 259. By the time of the Redemption, CoBank had not even possessed the full text of the Final Rule. SUMF, ¶ 312.

## VIII.   THE DIFFERENT PURPOSES OF THE T1LR AND THE NCR

The TILR, in contrast to the NCR, was adopted to enable the investing community and rating agencies to analyze System banks in terms that aligned with metrics of commercial banks. That is why the System urged for "regulations that are consistent with the approach adopted by the other Federal regulators." SUMF, ¶ 162. Closely aligning capital regulations to the standardized definitions of the Tier 1/ Tier 2 Capital regime "would facilitate equitable comparisons between System institutions and commercial banks by rating agencies and capital market investors…" SUMF, ¶ 163. The System declared that "alignment of capital definitions is extremely important to enable the System to operate on a level playing field with commercial banks in accessing the capital markets." SUMF, ¶ 164. Ultimately, the System wished to be "measured in a manner parallel to that of commercial banks." SUMF, ¶ 167. Mr. Engel endorsed this position as did CoBank's Rule 30(b)(6) witness, David Burlage, who stated that CoBank "absolutely" endorsed this position. SUMF, ¶¶ 165, 168.

## IX.    COBANK'S REDEMPTION OF THE NOTES



. SUMF, ¶¶ 274-80, 282-91.

SUMF, ¶¶ 276, 285.

SUMF, ¶¶ 278, 286.

SUMF, ¶ 129.

SUMF, ¶¶ 94-95, 99, 103, 281.

On March 11, 2016, CoBank announced that it would redeem all the Notes on April 15, 2016, based on the FCA's publication of the News Release and Fact Sheet. SUMF, ¶¶ 304-05. Following CoBank's announcement, but before the Redemption, certain Plaintiffs sent CoBank letters of protest. SUMF, ¶ 307. Mr. Burlage, responded to several Plaintiffs:

> [u]nder the net collateral ratio regime, subordinated debt, such as the Notes, received favorable treatment with respect to calculating CoBank's regulatory capital requirements. This favorable treatment was achieved specifically by virtue of the fact

that *the proceeds from the Notes were counted as Net Collateral (the numerator) but the Notes were excluded from the sum of total liabilities (the denominator) for purposes of calculating the net collateral ratio for regulatory capital purposes.* As a practical matter, this allowed CoBank to lever against the Notes proceeds as capital. The value of this is obvious; it made issuance of subordinated debt as a capital-raising vehicle relatively attractive at the time . . .

In contrast to the net collateral ratio regime, *in the new Tier 1 leverage ratio there is no language that deems the Notes "eligible for exclusion from the Bank's total liabilities for purposes of calculating . . . [CoBank's] regulatory capital requirements." Moreover, this is not merely a function of different nomenclature between the regimes (i.e., that the new regime does not speak to liabilities). The new rules reflect a sea-change, substantive difference* in that subordinated debt no longer receives favorable regulatory capital treatment to allow CoBank to lever against the Note proceeds as capital.

SUMF, ¶ 309 (emphasis added).

As of April 15, 2016, Plaintiffs owned $241,081,000 principal amount of Notes. SUMF, ¶¶ 3-33. On that date CoBank redeemed all Notes outstanding. SUMF, ¶ 315.

## ARGUMENT

## I.    LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 19 (2d Cir. 2014). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If that showing is made, the non-movant, to oppose the motion successfully, "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(a)). "A fact is material if it might affect the outcome of the suit under the governing law, and an issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Windsor v. United States*, 699 F.3d 169, 192 (2d Cir. 2012), *aff'd*, 133 S. Ct. 2675 (2013) (quotations omitted).

## II.     COBANK'S REDEMPTION CONSTITUTED A BREACH OF CONTRACT

### A.     GOVERNING LAW AND CONTRACT INTERPRETATION THEREUNDER

The Security, subject to New York law, SUMF, ¶¶ 79-80, was at all relevant times a valid and enforceable contract. "Under New York law, [t]he court's function in interpreting a contract is to apply the meaning intended by the parties, as derived from the language of the contract in question." *N.Y. Skyline, Inc. v. Empire State Bldg. Co. L.L.C.*, 542 B.R. 321, 326 (S.D.N.Y. 2015) (internal quotation and citation omitted). "A written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *Greenfield v. Phillies Records, Inc.*, 98 N.Y.2d 562, 569 (N.Y. 2002).

"Evidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing*." W.W.W. Assoc's, Inc. v. Giancontieri*, 77 N.Y.2d 157, 162 (N.Y. 1990). Only if the relevant written terms are ambiguous may a court consider extrinsic evidence of the parties' intent. *Greenfield v. Phillies Records, Inc.*, 98 N.Y.2d 562, 570 (N.Y. 2002). A contract is ambiguous if, when read as a whole, it is reasonably susceptible of more than one interpretation. *Stroll v. Epstein*, 818 F. Supp. 640, 643 (S.D.N.Y. 1993) (citations omitted), *aff'd*, 9 F.3d 1537 (2d Cir. 1993) (citations omitted). Ambiguity is a question of law for the court. *Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 465 (2d Cir. 2010) (citations omitted).

Although the court may consider extrinsic evidence to interpret a contractual provision it finds ambiguous, *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 397 (2d Cir. 2009), because "[t]he purpose of contract interpretation . . . is to determine the intentions of the parties," *Nycal Corp. v. Inoco PLC*, 988 F. Supp. 296, 301 (S.D.N.Y. 1997), aff'd, 166 F.3d 1201 (2d Cir. 1998), only "objective manifestations of the parties' intentions" are relevant. *Id.* (citations omitted). "This exclusive reliance upon evidence of objective manifestations of intent renders evidence of

uncommunicated subjective intent irrelevant." *Id.* (citing *Wells v. Shearson Lehman/Amer. Exp.*, 72 N.Y.2d 11, 24 (N.Y. 1988)); *see also Faulkner v. Nat'l Geographic Soc.*, 452 F. Supp. 2d 369, 378 (S.D.N.Y. 2006) ("Only objective manifestations of intent are relevant under New York law.") (citations omitted).

Where ambiguous contractual terms cannot be resolved by extrinsic evidence, a court may apply the doctrine of *contra proferentem* to construe ambiguous terms against the drafter. *Albany Savings Bank, FSB v. Halpin*, 117 F.3d 669, 674 (2d Cir. 1997) (citation omitted); *see also Jacobson v. Sassower*, 66 N.Y.2d 991, 993 (N.Y. 1985) (citation omitted).

## B.   UNDER THE CONTRACT'S PLAIN TERMS, NO REGULATORY EVENT OCCURRED

The Security is clear about what constitutes a Regulatory Event, and none occurred here. Under the Security's plain terms, a Regulatory Event occurs when the Notes are no longer eligible for exclusion from total liabilities in calculating CoBank's NCR, or any "comparable" successor regulation. These conditions were not met. First, the final rule as summarized in the Fact Sheet, allows the Notes to be excluded from total liabilities for purposes of calculating CoBank's then effective NCR, and the future T1LR. Second, the T1LR is not "comparable" to the NCR. Third, the Regulatory Event text requires that the regulations must change *first*, before the Notes may be redeemed. The T1LR was to be effective on January 1, 2017, and thus was not "applicable" prior to the Redemption. Similarly, the word "shall"—as in "none of the Notes shall any longer be eligible"— indicates a present mandate rather than a future occurrence, and no Regulatory Event could occur until a regulatory change became effective.

### 1.   The Final Rule Does Not Provide the Regulatory Treatment Necessary to Trigger a Regulatory Event

A Regulatory Event occurs if the Notes are no longer eligible for exclusion from total liabilities in calculating CoBank's NCR or any comparable regulatory capital requirements under

any successor regulations. This did not occur here. The Final Rule did nothing to change CoBank's ability to exclude the Notes from total liabilities in its NCR.

Similarly, nothing in the Fact Sheet provides that the Notes cannot be excluded from total liabilities to calculate the new, T1LR (assuming *arguendo* this regulation were comparable to the NCR). The T1LR measures a bank's health by looking at its tier 1 capital (*i.e.*, the sum of "common equity tier 1 capital," or "CET1 capital," as defined by 12 C.F.R. § 628.20(b), and "additional tier 1 capital," or "AT1 capital," each reduced by certain regulatory adjustments and deductions), SUMF, ¶¶ 406-10, in relation to its total assets (*i.e.*, all assets, not just eligible collateral), as opposed to the NCR, which compares net collateral (*i.e.*, eligible collateral) to liabilities. The concept of "excluding the Notes from total liabilities" is inapposite to the T1LR because, as CoBank acknowledged "the new regime does not speak to liabilities." SUMF, ¶ 309. Thus, the argument espoused by Mr. Burlage, that, "in the new [T1LR] there is no language that deems the Notes 'eligible for exclusion from [CoBank's] total liabilities for purposes of calculating…[its] regulatory capital requirements'" misses the mark. It would be nonsensical for the T1LR to include such text because total liabilities are not part of its calculation. However, nothing in the Final Rule prevents exclusion of the Notes from total liabilities in whatever calculations factor in total liabilities. The undisputed facts thus show that the plain terms of the Regulatory Event provision were not met in order for CoBank to conduct a lawful Redemption.

