UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

AMCO INSURANCE COMPANY, *et al.*,

                Plaintiffs,

       v.                              No. 16-cv-4422-LTS-HBP

COBANK, ACB,

                Defendant.

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S**
**<u>MOTION FOR SUMMARY JUDGMENT REGARDING LIABILITY</u>**

## <u>TABLE OF CONTENTS</u>

**Page(s)**

TABLE OF AUTHORITIES ............................................................................... ii

PRELIMINARY STATEMENT ........................................................................ 1

SUMMARY STATEMENT OF FACTS IN DISPUTE WHICH PRECLUDE
A FINDING OF SUMMARY JUDGMENT FOR COBANK ...................................... 4

ARGUMENT ................................................................................................. 6

I.      LEGAL STANDARD FOR SUMMARY JUDGMENT ................................. 6

II.     A REGULATORY EVENT DID NOT OCCUR, AND COBANK
THUS BREACHED THE AGREEMENTS ................................................ 7

      A.     NO REGULATORY EVENT OCCURRED UNDER THE PLAIN
TERMS OF THE DEFINITION ...................................................... 7

      B.     COBANK'S PURPORTED PURPOSE FOR THE PROCEEDS OF
THE NOTES IS IRRELEVANT ...................................................... 9

            1.     The Ability of the Notes to Increase CoBank's NCR Was
Contingent on the Undisclosed Approval by the FCA of
Special Treatment of the Notes ............................................... 11

            2.     CoBank Did Not Conduct the Redemption to Increase Its
Leverage Ratios ..................................................................... 12

            3.     The Notes Do Not Operate to Reduce CoBank's T1LR ........................ 13

      C.     THE UNDISPUTED FACTS DEMONSTRATE THAT THE T1LR WAS
NOT COMPARABLE TO THE NCR ................................................ 14

            1.     The Non-Risk Weighted Characteristic of the Two Ratios
Does Not Make Them Comparable ........................................... 14

            2.     The FCA's Choice of Term "Replace" Does Not Render
the Two Ratios Comparable ..................................................... 15

            3.     The History Leading to Inclusion of the Word "Comparable"
in the Regulatory Event Definition Does Not Require a Finding
that the T1LR Is Comparable to the NCR ................................... 16

      D.     THE UNDISPUTED FACTS DEMONSTRATE THAT COBANK DID
NOT RECEIVE NOTIFICATION OF AN "APPLICABLE" REGULATION
UNTIL JANUARY 1, 2017 ........................................................ 17

III.    COBANK BREACHED THE IMPLIED COVENANT OF GOOD FAITH AND FAIR
DEALING .................................................................................... 19

CONCLUSION ............................................................................................. 21

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ayotte v. Gervasio*,
  81 N.Y.2d 1062 (1993) ...................................................................................6

*In re Bank of New York Mellon*,
  51 N.Y.S.3d 356 (N.Y. Sup. 2017) ...............................................................11

*Blonder & Co., Inc. v. Citibank, N.A.*,
  28 A.D.3d 180 (N.Y. 1st Dep't 2006) ..............................................................9

*Butvin v. DoubleClick, Inc.*,
  99-cv-4727, 2001 WL 228121 (S.D.N.Y. Mar. 7, 2001) .................................20

*Carlson v. Am. Int'l Group, Inc.*,
  30 N.Y.3d 288 (N.Y. 2017) .............................................................................10

*Dalton v. Educ. Testing Serv.*,
  639 N.Y.S.2d 977 (1995) ................................................................................19

*Flag Wharf, Inc. v. Merrill Lynch Capital Corp.*,
  40 A.D.3d 506 (1st Dep't 2007) .................................................................. 9-10

*Hartford Fire Ins. Co. v. Federated Dep't Stores, Inc.*,
  723 F. Supp. 976 (S.D.N.Y. 1989) .................................................................19

*James L. Turkle Trust v. Wells Fargo & Co.*,
  11-cv-6494, 2012 WL 2568208 (N.D. Cal. July 2, 2012) ...........................18, 19

*Martin v. Briggs*,
  235 A.D.2d 192 (1st Dep't 1997) .....................................................................6

*Master-Built Constr. Co., Inc. v. Thorne*,
  22 A.D. 535 (2d Dep't 2005) ..........................................................................11

*MBIA Ins. Corp. v. Credit Suisse Sec. (USA) LLC*,
  58 N.Y.S.3d 874, 2017 WL 1201868 (N.Y. Sup. 2017) ...................................6

*Nomura Home Equity Loan, Inc. Series 2006-FM2, by HSBC Bank USA, Nat'l
  Assoc. v. Nomura Credit & Capital, Inc.*,
  30 N.Y.3d 572 (N.Y. 2017) ..............................................................................8

*Republic Nat'l Bank of New York v. Olshin Woolen Co. Inc.*,
   304 A.D.2d 401 (1st Dep't 2003) ...........................................................................................10

*Russell Publ'g Grp., Ltd., v. Brown Printing Co.*,
   13-cv-5193, 2014 WL 1329144 (S.D.N.Y. April 3, 2014).....................................................19

*W.W.W. Assocs., Inc. v. Giancontieri*,
   77 N.Y.2d 157 (1990) ...............................................................................................11, 12, 14

*Zuckerman v. City of New York*,
   49 N.Y.2d 557 (1980) ...................................................................................................................6

## Other Authorities

Fed. R. Civ. P. 56...........................................................................................................................1

*U.S. Implementation of the Basel Capital Regulatory Framework*,
   Congressional Research Service (April 9, 2014) (available at
   https://fas.org/sgp/crs/misc/R42744.pdf) ............................................................................15

Plaintiffs[1] respectfully submit this memorandum of law pursuant to Fed. R. Civ. P. 56 in opposition to the motion for summary judgment filed by Defendant CoBank, ACB. For the foregoing reasons, CoBank's[2] motion should be denied.