### 2.    The T1LR Is Not Comparable to the NCR, and Thus Cannot Trigger a Regulatory Event

A Regulatory Event is triggered only if the Notes are not excluded from total liabilities in a new regulation "comparable" to the NCR. The term "comparable," as used in the Security, must be given its plain meaning or, if ambiguous, construed against CoBank, the drafter. In ordinary parlance, "comparable" means "capable of or suitable for comparison." SUMF, ¶ 321.

Even CoBank recognizes that the NCR is not comparable to the T1LR. In the Redemption Response Letters themselves, Mr. Burlage refers to the adoption of a T1LR as a "sea-change" in the FCA's regulatory capital requirements. SUMF, ¶¶ 309-10. In a moment of candor at a 2012 meeting with the FCA, Mr. Burlage declared that the System's capital ratios were "unique," SUMF, ¶ 181, which is defined as first, "being the only one…" or second, "being without a like or equal." SUMF, ¶ 325. Similarly, in response to a question of whether the two ratios are "comparable," Andrew Jacob, CoBank's Chief Regulatory, Legislative, and Compliance Officer, and former director of the FCA's Office of Regulatory Policy, testified that there are "very unique differences" between the NCR and the T1LR. SUMF, ¶ 311.

Indeed, a host of factors preclude any conclusion that the two ratios are "comparable." They reflect divergent purposes for different audiences, measure different time periods, and measure fundamentally different attributes of financial health, subject to different degrees of modification by the regulator.

The NCR and the T1LR have divergent purposes and illuminate different attributes of a lending institution. SUMF ¶ 261. As Plaintiffs' expert, Dr. Ozgur B. Kan, PhD, CFA, FRM, testified, the NCR "had the ability to show that sufficient collateral was available for the banks to go to the markets for funding." SUMF, ¶ 262. The FCA imposed the NCR in order to require System banks to maintain sufficient liquidity (in the form of net collateral) so that they could access capital markets through the issuance of Systemwide debt securities issued by the Funding Corp. and to illuminate the amount of collateral held by a System institution relative to its liabilities. SUMF, ¶¶ 261-62. When the FCA adopted the NCR, it noted that "transparency to the investment community was not a significant consideration because the capital in the System institutions was held by or generated by their members." SUMF, ¶ 221. The FCA also was

focused on ensuring that each System bank, and the System as a whole, would never lack sufficient collateral to offer investors who purchased System debt securities. SUMF, ¶ 261.

In contrast, the T1LR constrains the buildup of leverage by an individual institution with an eye to adverse economic events and how ratings agencies and capital markets investors would look at that institution individually. SUMF, ¶ 263. Thus, in adopting the T1LR, the FCA was focused on how ratings agencies and capital markets investors would view the financial health of System banks like CoBank, in comparison to that of commercial banks. To be sure, the FCA and the System (including CoBank) made clear that the goal was to improve transparency of System capital, while reducing the costs of accessing the capital markets, and reducing the negative effects that can result from differences in regulatory capital standards. SUMF, ¶ 219. After all, the T1LR was adopted in order "[t]o modernize capital requirements" and "[t]o ensure that the System's capital requirements are comparable to the Basel III framework and the standardized approach that the federal banking regulatory agencies have adopted." SUMF, ¶ 247.

Moreover, the NCR and T1LR do measure their respective ratios over different time periods. The NCR is measured as of the end of each month, presenting a "snapshot" of the bank's collateral as of a particular date in time. SUMF ¶ 269. Conversely, the T1LR utilizes the average of total assets for a quarterly period. SUMF, ¶¶ 222, 268.