## PRELIMINARY STATEMENT

Plaintiffs filed a motion for summary judgment with supporting materials ("Plaintiffs' Motion") (ECF 119-122; *see also* ECF 99-103) demonstrating that no material disputed facts exist to prevent the Court from finding, as a matter of law, that CoBank breached the contracts that govern the Notes (*i.e.*, the Security and the "Fiscal Agency Agreement"), and that CoBank breached the implied covenant of good faith and fair dealing inherent in those contracts. CoBank filed what is essentially a mirror-image motion, attempting to demonstrate the opposite. For the reasons set forth in Plaintiffs' Motion and Memorandum in Support of Their Motion for Summary Judgment ("Pl. Liability Br."), CoBank's motion here fails. CoBank has raised no argument or advanced any fact that undermines the bases for granting summary judgment in favor of Plaintiffs. *A fortiori*, CoBank's motion for summary judgment should be denied.

The parties agree that the language governing a Redemption of the Notes requires that CoBank may only redeem the Notes if a "Regulatory Event" occurred, defined as:

---

[1]  Plaintiffs are AMCO Insurance Company, American Family Life Assurance Company of Columbus, Americo Financial Life and Annuity Insurance Company, Athene Annuity and Life Company, Bank of Utica Investment Subsidiary, Ltd., Beaumont Health, Bio-Rad Laboratories, Inc., Continental Casualty Company, Crestbrook Insurance Company, Dedham Institution for Savings, Ephrata National Bank, Erie Family Life Insurance Company, Federated Life Insurance Company, Great Southern Life Insurance Company, Health Care Service Corporation, Metropolitan Life Insurance Company, Mutual of America Life Insurance Company, Nationwide Life and Annuity Insurance Company, Nationwide Life Insurance Company, Nationwide Mutual Insurance Company, The Northwestern Mutual Life Insurance Company, Ohio National Life Assurance Corporation, The Ohio National Life Insurance Company, Scottsdale Insurance Company, Scottsdale Surplus Lines Insurance Company, Tauck, Inc., Thrivent Financial for Lutherans, Veterinary Pet Insurance Company, Victoria Fire & Casualty Company, and Waukesha State Bank.

[2]  Capitalized terms carry the same definitions as used by Plaintiffs in their Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment as to Liability, ECF 119.

> receipt by [CoBank] of a notification from the [FCA] . . . to the effect that, whether as a result of a change in applicable law or regulation or otherwise, none of the [Notes] shall any longer be eligible for . . . (ii) exclusion from total liabilities for purposes of calculating [CoBank's] net collateral ratio or any comparable regulatory capital requirements under any successor regulations.

Pl. Liability Br. at 7; Def. Liability Br. at 5. CoBank does not (and cannot) argue that the Final Rule[3] requires CoBank to include the Notes in its total liabilities for purposes of calculating its net collateral ratio ("NCR"). Thus, whether or not the Redemption was a breach of contract boils down to three questions: first, is the "successor regulation" in question, *i.e.*, the tier 1 leverage ratio ("T1LR"), "comparable" to the NCR? Second, under the new regulations, is CoBank precluded from deducting the Notes from total liabilities in calculating its T1LR? And third, did CoBank receive notification of a "change in ***applicable*** law or regulation" such that the notes "***shall*** no longer be eligible for exclusion from total liabilities" (emphases added). The answer to these three questions is "no," and the Redemption was therefore in breach of contract.

For the reasons explained in Plaintiffs' Liability Brief, the undisputed material facts demonstrate that CoBank cannot establish any of those requirements, and CoBank has raised no argument to the contrary. *First*, CoBank argues that the FCA's notification of its board's approval of a final capital rule created an "effect" that the Notes shall no longer be eligible for exclusion from total liabilities for purposes of calculating the NCR or T1LR. Def. Liability Br. at 15-16. The FCA's board's approval of a final capital rule on March 10, 2016, however, did not change anything about how the NCR must be calculated, and "Total Liabilities" is not a

---

3   CoBank misleadingly defines the "Final Rule" as the March 10, 2016 announcement by the FCA Board that it "adopted the tier 1 / Tier 2 Regulatory Capital framework final rule." Def. Liability Br. at 10. On that date, there was no actual "Final Rule" issued by the FCA. SUMF, ¶¶ 244-246, 256-259. Rather, the News Release (*see* SUMF, ¶¶ 244-246, 256-259) issued on March 10, 2016, disclosed that the FCA's board had adopted a final capital rule, but did not disclose the specific text of that final rule. Similarly, the Fact Sheet (*see* SUMF, ¶¶ 244-246, 255) issued on March 10, 2016, provided more information about the final rule, but again did not disclose the specific text of that final rule. It wasn't until July 28, 2016, more than three months *after* the Redemption, that the FCA published the Final Rule in the Federal Register. SUMF, ¶ 259. And it wasn't until January 1, 2017, that the Final Rule was scheduled to go into effect. SUMF, ¶¶ 246, 257, 318, 412.

component of the T1LR calculation. *See* Part II.A., *infra*, and Pl. Liability Br. at 15-16. CoBank's arguments regarding the "purpose" of the Notes must be rejected in light of the unambiguous language of the contract, and glaringly missing from CoBank's submission are any arguments concerning the plain language of the Regulatory Event definition. Moreover, CoBank's unmanifested purpose for issuance of the Notes is shockingly missing.

*Second*, CoBank argues that the T1LR is "comparable" to the NCR. Def. Liability Br. at 16-20. A finding of "comparability" between the T1LR and the NCR is essential to a determination that the Redemption was permitted under the contract. However, the undisputed facts demonstrate that, in fact, the two ratios were not comparable. *See* Pl. Liability Br. at 16-20. CoBank's arguments to the contrary oversimplify the various elements of the two ratios, from their components, to their developmental histories, to their purposes. CoBank essentially argues that because the two ratios are non-risk weighted, Def. Liability Br. at 16-18, and because the FCA stated that the T1LR "replaces" the NCR, Def. Liability Br. at 18, they are deemed comparable. However, as explained in Part II.C., *infra*, these arguments are unavailing, and as explained in Plaintiffs' Brief, the substance of the two ratios demonstrates that they are anything ***but*** comparable. Pl. Liability Br. at 16-20.