The NCR and T1LR also differ because, unlike the NCR, the T1LR differentiates higher from lower quality capital. By taking the quality of capital into account, the T1LR illuminates the first loss capital of an institution. SUMF, ¶¶ 265, 267. By instituting this requirement, the FCA's banking regulatory regime evolved significantly, becoming ever more different from the NCR standard, and permitting capital markets investors to more easily compare System institutions to commercial banks. SUMF, ¶¶ 194, 196-98; *see also* SUMF ¶ 270. In contrast,

under the NCR regime (effective through the end of 2016), the FCA required each System institution to possess an amount of "net collateral" sufficiently greater than its "total liabilities." SUMF, ¶¶ 145-46, 148, 150-51; *see also* Kan Report, 8-9. In 2008, a bank's net collateral was defined as a bank's total eligible collateral as defined by §615.5050, subject to adjustments. SUMF, ¶¶ 144-45. But "eligible collateral" included net loans, which did not have any qualitative component; ***only quantity was important***. SUMF ¶ 265. By taking into account the quality of assets, the T1LR "standardized" System capital requirements to safeguard against the impact that an adverse economic event could have on System institutions. SUMF, ¶ 270.

It is irrelevant that the FCA has stated that the T1LR "replace[d]" the NCR. SUMF, ¶ 248. The fact that one ratio was implemented in place of another sheds no light on whether the two ratios are comparable. Moreover, the FCA's view, expressed in 2016, that the T1LR replaced the NCR, carries no weight in determining whether the two regulations are "comparable" pursuant to the Security, a contract to which the FCA was never a party.

For all these reasons, CoBank accurately described the new regulations as a "sea-change, substantive difference," and undermines any argument that the two ratios were "comparable". SUMF, ¶¶ 309-10. Mr. Jacob, CoBank's senior executive and former FCA employee, expressed his belief that the two ratios are not comparable when he testified that the T1LR represents "a philosophical change" in the FCA's approach to regulatory capital requirements. SUMF, ¶ 311.

To the extent that there is some open question as to the "comparability" of the NCR and T1LR, the Court should consider that there was no discussion or negotiation regarding the term "comparable," or the clause including it, between CoBank and the relevant counterparties. SUMF, ¶¶ 93-98, 103-07, 109. Further, CoBank never disclosed the reason for its inclusion. SUMF, ¶¶ 103-04, 113-16, 122. Thus, any extrinsic evidence of CoBank's intent is irrelevant to

19

establish the meaning of "comparable." *See Nycal Corp.*, 988 F. Supp. at 301 (holding that "evidence of uncommunicated subjective intent [is] irrelevant" to contract interpretation) (citation omitted). CoBank lawyer Susan McPhillips asserted that the FCA required CoBank to include the word "comparable" in connection with the issuance of Series C Non-Cumulative Perpetual Preferred Stock in 2007. SUMF ¶ 65. Considering the non-disclosure of this communication at the time of drafting and negotiating the Security, any ambiguity should be construed against CoBank, and "in favor of the party who had no voice in the selection of its language." *Jacobson*, 66 N.Y.2d at 993. Moreover, Ms. McPhillips's suggestion that the T1LR is comparable to the NCR because an FCA lawyer told her to include "comparable" in a separate, prior equity issuance, misses the point. This fact does not evidence CoBank's belief as to what "comparable" meant nor does it evidence that a T1LR is comparable to the NCR.

### 3. Even if the New Regulations Could Trigger a Regulatory Event, the Redemption Was Premature and Constitutes a Breach of Contract

It is well-established that an aggrieved party's contract "claim accrue[s] at once in the theory of the law and it does not inquire into later events." *Southern Pac. Co. et al. v. Darnelltaenzer Lumber Co., et al.*, 245 U.S. 531, 534, 38 S. Ct. 186 (1918) (Holmes, J.) (*citing Olds v. Mapes-Reeve Constr. Co.*, 177 Mass. 41, 44, 58 N.E. 478); *see also Orange and Rockland Util. v New England Petroleum Corp.*, 400 N.Y.S.2d 79 (N.Y. App. Div. 1st Dep't 1977) (noting that New York law "measures damages from the time of the breach 'and it does not inquire into later events'") (quoting *Southern Pacific Co.*, 245 U.S. at 534); *J. M. Rodriguez & Co., Inc., v. Moore-McCormack Lines*, 32 N.Y.2d 425, 299 N.E.2d 243, 345 N.Y.S.2d 993 (1973) (measure of damages is based upon the date of the breach of contract).