*Third*, CoBank argues that the FCA's notification of the FCA's board's approval of a final capital rule was sufficient, for timing purposes, to trigger the Redemption Provision. Def. Liability Br. at 14-15. However, CoBank ignores that the Regulatory Event definition requires the change be made to an "applicable" rule, and CoBank relies upon a distortion of the word "shall." *See* Part II.D., *infra*, and Pl. Liability Br. at 20-23.

Similarly, CoBank's arguments concerning the implied covenant of good faith and fair dealing must fail because the material undisputed facts demonstrate that CoBank in fact breached

the covenant by depriving Plaintiffs of the benefit of the limited Redemption Provision. *See* Part III, *infra*, and Pl. Liability Br. at 24-26.

## SUMMARY STATEMENT OF FACTS IN DISPUTE WHICH PRECLUDE A FINDING OF SUMMARY JUDGMENT FOR COBANK[4]

Plaintiffs' Statement of Undisputed Material Facts in Support of Their Motion for Summary Judgment (ECF 121) ("SUMF") sets forth the undisputed, material facts relevant to determining that CoBank breached the Form of Security and Fiscal Agency Agreement. *See also* Pl. Liability Br. at 5-13 (Plaintiffs' Summary Statement of Undisputed Facts).

Much of CoBank's motion is based on facts which Plaintiffs do not dispute. *See* Plaintiffs' Responses to CoBank's Statement of Material Facts (admitting in full to 36 of 65 facts, and in part to another 11 facts, in CoBank's Local Rule 56.1 Statement of Material Facts in Support of Its Motion for Summary Judgment ("CoBank SUMF")). Rather, Plaintiffs disagree with the legal conclusions to be drawn from those facts concerning CoBank's liability for breach of contract and of the implied covenant of good faith and fair dealing.

There are two facts, however, which Plaintiffs dispute and which require some discussion. CoBank advances an argument that the "purpose" behind its issuance of the Notes was to "increase its regulatory capital ratios." *See* Def. Liability Br. at 8, 9, 11, 16. CoBank further argues that Redemption of the Notes was "consistent" with that "purpose." *Id.* at 16. For the reasons explained in Section II.B., *infra*, these facts are legally irrelevant and therefore immaterial. However, Plaintiffs dispute the veracity of the following two facts which CoBank asserts support its arguments concerning the purpose of the Notes.

---

[4]  Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion for Partial Summary Judgment as to Liability, were filed on March 13, 2018, ECF 119, along with Plaintiffs' SUMF, ECF 121, contain a more complete statement of undisputed facts, to which Plaintiffs respectfully refer the Court for additional background.

*First*, CoBank argues that its purpose for issuing the Notes was to "use the net proceeds from the sale of the Notes to increase its regulatory capital ratios pursuant to FCA Regulation…." *See* CoBank SUMF, ¶ 35. In fact, the 2008 Notes Offering Circular, to which CoBank refers, states that the proceeds of the Notes may also be used "for general corporate purposes." Furthermore, pursuant to its agreement with the FCA, in the five years remaining on the Notes prior to maturity (*i.e.*, 2012-2017), CoBank had to reduce by 20% each year the amount of the Notes it was permitted to use to "increase its leverage ratios." SUMF, ¶ 70. Thus, as of the date of Redemption in 2016, only 20% of the Notes were being used to "increase [CoBank's] regulatory capital ratios." This was the contractual bargain that CoBank agreed to in 2008.

*Second*, CoBank asserts that "[u]nder the terms of the [2014] Proposed Rule, the proceeds of CoBank's [] Notes were to be included in Total Assets (the denominator of the T1LR)." CoBank SUMF, ¶ 43. Plaintiffs dispute this fact.[5] CoBank has not carried its burden to provide admissible evidence demonstrating that the proceeds of the Notes are, or ever were, included in "Total Assets" for purposes of its T1LR calculations, *see* CSOF, ¶ 43, or that CoBank in 2016 even possessed the proceeds of the Notes, some eight years after such proceeds were received by CoBank. In particular, CoBank cites as evidence testimony by David Burlage concerning the proceeds of the Notes. CoBank SUMF, ¶ 43. In fact, that testimony simply states that, as a general rule, the subordinated debt proceeds would be considered assets *i.e.*, included in

---

[5]   CoBank's assertion is inapplicable because CoBank cites to the 2014 Proposed Rule, and not the News Release or Fact Sheet, both issued on March 10, 2016, upon which the Redemption was premised. CoBank cannot cite to the actual text of the Final Rule, since the Final Rule was not published under July 28, 2016. SUMF, ¶ 259. Additionally, there is no admissible evidence confirming that the 2014 Proposed Rule had been adopted in full by the FCA's board on March 10, 2016. The email from CoBank executive David Burlage recounting what was told to him during a phone call is not admissible evidence. CoBank SUMF, ¶ 52, Plaintiffs' Local Rule 56.1 Response to CoBank's Statement of Material Facts and Counter-statement of Undisputed Material Facts ("CSOF"), ¶ 52.

the denominator of the T1LR, but CoBank's subordinated debt would not qualify as capital, *i.e.*, the numerator of the T1LR. Declaration of Shawn Patrick Regan, Esq. in Support of Defendant CoBank, ACB's Motion for Summary Judgment (ECF 105) ("Regan Decl."), Ex. 9 (Excerpts from Deposition Transcript of David Burlage) at 202:10-13. Therefore, Mr. Burlage concluded, without referring specifically to the Notes, that any subordinated debt issuance would reduce CoBank's Tier 1 leverage ratio. *Id.* at 202:13-15 (emphasis added). Mr. Burlage, therefore, is only referring generically to subordinated debt; he never mentions the proceeds of the Notes specifically. Further, because one reason why CoBank issued the Notes was for "general corporate purposes," it is entirely plausible – probable even – that the proceeds of the Notes were depleted between 2008 and 2016, when the Fact Sheet and News Release were issued, and thus would not have any effect on any T1LR calculation, once effective.