The final rule did not become effective until January 1, 2017. Thus, any "change in applicable law or regulation" could not occur until that date. Even if the new regulations *would*

*have* constituted a Regulatory Event once they became effective, CoBank nevertheless breached the Security by redeeming the Notes prior to the effective date, and during a time in which the NCR still applied.

### a. The T1LR Was Not "Applicable" to CoBank as of the Date of Redemption

The final rule was not "applicable"—as required to constitute a Regulatory Event—on the Redemption date. Instead, the NCR was still "applicable" and had not been changed. CoBank's financial reporting and issuance of preferred equity securities each applied the existing regulatory regime until December 31, 2016. To reach CoBank's interpretation of the provision, the word "applicable" would have to be rendered superfluous or meaningless, a result which "is not preferred and will be avoided if possible." *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) (citation omitted).

In order to give meaning to "applicable", the Security must be construed to require an actual, effective change to the then-pertinent regulations. When the Redemption occurred, the "Final Rule" could not have applied, as evidenced by the fact that the final rule had not even been published in the Federal Register, which is a prerequisite for effectiveness. Further, the NCR still "applied" to CoBank, as evidenced by its own 2016 financial statements that report the NCR. Tellingly, CoBank's 2017 annual report *explicitly admits* that the T1LR was "*not applicable* for periods ending prior to" January 1, 2017. SUMF, ¶ 412 (emphasis added). Therefore, as of the Redemption date, there was no change to applicable regulations.

### b. The Word "Shall" Is Properly Read to Represent a Mandatory Obligation

The inclusion of the word "shall" in the phrase "none of the [Notes] shall any longer be eligible for…" in the "Regulatory Event" provision, connotes a mandatory obligation. This reading accords with its primary definition as well as with its use elsewhere in the Security.

Black's Law Dictionary defines "shall" as: "1. Has a duty to; more broadly, is required to … * This is the mandatory sense that drafters typically intend and that courts typically uphold." SUMF, ¶ 320. Here, "shall" is a mandatory term, and it would have been contrary to good drafting principles to give it any other meaning.[10]

████████████████████████████████████████ SUMF ¶¶ 278, 286, ██████

██████████████████████████████████████████████████ The Security assigns "shall" its mandatory meaning and limits temporal application of the Regulatory Event provision to *after* there has been a "change in applicable law or regulation or otherwise." As discussed above, "applicable" may only mean "capable of or suitable for being applied." SUMF, ¶ 326. Thus, as of April 15, 2016, the "Final Rule" could not be applied because it was unavailable. The Fact Sheet and News Release merely indicate that, at a future date, the regulatory capital requirements could change. If CoBank wanted a temporal-free "Regulatory Event" definition, it could have used different words therein.

Additionally, as a general canon of contractual construction, the same words used in different parts of a single document have the same meaning. *See Imation Corp. v. Koninklijke Philips Elecs. N.V.,* 586 F.3d 980 (Fed. Cir. 2009); SUMF, ¶ 328. Proper interpretation of a contract generally assumes consistent usage of terms throughout the Agreement. *Finest Invs. v. Sec. Trust Co. of Rochester*, 96 A.D.2d 227, 230, 468 N.Y.S.2d 256, 258 (App. Div. 1983), aff'd, 61 N.Y.2d 897, 474 N.Y.S.2d 481, 462 N.E.2d 1199 (1984) (New York courts "presume that the same words used in different parts of a writing have the same meaning."). Here, the word "shall"

---

[10]   Bryan A. Garner, a noted expert on legal usage, and the Editor-in-Chief of Black's Law Dictionary, further notes in his famed dictionary available at the time the Notes were issued, that inclusion of the word "shall" "runs afoul of several basic principles of good drafting" and "when a word takes on too many senses and cannot be confined to one sense in a given document, it becomes useless to the drafter." SUMF, ¶ 328. Thus, "shall any longer be eligible" simply means "is no longer eligible" and does not, as CoBank has asserted, support only a forward looking and strained invocation meaning "will at some future time no longer be eligible."

is used elsewhere in the Fiscal Agency Agreement and the Security to represent a mandatory obligation. In particular, these agreements are "governed by, and shall be construed with, the laws of the State of New York." *See* SUMF, ¶¶ 79, 80. This can only be understood to be mandatory, as opposed to temporal.