## ARGUMENT

## I.   LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is only appropriate when "it is clear that no triable issue of fact exists." *MBIA Ins. Corp. v. Credit Suisse Sec. (USA) LLC*, 58 N.Y.S.3d 874, 2017 WL 1201868, at *3 (N.Y. Sup. 2017). The party seeking summary judgment bears the burden to make a *prima facie* showing that summary judgment is appropriate. *Zuckerman v. City of New York*, 49 N.Y.2d 557, 562 (1980). Failure to meet this burden mandates denial of the motion, regardless of the opposing papers. *Ayotte v. Gervasio*, 81 N.Y.2d 1062, 1063 (1993). All facts must be viewed in the light most favorable to the party opposing summary judgment. *Martin v. Briggs*, 235 A.D.2d 192, 196 (1st Dep't 1997). "[A]ny doubt as to the existence of a triable issue of fact" must lead to denial of the motion. *MBIA Ins. Corp.*, 2017 WL 1201868, at *3. CoBank has failed to meet its burden entitling it to summary judgment as a matter of law on both the breach of contract and breach of implied covenant of good faith and fair dealing claims.

## II.    A REGULATORY EVENT DID NOT OCCUR, AND COBANK THUS BREACHED THE AGREEMENTS

CoBank and Plaintiffs agree that CoBank's Redemption would have been permissible if (and only if) a "Regulatory Event," as defined in the Fiscal Agency Agreement and Security occurred. *Compare* Pl. Liability Br. at 7 *with* Def. Liability Br. at 14. Plaintiffs explained in their Motion for Summary Judgment the reasons why the undisputed facts establish that no Regulatory Event occurred under the plain definition of a Regulatory Event. Pl. Liability Br. at 15-16.

CoBank raises three arguments in its unsuccessful attempt to demonstrate the opposite: (1) the Fact Sheet and News Release triggered a Regulatory Event because its "effect" was that "none of the [] Notes shall any longer be eligible for exclusion from total liabilities for purposes of calculating CoBank's NCR or the T1LR," (Def. Liability Br. at 15-16); (2) the NCR and the T1LR are "comparable," (Def. Liability Br. at 16-20); and (3) for timing purposes, CoBank's receipt of notification that the FCA had ***adopted*** a final rule (as opposed to receipt of the Final Rule itself) was sufficient to trigger CoBank's ability to redeem the Notes, (Def. Liability Br. at 14-15). In their brief, Plaintiffs demonstrate not only why the undisputed facts do not support CoBank's arguments, but also, in fact, that the undisputed facts support the ***opposite*** conclusion that CoBank ***did*** breach the agreements. *See* Pl. Liability Br. at 15-24.

### A.    NO REGULATORY EVENT OCCURRED UNDER THE PLAIN TERMS OF THE DEFINITION

Plaintiffs demonstrated in their Motion for Summary Judgment that CoBank breached the Form of Security when it redeemed the Notes because (1) following announcement of the T1LR, CoBank was still permitted to exclude the Notes from its total liabilities for purposes of calculating its NCR; and (2) even assuming the T1LR is "comparable" to the NCR (which, as explained in Section II.C., *infra*, it is not), the notion of "excluding the Notes from total

liabilities" in calculating the T1LR is nonsensical, because total liabilities are not included in the T1LR calculation. *See* Pl. Liability Br. at 15.

CoBank offers only a half-hearted effort to argue that a Regulatory Event occurred under the plain, unambiguous Regulatory Event definition. CoBank attempts to demonstrate that the "effect" of the "Final Rule" was that it would no longer be able to exclude the Notes from Total Liabilities in calculating its NCR and its T1LR. *See* Def. Liability Br. at 16. CoBank points to language in the Form of Security suggesting that what matters in determining whether a Regulatory Event occurred is the ***effect*** that a successor regulation has on CoBank's ratio calculations. *See* CoBank Br. at 15-16. However, CoBank glosses over the unambiguous language explaining ***what that effect must be***, replacing the detailed terms in the Regulatory Event definition with "certain conditions would no longer be extant." *Id.* at 16. In CoBank's view, those "certain conditions" are that the Notes would increase its NCR (or T1LR). But neither this precise language, nor any notion thereof, is included in the Regulatory Event definition. This strained interpretation of the Regulatory Event definition must be rejected. *Nomura Home Equity Loan, Inc. Series 2006-FM2, by HSBC Bank USA, Nat'l Assoc. v. Nomura Credit & Capital, Inc.*, 30 N.Y.3d 572, 581 (N.Y. 2017) ("Courts may not, through their interpretation of a contract, add or excise terms or distort the meaning of any particular words or phrases, thereby creating a new contract under the guise of interpreting the parties' own agreements.").

In fact, the "effect" referred to was not that the Notes would no longer increase CoBank's leverage ratio (as CoBank would prefer), Def. Liability Br. at 16, but rather that the Notes "shall no longer be eligible for exclusion from Total Liabilities for purposes of calculating" the NCR or

a comparable successor ratio, Pl. Liability Br. at 7. CoBank's summary judgment papers ignore these precise terms because it knows that these conditions were not met.