Lastly, discovery confirmed that there was no communication between CoBank and any counterparty, including Lehman/Merrill, BNY, or their lawyers and potential investors, concerning the meaning of the word "shall," or CoBank's theory that "shall" serves as a future-tense verb. SUMF, ¶¶ 101, 108. Moreover, Ms. McPhillips, Brian Jackson and Mr. Engel, could not recall any discussion of "shall" as a future-tense verb *within CoBank* in 2008, and there was no discussion or negotiation of this term. The doctrine of unmanifested intent defeats any argument that CoBank's employees' subjective intent should be given any weight to determine the plain meaning of the word "shall." *Nycal Corp.*, 988 F. Supp. at 301.

As with the word "comparable," discussed above, to the extent that the Court finds that the meaning of "shall" in the Regulatory Event definition is ambiguous, then the Court should apply the doctrine of *contra proferentem*, and the ambiguity should be construed against CoBank. *See supra* at 15. If CoBank had intended for "shall" to represent futurity, contrary to its common meaning, then CoBank should have drafted as much in the "Regulatory Event" definition. Having failed to do that, CoBank cannot benefit from this ambiguity.

Application of the face value of the word "shall" – to connote a mandatory action – demonstrates that CoBank acted prematurely when it redeemed the Notes in April 2016, at which time there was no change to the applicable law or regulation. As a result, and because the final rule did not become effective until January 1, 2017, even if the new regulations *would have* constituted a Regulatory Event once they became effective, CoBank nevertheless breached the

Security by redeeming the Notes prior to the effective date, and during a time in which the NCR still applied. This premature redemption constituted a breach of contract.

## III.   COBANK VIOLATED THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING BY LOBBYING FOR A REGULATORY CHANGE ON WHICH TO PREMISE THE REDEMPTION

### A.   APPLICABLE LAW

The Security, like every contract governed by New York law, is subject to an implied covenant of good faith and fair dealing. *M/A-Com Security Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir.1990). The implied covenant provides that "neither party to a contract shall do anything which has the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Id*. "[A] plaintiff adequately states an implied covenant claim by alleging conduct that subverts the contract's purpose without violating its express terms." *JPMorgan Chase Bank, N.A. v. IDW Group, LLC*, No. 08 Civ. 9116(PGG), 2009 WL 321222, at *5 (S.D.N.Y. Feb. 9, 2009); *see also Empresas Cablevision, S.A.B. de C.V. v. JPMorgan Chase Bank, N.A.*, 680 F. Supp. 2d 625, 631-32 (S.D.N.Y. 2010), aff'd in relevant part, 381 Fed. App'x. 117 (2d Cir. 2010) (enjoining transaction that, although technically permissible under the express terms of a contract, was an "end-run, if not a downright sham . . . [that did] away with the 'fruits' of the contract"). If the Court determines that CoBank did not technically violate the terms of the Notes, there is ample undisputed evidence to demonstrate that CoBank did act in such a way as to "subvert" their terms, and to "destroy[] . . . the right of [Plaintiffs] to receive the fruits of the contract."

### B.   COBANK'S LOBBYING VIOLATED THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

It is not genuinely disputed that CoBank, the largest bank in the Farm Credit System, actively lobbied the FCA to abandon the NCR in favor of a T1LR and never requested that the

FCA provide "favorable regulatory capital treatment" of the Notes under the T1LR. SUMF ¶¶ 161-70, 174-82, 186-88, 191-214, 225-43. These actions violated the implied covenant of good faith and fair dealing because they "subvert[ed]" the purpose of the provision allowing CoBank only a narrow right to redeem the Notes early—a provision which generally inures to the benefit of Plaintiffs.

The following facts demonstrate that CoBank actively and enthusiastically encouraged the FCA to discontinue imposing a NCR requirement on System banks, and to apply a T1LR requirement instead. First, on December 19, 2008, mere months after the issuance of the Notes, the activities of the Capital ANPR Workgroup, a body formed by members of the System— including CoBank—resulted in a letter sent on behalf of the System to the FCA stating that "[t]he System wishes to be measured in a manner parallel to that of commercial banks. Accordingly, a Tier 1 unweighted leverage ratio . . . is appropriate for all System institutions." SUMF, ¶¶ 40, 161, 167. That letter attached a document asserting that "[a] [T1LR] is preferable to the current [NCR]." SUMF, ¶ 169. CoBank agreed with both of these statements, and the FCA acknowledged the System's stated desire in its subsequent ANPR regarding regulatory capital requirements. SUMF, ¶¶ 168, 170-71.