CoBank also asserts, without any factual, legal or expert support, that the "'effect' of the changes adopted by the FCA Board was that, under the Final Rule, none of the [] Notes shall any longer be eligible for exclusion from Total Liabilities for purposes of calculating CoBank's NCR." CoBank Liability Br. at 16. CoBank does not carry its burden to demonstrate that this is an undisputed fact. In reality, the ***opposite*** is true. Nothing about the Final Rule had any effect whatsoever on CoBank's calculation of its NCR, including its ability to deduct the Notes (an obligation) from its Total Liabilities. And this is not a meaningless fact – CoBank was required to – and did – report its NCR through the end of 2016. Similarly, CoBank's baseless assertion that the Notes would not be "eligible for exclusion from Total Liabilities for purposes of calculating" the T1LR, *id.*, is similarly false. In fact, Total Liabilities are not a component of the T1LR, and thus the Notes are excluded for the purpose of calculating the T1LR. *See* Pl. Liability Br. at 16.

### B. COBANK'S PURPORTED PURPOSE FOR THE PROCEEDS OF THE NOTES IS IRRELEVANT

CoBank repeatedly attempts to rewrite the Security to state that a Regulatory Event occurs whenever the Notes no longer have the effect of increasing CoBank's leverage ratios. Def. Liability Br. at 2, 5, 9, 11, 16. One such attempt is the invocation of CoBank's "purpose" for issuing the Notes. *Id.* at 16 ("CoBank's redemption was consistent with . . . the purpose of the [] Notes"). Yet the Regulatory Event definition does not speak to such purposes, and CoBank's request for the Court to rewrite the Security now to include its retrospectively preferred terms should be denied. *Blonder & Co., Inc. v. Citibank, N.A.*, 28 A.D.3d 180, 182 (N.Y. 1st Dep't 2006) ("[I]t is fundamental that courts enforce contracts, not rewrite them."); *Flag Wharf, Inc. v.*

*Merrill Lynch Capital Corp.*, 40 A.D.3d 506, 507 (1st Dep't 2007) ("Courts will not rewrite contracts that have been negotiated between sophisticated, counseled commercial entities."); *Republic Nat'l Bank of New York v. Olshin Woolen Co. Inc.*, 304 A.D.2d 401, 402 (1st Dep't 2003) ("It is well settled that a court may not, under the guise of interpretation, fashion a new contract for the parties by adding or excising terms and conditions which would contradict the clearly expressed language of the contract."). The Regulatory Event definition is unambiguous, and CoBank should not be permitted to present extrinsic evidence "to create an ambiguity in a written contract which is complete and clear and unambiguous upon its face," *Carlson v. Am. Int'l Group, Inc.*, 30 N.Y.3d 288, 317 (N.Y. 2017) (citations omitted).

Even if CoBank's "purpose" for issuing the Notes were relevant, the undisputed facts do not demonstrate that it issued the Notes solely to increase its leverage ratios. CoBank points to a cherry-picked and incomplete phrase from the Notes' Offering Circular that it would "use the net proceeds from the sale of the [] Notes to increase its regulatory capital ratios pursuant to FCA Regulations…" *See* Def. Liability Br. at 8, 11, 16. CoBank argues that the Redemption was "consistent" with this purpose. *Id.* at 16. However, this is not the only stated "purpose" for the Notes. Although CoBank may have stated in its Offering Circular that ***one*** purpose of the Notes was to increase its leverage ratio, the Offering Circular further states that Notes may be used "for general corporate purposes." *See* Declaration of Gordon Z. Novod in Support of Plaintiffs' Motion for Summary Judgment (ECF 122) ("Novod Decl."), Ex. 40 (PEX 4) at COBANK_00007654.

CoBank's attempt to interject misleading, partial provisions of the Offering Circular as terms in the Security must be rejected. The Fiscal Agency Agreement and the Security are the operative documents that comprise CoBank's rights and responsibilities towards the noteholders.

*See* SUMF, ¶¶ 47-48. CoBank's attempts to focus the Court on extrinsic evidence from the Offering Circular must be rejected. *See, e.g.*, *Master-Built Constr. Co., Inc. v. Thorne*, 22 A.D. 535, 535 (2d Dep't 2005) (extrinsic evidence not permitted where a contract is unambiguous); *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990) (A "clear, complete document . . . should as a rule be enforced according to its terms."); *In re Bank of New York Mellon*, 51 N.Y.S. 3d 356, 367 (N.Y. Sup. 2017) (refusing to look beyond the "four corners of the relevant agreement to determine the parties' intent, when the contract itself is clear").

### 1. The Ability of the Notes to Increase CoBank's NCR Was Contingent on the Undisclosed Approval by the FCA of Special Treatment of the Notes

Even if the Offering Circular evidenced CoBank's purpose for issuing the Notes as a general matter, relying on that fact here is improper because CoBank did not disclose material information to investors. It was not disclosed that CoBank's ability to exclude the Notes from "total liabilities" in its NCR denominator (thereby increasing its NCR) required the FCA's approval, and was subject to the FCA's continued discretion. *See* Novod Decl., Ex. 5 (PEX 5), at COBANK_00017970 (FCA letter approving the Notes issuance and stating that CoBank may include the Notes "in Permanent Capital and Total Surplus and exclude it from Total Liabilities for the Net Collateral Ratio computation" subject to conditions). Without this permission, CoBank would not have been able to exclude the Notes from total liabilities in its NCR calculation, and the "purpose" of issuing the Notes would not have been achieved.

No potentially relevant party – including the counterparties to the Security and the Fiscal Agency Agreement, and the investors themselves – was ever apprised that the Notes' ability to increase CoBank's NCR was contingent on CoBank seeking, and receiving, special treatment of the Notes from the FCA. SUMF, ¶¶ 66-70. Thus, even if the Offering Circular's statement of CoBank's purpose were sufficient to put investors on notice of CoBank's intentions, they were

deprived of crucial information that this purpose could only be achieved through the continued approval of the FCA. *See W.W.W. Assocs.*, 77 N.Y.2d at 162 ("Evidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing."). Without this crucial information, nothing regarding the Offering Circular's statement of CoBank's "purpose" for issuing the Notes can be imputed to the Notes' investors in terms of interpreting the Regulatory Event definition (which is, in any event, unambiguous on its face).