Second, on September 18, 2012, Mr. Burlage and other CoBank representatives participated in a meeting between the "System Capital Workgroup" (comprised of System members, including CoBank, and of which Mr. Burlage served as Chairman at the time) and the FCA. SUMF, ¶¶ 42, 174, 176. At this meeting, the System Capital Workgroup "encouraged the FCA to implement new regulations that mirror the provisions of Basel III as closely as possible," and Mr. Burlage stated that "the System's view would be to . . . generally align with the Basel III framework." SUMF, ¶¶ 175-76. On December 4, 2012, in another industry meeting with the

FCA, Mr. Burlage "reiterated that the [System] believes it is important to align the regulatory capital framework with that of commercial banks." SUMF, ¶¶ 180-81.

Third, on February 13, 2015, the Farm Credit Council—the lobbying arm of the System, which included CoBank representatives—in a letter to which Mr. Jacob substantially contributed, wrote the FCA reiterating a preference to replace the NCR with leverage ratios that mimicked those used by commercial banks. SUMF, ¶¶ 225-28. Of course, those non-System commercial banks did not have a NCR requirement. SUMF, ¶ 183.

CoBank's conduct did not just have a collateral effect on the Notes; rather they were part of a measured and deliberate attempt to provide itself with a basis to redeem the Notes prematurely under the Regulatory Event provision. At a May 30, 2013 industry meeting attended by Mr. Burlage, Mr. Jacob, Mr. Hurley, and Ms. McPhillips, it was discussed whether "not counting subordinated debt in the Leverage Ratio would constitute 'regulatory events.'" SUMF, ¶¶ 189-90. The meeting minutes do not reflect whether CoBank employees opined on that question, but Mr. Burlage noted that "subordinated debt would no longer be given capital treatment in the Leverage Ratio," and "recommend[ed] . . . that we adopt Basel III capital measures." SUMF, ¶¶ 187, 191. At a meeting with the FCA in August 2013, Mr. Burlage queried whether the anticipated regulatory change—under which subordinated debt "would qualify as Tier 2 capital but not Tier 1," according to Mr. Burlage—would constitute "regulatory events." SUMF, ¶¶ 200-01. Moreover, in the months before the Fact Sheet was published, Mr. Burlage "had conversations with the FCA … about the potential for a regulatory event." SUMF, ¶ 243.

Finally, CoBank never requested that the FCA grant the Notes regulatory capital treatment akin to that which it had requested when it issued the Notes. SUMF, ¶ 199, 209, 213, 242-43; *see also* SUMF, ¶¶ 66-70. Yet, CoBank actively lobbied for a regulatory change that, in

its view, would give it license to redeem the Notes. SUMF, ¶¶ 161-70, 174-82, 186-88, 191-214, 225-43.

The facts are clear that CoBank actively lobbied the FCA to abandon the NCR in favor of a T1LR and then relied on the results of its lobbying as justification for triggering the Regulatory Event Redemption provision. When the FCA board approved the new regulations, CoBank leapt to redeem the Notes. CoBank's actions were intended to, and ultimately did, effectuate the very narrow redemption right, thereby depriving Plaintiffs of the benefit of the bargain, which was that the Notes would generally not be subject to early redemption absent very limited circumstances. As a result, Plaintiffs are entitled to summary judgment as to CoBank's liability for breaching the implied covenant of good faith and fair dealing.

## CONCLUSION

For all of the foregoing reasons, the Court should grant summary judgment against CoBank on Counts I and II of the Plaintiffs' Second Amended Complaint as to liability.

Dated: New York, New York

March 13, 2018

GRANT & EISENHOFER P.A.

By: _Gordon Z Novod_

　　　Jay W. Eisenhofer
　　　Gordon Z. Novod
　　　Caitlin M. Moyna
　　　Jonathan D. Park
　　　485 Lexington Avenue, 29th Floor
　　　New York, New York 10017
　　　(646) 722-8500

　　　*Attorneys for Plaintiffs*