### 2. CoBank Did Not Conduct the Redemption to Increase Its Leverage Ratios

CoBank's arguments that the Redemption was proper because CoBank issued the Notes to increase its NCR are also belied by undisputed facts of its circumstances and its conduct. At the time of the Redemption, the Notes had a diminished function in calculating CoBank's NCR. When the FCA gave its approval for CoBank to deduct the Notes from Total Liabilities in its NCR calculations, it stated that CoBank must deduct 20% of the Notes from its Total Surplus in each of the last five years before the maturity date, and further stated that it could only exclude from Total Liabilities that portion of the Notes that could be included in Total Surplus. *See* SUMF, ¶¶ 69-70. The effect of these provisions is that the Notes' "beneficial effect of increasing CoBank's leverage ratio," Def. Liability Br. at 11, was already diminished by 80% at the time of the Redemption. SUMF, ¶¶ 72-73 (CoBank could include only $80,937,000 as permanent capital and total surplus in its NCR calculation, out of a total principal of $404,685,000, as of the date of the Redemption). Thus, CoBank's arguments about the effect of the Notes on its ratios – while legally irrelevant in any event – are belied by the facts showing that at the time of the Redemption, the Notes' effect on CoBank's NCR was already substantially diminished by CoBank's own agreement and the FCA's 2008 mandate.

In addition, CoBank actively participated in negotiations and conversations with the FCA for several years before the T1LR was announced. But not once did CoBank argue for or support a position that would afford treatment of the Notes consistent with its "purpose" for issuing them. SUMF, ¶¶ 161-165, 174-215. CoBank could have advocated that the Notes should be considered as tier 1 capital, but never once made this suggestion. Inclusion of the Notes as tier 1 capital would have had the desired effect of increasing CoBank's T1LR. Its failure to push for this treatment of the Notes undermines its arguments that the Redemption was "consistent with the fact that the purpose of the [] Notes was 'to increase its regulatory capital ratios pursuant to FCA Regulations." Def. Liability Br. at 16.

### 3.      The Notes Do Not Operate to Reduce CoBank's T1LR

CoBank's argument that the Notes operate to reduce its T1LR is misleading. Def. Liability Br. at 9, 16. CoBank asserts that in the T1LR calculation, "the proceeds of the [] Notes would be *included* in the denominator (Total Assets) and would *not be included* in the numerator (Tier 1 Capital.)" Def. Liability Br. at 9 (emphasis in original). However, the ***proceeds*** of the Notes were intermingled with all of CoBank's assets. CoBank has adduced no evidence that all, or even a portion, of those proceeds – which CoBank acquired in 2008 – remained in its coffers in 2016 and would thereby be included in the T1LR denominator. Thus, whether or not the Notes had the "effect" of decreasing CoBank's T1LR, to the extent it is even necessary, is in dispute.

Even more to the point, however, is that whether or not the Notes decreased CoBank's T1LR is ***irrelevant*** to determining whether a Regulatory Event occurred, which says nothing about whether the Notes, or their proceeds, in the NCR or any other leverage ratio, have the effect of increasing or decreasing those ratios. The undisputed facts demonstrate that the plain terms of the Regulatory Event definition did not allow for the Redemption. CoBank's arguments do not refute those facts, nor do they lead to the conclusion that the Redemption was permitted.

Instead, they amount to a classic case of an attempt to replace the plain terms of the contract with an (unstated) purpose behind the contract. The law forbids this practice. *W.W.W. Assocs.,* 77 N.Y.2d at 162.

### C.   THE UNDISPUTED FACTS DEMONSTRATE THAT THE T1LR WAS NOT COMPARABLE TO THE NCR

As explained in Section II.B., *supra*, any arguments concerning the treatment of the Notes in the T1LR are inapposite if CoBank cannot demonstrate that the T1LR is "comparable" to the NCR. For the reasons explained in Plaintiffs' Liability Brief at 16-20, the undisputed material facts compel the opposite conclusion: that the T1LR was ***not*** comparable to the NCR. CoBank's arguments do not undermine that conclusion. First, CoBank argues that the two ratios are comparable because they are both non-risk weighted leverage ratios. Def. Liability Br. at 16-17. However, just as any two items can share some characteristics without being "comparable," the non-risk weighting characteristic of the two ratios does not render these comparable. CoBank next points to the FCA's use of the word "replace" to describe the T1LR's relationship to the NCR. Def. Liability Br. at 18. CoBank's reliance on language by a non-party to the agreement does not lead to a finding of comparability, particularly when non-comparable items may replace each other in many circumstances. Finally, CoBank points to the history leading to its inclusion of the phrase "comparable regulatory capital requirements" in the Regulatory Event definition as evidence of comparability. Def. Liability Br. at 18-20. The undisputed material facts do not allow this conclusion.

### 1.   The Non-Risk Weighted Characteristic of the Two Ratios Does Not Make Them Comparable

CoBank makes much of the fact that the NCR and T1LR are both non-risk weighted ratios. Def. Liability Br. at 16-17. Plaintiffs do not dispute this fact. However, it is immaterial. Sharing this single trait does not render the two ratios "comparable," and there are no facts in the

record to suggest otherwise. In particular, although the various components of the two ratios are not assigned risk weights, those components themselves are quite different. *See* Pl. Liability Br. at 18-19.

Further, when the NCR was adopted by the FCA, there was no discussion of the import of non-risk weighting, thus it is impossible to discern the rationale behind it. However, when the decision was made to include the T1LR in the Final Rule, much attention was paid to the importance of using a non-risk weighted ratio, as borrowed from Basel III. In particular, a non-risk weighted ratio was important because it would come into play "when financial risks suddenly rise above what the assigned risk weight can feasibly capture." *See U.S. Implementation of the Basel Capital Regulatory Framework*, Congressional Research Service (April 9, 2014), at 10 (available at https://fas.org/sgp/crs/misc/R42744.pdf). Thus, "the logic behind this ratio is to illuminate financial risks that could be assigned lower weights and still translate into substantial losses." *Id.* at 18. This rationale was deemed important with the 2016 overhaul of the FCA's regulations, but was never discussed in connection with adopting the NCR. Thus, the fact that the NCR, like the T1LR ultimately adopted, as non-risk weighted, is inapposite.

### 2. The FCA's Choice of Term "Replace" Does Not Render the Two Ratios Comparable

CoBank also argues that because the FCA described the T1LR as "replac[ing]" the NCR, the two ratios are comparable. Def. Liability Br. at 18. CoBank is incorrect for two reasons. *First*, to "replace" means to "1: to restore to a former place or position, ***2: to take the place of especially as a*** substitute or ***successor***, 3: to put something new in the place of." Declaration of Gordon Z. Novod in Opposition to Defendant CoBank, ACB's Motion for Summary Judgment ("Novod Opp. Decl."), Ex. 3 (Merriam Webster Dictionary definition of "replace") at 1

15

(*emphasis added*). Thus, as here, it is appropriate to read the FCA's use of the word "replace" to mean that the T1LR is "to take the place of especially as a substitute or successor" of the NCR.

*Second*, that one item may "replace" another does not suggest comparability; in fact, it often suggests the opposite. For example, in providing examples of common usage of the term "replace," many dictionaries demonstrate that "replace" indicates the opposite of comparability. *See, e.g.*, Novod Opp. Decl., Ex. 4 (TheFreeDictionary.com definition of "replace") at 1 ("The manual worker is being replaced by the machine."); Novod Opp. Decl., Ex. 5 (Macmillan Dictionary definition of "replace") at 1 ("Suddenly Jon's relaxed mood was replaced by a feeling of panic."); Novod Opp. Decl., Ex. 6 (Google search results for "replace") at 1 ("Ian's smile was replaced by a frown.").

### 3. The History Leading to Inclusion of the Word "Comparable" in the Regulatory Event Definition Does Not Require a Finding that the T1LR Is Comparable to the NCR

CoBank also argues that because the FCA required CoBank to add the phrase "or any comparable regulatory capital requirements" to the definition of "Regulatory Event," the T1LR is "comparable" to the NCR. *See* CoBank Br. at 18-20. CoBank is incorrect. SUMF, ¶ 65. The FCA issued this requirement in 2007. At that time, neither the FCA, nor CoBank, nor anyone else knew that the T1LR would be adopted. Indeed, it took nearly *nine* years for the new regulations to be proposed, and nearly *ten* years for them to be implemented. The interim period consisted of significant discussion and debate among all the Farm Credit System participants as to the various components of the new regulations. SUMF, ¶¶152-217. Moreover, the fact that the FCA asked that certain text be added to an unrelated agreement (*i.e.*, *not* to the Security for the Notes), and the FCA was not a party to the Security or the Fiscal Agency Agreement, renders the FCA's view of what "Comparable" meant irrelevant, let alone blatant hearsay.

16

Furthermore, there is no basis to conclude that the FCA's effort to make the NCR "more comparable" to the T1LR means that it believed those ratios to be "comparable" to begin with. Indeed, the opposite conclusion could just as easily be reached.[6]

### D.   THE UNDISPUTED FACTS DEMONSTRATE THAT COBANK DID NOT RECEIVE NOTIFICATION OF AN "APPLICABLE" REGULATION UNTIL JANUARY 1, 2017

CoBank states that "on March 10, 2016, CoBank received a notification from the FCA of the adoption of the Final Rule." Def. Liability Br. at 14. However, this fact – whether true or not – is legally meaningless for at least two reasons.

First, the notice announcing the "*adoption* of the Final Rule," did not set forth the terms of the Final Rule itself. Rather, it condensed what eventually became a 94 page rule into a 5-page, high-level summary of the rule, known as the "Fact Sheet." Thus, CoBank was not in a position to determine with certainty whether the Final Rule that was ultimately adopted would trigger a Regulatory Event. CoBank's allusion to a telephone call between Burlage and the FCA, Def. Liability Br. at 10, serves to undermine CoBank's argument. In fact, the recounting by a CoBank executive of hearsay confirms, even if true, that there were changes from the 2014 Proposed Rule to the version that the FCA would adopt ultimately. But those changes are not highlighted in the Fact Sheet or the News Release, and without further information, CoBank has not met its burden to show that these documents provided CoBank with sufficient information to conclude that a Regulatory Event would even be appropriate when the Final Rule eventually applied to CoBank, let alone before.

Further, as explained in Plaintiffs' Brief, the plain language of the Regulatory Event requires that any rule relied upon for a regulatory event redemption must "apply" to CoBank. *See*

---

[6]   Invoking the comparative form of an adjective to describe two items does not compel the conclusion that the two items possess or share the characteristics of that adjective. Thus, for example, nobody would dispute that the Empire State Building is "shorter" than the Freedom Tower, but neither would anyone suggest that either building is "short."

Pl. Liability Br. at 21. The Final Rule did not "apply" to CoBank until January 1, 2017. *Id.* Plaintiffs do not, as CoBank suggests, attempt to insert a provision into the Regulatory Event definition that a Regulatory Event may only be triggered by the "effective date of the new rule," CoBank Br. at 15; however, that is the practical effect of the provision because it is only triggered by an "applicable" rule.

CoBank offers a meager attempt to explain its view that use of the word "shall" in the Regulatory Event definition "express[es] . . . futurity." Def. Liability Br. at 15. To do so, CoBank ignores the first two definitions in the Merriam Webster online dictionary, jumping instead to "shall's" third definition which connotes futurity. *See* Novod Opp. Decl., Ex. 2 (Merriam Webster Dictionary definition of "shall") at 1. It is no wonder why CoBank ignores the first two definitions: they both demonstrate that the primary meaning of the word "shall" is "used to express a command or exhortation." In particular, definition 2(b) states: "used in laws, regulations, or directives to express what is ***mandatory***." *Id.* (emphasis added). CoBank cannot escape this plain definition of the word "shall." *See also* Plaintiffs' Br. at 21-24. To the extent there is any ambiguity, the word should be construed against CoBank as drafter. *Id*. at 23. CoBank also ignores the fact that at no time, from 2008 through 2014, did CoBank, its board of directors or senior management, express an intention that "shall" in the Security expresses futurity.

CoBank also cites *James L. Turkle Trust v. Wells Fargo & Co.*, 11-cv-6494, 2012 WL 2568208, at *1 (N.D. Cal. July 2, 2012) to support its temporal argument. Def. Liability Br. at 15. *Turkle* gets CoBank no further. The operative language in *Turkle* involved use of the word "will," not "shall." In fact, the plaintiff there "agree[d] that the clause contains forward-looking language and that Defendant may declare a capital treatment event based on a change that will

take effect in the future." *Id.* at *3. In contrast, the Regulatory Event provision at issue here uses the word "shall," not "will," which is ***not*** forward-looking, but rather denotes that a mandatory event must occur before a redemption is permissible. *See* Pl. Liability Br. at 21-24. Thus, the temporal aspect to the holding of *Turkle* is inapplicable here. Additionally, the contract in *Turkle* affirmatively permitted redemption upon an announcement of a "prospective change." Here, the redemption right is far more limited, as there was no such prospective text in the Security for the Notes.

## III.   COBANK BREACHED THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

The implied covenant of good faith and fair dealing prevents a party to the contract from doing "anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Dalton v. Educ. Testing Serv.*, 639 N.Y.S.2d 977, 979 (1995) (citations omitted). An implied covenant claim will stand with a breach of contract claim where, as here, the underlying conduct that breached the duty of good faith and fair dealing is separate and distinct from the conduct that breached the contractual duties ***or*** where a separate claim for damages is alleged.

A good faith claim is not barred under New York law when such a claim is not redundant of a breach of contract claim. *Russell Publ'g Grp., Ltd., v. Brown Printing Co.*, 13-cv-5193, 2014 WL 1329144 (S.D.N.Y. April 3, 2014) (Scheindlin, J.). Moreover, Plaintiffs' good faith claims, for the reasons set forth in Plaintiffs' Memorandum in Support of Summary Judgment, do not "imply a covenant inconsistent with the terms expressly set forth in the contract." *Hartford Fire Ins. Co. v. Federated Dep't Stores, Inc.*, 723 F. Supp. 976, 991 (S.D.N.Y. 1989) (Sweet, J.) (citation omitted). Lastly, "New York Courts have recognized a separate cause of action for breach of the covenant of good faith and fair dealing … in cases involving efforts by one party to

a contract to subvert the contract itself." *Butvin v. DoubleClick, Inc.*, 99-cv- 4727, 2001 WL 228121, at *8 (S.D.N.Y. Mar. 7, 2001) (Keenan, J.) (citing *Aventine Inv. Mgmt., Inc. v. Canadian Imperial Bank of Commerce*, 697 N.Y.S.2d 128, 130 (N.Y. App. Div. 1999); *Sauer v. Xerox Corp.*, 95 F. Supp. 125, 132 (W.D.N.Y.2000) ("[S]uch a claim may be brought . . . only where one party's conduct, though not breaching the terms of the contract in a technical sense, nonetheless deprived the other party of the benefit of its bargain.")).

CoBank does not satisfy its burden to raise undisputed facts demonstrating that summary judgment should be entered in its favor. Def. Liability Br. at 20-21. CoBank's argument rests on its incorrect assertion that Plaintiffs' implied covenant claim is grounded upon CoBank's impermissible Redemption of the Notes. That is incorrect. Plaintiffs have adduced facts regarding CoBank's course of conduct during the period when the FCA was considering what new regulations should be imposed on the System banks that entitle Plaintiffs to a finding in *their* favor as to the implied covenant claim. As explained in Plaintiffs' motion, CoBank actively lobbied for regulations that would subvert its purported purpose for issuing the Notes. *See* Pl. Liability Br. at 25-27. In particular, CoBank lobbied for a Tier 1 unweighted leverage ratio," SUMF, ¶¶ 40, 161, 167, and "encouraged the FCA to implement new regulations that mirror the provisions of Basel III as closely as possible," SUMF, ¶¶ 175-76. *See also* SUMF, ¶¶ 225-228 (describing letter written by the Farm Credit Council, which included CoBank representatives, seeking to replace the NCR with leverage ratios similar to those used by commercial banks). The effect on the Notes of CoBank's lobbying efforts was not accidental. They were part of CoBank's design to provide it with a basis to redeem the Notes prematurely and to deprive Plaintiffs of the benefit of the bargain. *See* Pl. Liability Br. at 26; SUMF, ¶¶187, 191, 243.

## CONCLUSION

For all of the foregoing reasons, the Court should deny CoBank's motion for summary judgment regarding liability.

Dated: New York, New York
April 30, 2018

GRANT & EISENHOFER P.A.

By: *Gordon Z. Novod*
    Jay W. Eisenhofer
    Gordon Z. Novod
    Caitlin M. Moyna
    Jonathan D. Park
485 Lexington Avenue, 29th Floor
New York, New York 10017
(646) 722-8500

*Attorneys for Plaintiffs*

21

## CERTIFICATE OF SERVICE

I, Gordon Z. Novod, hereby certify that on April 30, 2018, I caused a copy of the foregoing to be served via CM/ECF on the following counsel:

Shawn Patrick Regan
Patrick L. Robson
Joseph J. Saltarelli
Jennifer L. Bloom
Peter M. Mustalish
HUNTON & WILLIAMS LLP
200 Park Avenue
New York, NY 10166
sregan@hunton.com
probson@hunton.com
jsaltarelli@hunton.com
jbloom@hunton.com
pmustalish@hunton.com


*/s/ Gordon Z. Novod*
Gordon Z. Novod