UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
AMCO INSURANCE COMPANY, *et al.*,          :
                                           :
                        Plaintiffs,        :
                                           :
            - against -                    :       No. 16-cv-4422 (LTS)(HBP)
                                           :
COBANK, ACB,                               :
                                           :
                        Defendant.         :
------------------------------------------------------------X

---

## COBANK'S
## MEMORANDUM OF LAW
## IN OPPOSITION TO PLAINTIFFS' MOTION
## FOR SUMMARY JUDGMENT AS TO LIABILITY

---

Shawn Patrick Regan
Joseph J. Saltarelli
Peter Mustalish
Jennifer L. Bloom
Silvia N. Ostrower
HUNTON ANDREWS KURTH LLP
200 Park Avenue, 52nd Floor
New York, New York 10166
(212) 309-1000

*Attorneys for Defendant
CoBank, ACB*

## **TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ............................................................................................1

SUMMARY JUDGMENT STANDARD ...........................................................................3

ARGUMENT ......................................................................................................................4

I.      Given the Evidence, Plaintiffs Cannot Establish that a Regulatory Event
        Did Not Occur as a Matter of Law...........................................................................4

II.     The Evidence Contravenes Plaintiffs' Claim that the T1LR Is Not a "Comparable"
        Regulatory Capital Ratio Under a Successor Regulation. ........................................6

        A.      The Chronology of Undisputed Facts Regarding the Origin of the Term
                "Comparable Regulatory Capital Requirement" and the FCA's Adoption
                of the T1LR as a "Replacement" for the NCR Reinforce that the T1LR Is
                Squarely Within the Ambit of the Phrase "Comparable Regulatory Capital
                Requirement Under a Successor Regulation" vis-a-vis the NCR. ..........................6

        B.      There Is No Reasonable Basis to Conclude that Differences from the NCR
                Render the T1LR Not a "Comparable Ratio Under a Successor
                Regulation." ...........................................................................................................8

        C.      Plaintiffs' Argument that the Term "Comparable" Should Be Construed
                Against CoBank Is Wrong on the Law and the Facts. ..........................................10

        D.      Mr. Burlage's Statement that the New Rules Reflect a "Sea-Change" in
                Regulatory Capital Treatment of the 2008 Notes Does Not Mean the
                T1LR Is Not a "Comparable Regulatory Capital Requirement" Under the
                Successor Regulation. ............................................................................................13

        E.      Plaintiffs' Argument that CoBank Did Not Disclose "the Reason for
                Inclusion of the 'Comparable' Term" Is Inapposite to Their Causes of
                Action......................................................................................................................15

III.    CoBank Did Not "Jump the Gun." ..........................................................................16

        A.      Plaintiffs' Theory that CoBank Lacked Information Sufficient to Conclude
                a Regulatory Event Occurred Is Belied by the Undisputed Facts.........................16

        B.      Plaintiffs' Theory that the Word "Shall" Means "Has a Duty To"
                Would Render the Regulatory Event Provision Nonsensical. ...............................18

        C.      Plaintiffs' Theory that the Word "Applicable" Means the 2008 Notes
                Could Not Be Redeemed Until the T1LR Was "Effective" Is Baseless................20

IV.     Plaintiffs Are Not Entitled to Summary Judgment on Their Claim for
        Breach of an Implied Covenant of Good Faith and Fair Dealing. ...........................21

        A.      As a Matter of Law and Fact, There Was No Implied Covenant to Refrain
                from Participation in the FCA's Regulatory Capital Rulemaking.........................22

i

B.      Plaintiffs Cannot Maintain an Implied Covenant Claim on the Theory that
        CoBank Failed to Request Continued Favorable Treatment of the 2008
        Notes. ................................................................................................................24

CONCLUSION................................................................................................................26

## TABLE OF AUTHORITIES

**Cases**                                                                         **Page(s)**

*Aircraft Servs. Resales LLC v. Oceanic Capital Co.*,
    2013 WL 4400453 (S.D.N.Y. Aug. 14, 2013), *aff'd*, 586 F. App'x 761 (2d
    Cir. 2014) .................................................................................................................10

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ..............................................................................................3

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ..............................................................................................3

*D'Amato v. Five Star Reporting, Inc.*,
    80 F. Supp. 3d 395 (E.D.N.Y. 2015) ...................................................................11

*Davis v. Elec. Arts Inc.*,
    2011 WL 2621626 (N.D. Cal. Jul. 5, 2011).........................................................22

*Empresas Cablevision, S.A.B. de C.V. v. JP Morgan Chase Bank, N.A.*,
    680 F. Supp. 2d 625 (S.D.N.Y. 2010).................................................................22

*Finest Invs. v. Secs. Trust Co. of Rochester*,
    96 A.D.2d 227 (4th Dep't 1983) .........................................................................20

*Fuentes v. Shevin*,
    407 U.S. 67 (1972)..............................................................................................22

*Imation v. Koninklijke Philips Elec. N.V.*
    586 F.3d 980 (Fed. Cir. 2009).............................................................................20

*JA Apparel Corp. v. Abboud*,
    568 F.3d 390 (2d Cir. 2009)..................................................................................7

*James L. Turkle Trust v. Wells Fargo & Co.*,
    2012 WL 2568208 (N.D. Cal. July 2, 2012), *aff'd*, 602 Fed. Appx. 360 (9th
    Cir. 2015) ...............................................................................................................2

*JP Morgan Chase Bank, N.A. v. IDW Group, LLC*,
    2009 WL 321222 (S.D.N.Y. Feb. 9, 2009).........................................................22

*Kass v. Kass*,
    91 N.Y.2d 554 (1988) .......................................................................................6, 7

*M/A-COM Sec. Corp. v. Galesi*,
    1989 WL 115953 (S.D.N.Y. Sept. 27, 1989).................................................22, 23

iii

*Mercury Partners LLC v. Pac. Med. Bldgs., L.P.,*
  2007 WL 2197830 (S.D.N.Y. Jul. 31, 2007) ............................................................11

*Moran v. Erk,*
  11 N.Y.3d 452 (2008) ...........................................................................................22

*Nagle v. Marron,*
  663 F.3d 100 (2d Cir. 2011) ....................................................................................4

*National Union Fire Ins. Co. v. Xerox Corp.,*
  25 A.D.3d 309 (1st Dep't 2006) .............................................................................21

*Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,*
  391 F.3d 77 (2d Cir. 2004).......................................................................................4

*Shadlich v. Rongrant Assocs., LLC,*
  66 A.D.3d 759 (2d Dep't 2009) .............................................................................11

*Smith v. BarnesandNoble.com, LLC,*
  2014 WL 4828107 (S.D.N.Y. Sept. 23, 2014) ...........................................................3

*Thompson v. Gjivoje,*
  896 F.2d 716 (2d Cir. 1990)......................................................................................7

*Warner Theatre Assocs. Ltd. P'ship v. Metro. Life Ins. Co.,*
  1997 WL 685334 (S.D.N.Y. Nov. 4, 1997).............................................................21

*Wilson v. Nw. Mut. Ins. Co.,*
  625 F.3d 54 (2d Cir. 2010)........................................................................................3

*Zalaski v. City of Bridgeport Police Dep't,*
  613 F.3d 336 (2d Cir. 2010)......................................................................................3

**Other Authorities**

12 C.F.R. § 615.5050 .................................................................................................9

60 Fed. Reg. 38521 ...................................................................................................8

Black's Law Dictionary ......................................................................................20, 21

Fed. R. Civ. P. 56 ..................................................................................................1, 3

Local Rule 56.1 .....................................................................................................1, 5

Defendant CoBank, ACB ("CoBank") respectfully submits this memorandum of law in opposition to Plaintiffs' motion for summary judgment on liability pursuant to Fed. R. Civ. P. 56.

## PRELIMINARY STATEMENT

Plaintiffs' motion for summary judgment is based on **413 paragraphs** of allegedly undisputed, material facts. (Dkt. Nos. 100, 121.) Contrary to the mandate of Local Rule 56.1, Plaintiffs' 56.1 Statement is not "short," not "concise" and not limited to "material facts." At the most elementary level, Plaintiffs' motion must be denied because Plaintiffs cannot establish, as a matter of law, that a reasonable jury could decide only in Plaintiffs' favor on each one of the 413 paragraphs of facts Plaintiffs claim to be material.[1]

Plaintiffs' motion must be denied also because it hinges on two brazen misstatements. First, Plaintiffs misstate the Regulatory Event definition from the Fiscal Agency Agreement. Plaintiffs assert that "[u]nder the Security's plain terms, a Regulatory Event occurs *when the Notes are no longer eligible* for exclusion from total liabilities in calculating CoBank's NCR, or any 'comparable' successor regulation." (Pl. Br. at 15 (emphasis added).)[2] The actual Regulatory Event clause, with the key terms Plaintiffs omit shown in underlined-bold, was:

> **"Regulatory Event" means the receipt by the Bank of a notification from the Farm Credit Administration, or other primary regulator at the time, to the effect that, whether as a result of a change in applicable law or regulation or otherwise,** none of the Securities **shall** any longer be eligible for ... (ii) exclusion from total liabilities for purposes of calculating the Bank's net collateral ratio or any comparable regulatory capital requirements under any successor regulations.

---

[1] Plaintiffs' "everything-but-the-kitchen-sink" approach reveals their filing for what it really is — a feint to prevent CoBank from obtaining summary judgment on the hope that volume alone will overwhelm and lead the Court to assume there must be a fact dispute to be tried. But summary judgment in favor of CoBank is appropriate because, considering all facts that actually are material, the evidence establishes a Regulatory Event occurred.

[2] *See also* Mem. of Law ISO Pls' Mot. for Summary Judgment, Dkt. No. 101 ("Pl. Br.") at 15-16 (misstating that "[a] Regulatory Event occurs if the Notes *are no longer eligible* for exclusion from total liabilities in calculating CoBank's NCR or any comparable regulatory capital requirements under any successor regulations") (emphasis added).

(Regan Decl., Dkt. No. 105 ("Regan Decl.") Ex. 14 at A-9.)[3] Plainly, a Regulatory Event occurs

upon "receipt of a notification … to the effect that … none of the Notes shall any longer be

eligible…," and not, as Plaintiffs claim, "when the Notes are no longer eligible …."

      Nowhere in Plaintiffs' twenty-seven page brief is there a discussion of the "receipt of

notification" concept. Plaintiffs also ignore the related terms "to the effect that none of the Notes

shall …." Moreover, Plaintiffs' omission does not concern a novel, unimportant or surprising

concept. As one Court explained, in a case involving a bank's redemption of securities based on

the occurrence of a "regulatory event":

> the clear purpose of the forward-looking language in the capital
> treatment event clause is to allow [the bank defendant] the
> flexibility to redeem the securities before the prospective change
> affecting the favorable treatment of those securities has actually
> taken effect, in order to anticipate the change in a manner that it
> deems to make good business sense and ensure adequate
> capitalization, rather than requiring it to redeem the securities … at
> the moment the change takes effect ….

*James L. Turkle Trust v. Wells Fargo & Co.*, 2012 WL 2568208 at *6 (N.D. Cal. July 2, 2012)

(applying New York law, granting defendant bank's dispositive motion and rejecting plaintiff's

argument that a "capital treatment event clause should be read to allow redemption only if such

event has taken effect" because redemption clause did not include "such a temporal limitation"),

*aff'd*, 602 Fed. Appx. 360 (9th Cir. 2015).[4] Plaintiffs' effort to obscure from the Court the full

contractual definition of a Regulatory Event is indefensible.

      Second, Plaintiffs fundamentally mischaracterize the FCA's actions on March 10, 2016,

---

[3] Plaintiffs' Complaint similarly omitted key terms from the remedies limitation provision of the 2008 Notes, leading CoBank to file a separate motion and brief on that issue. (*See* Mem. of Law ISO CoBank's Mot. for Summary Judgment Regarding Damages, Dkt. No. 108, at 1-3.)

[4] Thus, as the 30(b)(6) witness for Plaintiff Continental Casualty explained, a regulatory event redemption provision is "universal" "for a security like this", and "all capital securities issued by financial institutions have regulatory par call language in the documentation." (Regan Opp. Decl. Ex. 38 (Betsy Monroe Dep.) 37:19-38:16, 50:19-51:4; 112:22-113:7; *id.* 37:11-18) (having a regulatory call provision "is typical for any capital security issued by a financial institution"). For the reasons articulated by the Court in *Turkle Trust*, it would not be sensible for such an option to be available only upon the effective date of the rule change.

as well as the News Release and Fact Sheet the FCA issued that day.[5]  Plaintiffs claim the News Release "announced that the FCA *planned to adopt* new regulations that, when they became effective, would replace the net collateral ratio with a 'tier 1 leverage ratio' (the 'T1LR')." (Pl. Br. at 2 (emphasis added); *see also id.* at 22 (claiming the "Fact Sheet and News Release merely indicate that, at a future date, the regulatory capital requirements could change").)  But the News Release did not announce that the FCA "planned to" adopt new regulations — it announced that the FCA Board "today adopted ..." the rules at issue in this case.  (CoBank's Request for Judicial Notice, Dkt. No. 106 ("RJN") Ex. 18 at 1.)

For these reasons, and those set forth in detail below, Plaintiffs' motion must be denied.

## SUMMARY JUDGMENT STANDARD

Summary judgment may be granted only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)); *Smith v. BarnesandNoble.com, LLC*, 2014 WL 4828107, at *3 (S.D.N.Y. Sept. 23, 2014) (same). The Court "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Wilson v. Nw. Mut. Ins. Co.*, 625 F.3d 54, 60 (2d Cir. 2010) (citation omitted).  It is the moving party's burden to establish the absence of any genuine issue of material fact. *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010).  A dispute regarding a material fact is genuine if there is sufficient evidence upon which a reasonable jury could return a verdict for the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In deciding Plaintiffs' motion for summary judgment, the Court

---

[5] *See* RJN Ex. 17 (FCA "News Release") (providing public notification that the FCA Board had "adopted the Tier 1/Tier 2 Regulatory Capital Framework final rule"); RJN Ex. 18 (FCA "Fact Sheet on Tier 1/Tier 2 Regulatory Capital Framework Final Rulemaking").)

is to resolve all ambiguities and draw all permissible factual inferences in favor of CoBank, the non-moving party. *Nagle v. Marron*, 663 F.3d 100, 105 (2d Cir. 2011). If there is evidence from which a reasonable inference could be drawn in favor of CoBank on an issue, Plaintiffs are not entitled to summary judgment. *See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 83 (2d Cir. 2004). Here, there can be no question that a reasonable jury could find in CoBank's favor on the issues presented in Plaintiffs' Motion for Summary Judgment. Indeed, as reflected below and in CoBank's motion for summary judgment (Dkt Nos. 104-109), based on the actual evidence, summary judgment in favor of CoBank is appropriate because no reasonable jury could find CoBank's redemption of the 2008 Notes breached the Agreement.

## ARGUMENT

### I.  Given the Evidence, Plaintiffs Cannot Establish that a Regulatory Event Did Not Occur as a Matter of Law.

Plaintiffs first argue that "the new regulations do not constitute a Regulatory Event under the language of the Security" because "[t]he Final Rule did not change the status of the Notes," the Notes are not "deprive[d] of [the] explicit treatment" of being "eligible for … exclusion from total liabilities" in the NCR, and the Notes are "excluded from the T1LR calculation." (Pl. Br. at 2; *see also id.* at 16.)

As a threshold matter, Plaintiffs ignore that a Regulatory Event occurs upon "receipt of a notification … to the effect that … none of the Notes shall any longer be eligible …," and not, as Plaintiffs claim, "when the Notes are no longer eligible …." (Pl. Br. at 15.) The question is whether the information received by CoBank was sufficient to constitute:

> **receipt of a notification … to the effect that, whether as a result of a change in applicable law or regulation or otherwise,** none of the Securities **shall** any longer be eligible for … (ii) exclusion from total liabilities for purposes of calculating the Bank's net collateral ratio or any comparable regulatory capital requirements under any successor regulations.

4

(Regan Decl. Ex. 14, at A-9.) It plainly was, for the reasons set forth in CoBank's motion for summary judgment. (Dkt. Nos. 104-109.)

Moreover, Plaintiffs' assertions that the Final Rule "did not change the status of the Notes" (Pl. Br. at 2; *see id.* at 16) and did not "deprive [the 2008 Notes] of the explicit treatment" of being "eligible for ... exclusion from total liabilities" are belied by the indisputable facts. Under the predecessor rules, in calculating CoBank's leverage ratio (the NCR), the 2008 Notes obligation was *excluded from Total Liabilities* (the ratio denominator), while proceeds from the issuance of the 2008 Notes were *included in Net Collateral* (the ratio numerator). (CoBank's Rule 56.1 Stmt. in Support of Motion for Summary Judgment, Dkt. No. 107 ("CoBank 56.1") ¶ 58.) The 2008 Notes thus had the beneficial effect of *increasing* CoBank's leverage ratio (the NCR), furthering the stated purpose of the 2008 Notes. (*id.* ¶ 58, 35; Novod Decl. Ex. 40 at 7654 (explaining CoBank issued the 2008 Notes "to increase its regulatory capital ratios ...").)[6] In contrast, under the Final Rule, the 2008 Notes are not excluded from Total Liabilities for purposes of calculating CoBank's NCR or the successor regulation's comparable ratio (the T1LR). Indeed, in calculating the T1LR, the proceeds of the 2008 Notes issuance would be *included in the ratio denominator* (Total Assets), while the 2008 Notes obligation would *not be included in the ratio numerator* (Tier 1 Capital). (CoBank 56.1 ¶ 59.)[7] Thus, if not redeemed, the 2008 Notes would have had the opposite effect of *decreasing* CoBank's leverage ratio (the

---

[6] That this capital treatment was crucial in CoBank's decision to issue the 2008 Notes was explained by Brian Jackson (CoBank's CFO at the time the 2008 Notes were issued):

> [The Regulatory Event] provision ... was ... important [because] ... we issued [the 2008 Notes] solely because of its treatment as capital subject to certain limitations by the FCA ... Without the treatment of this instrument as permanent capital or it being excluded from total liabilities, the subordinated debt simply became high-cost debt. And we had regular liquid and very efficient, from a price perspective, access to the agency debt markets through the funding corporation, and it would have been imprudent for CoBank to issue this kind of debt at this interest rate when we had many other -- far more liquid and efficient sources of debt.

(Regan Opp. Decl. Ex. 30 (Jackson Dep.) 180:4-181:3.)
[7] The leverage ratio is calculated under the T1LR by dividing Tier 1 Capital by Total Assets (T1LR = Tier 1 Capital / Total Assets). (RJN Ex. 9 at 49788 (§ 628.10(c)(4)); *see also* CoBank 56.1 ¶ 41.)

5

T1LR), counter to the purpose of the 2008 Notes.  (RJN Ex. 9 at 49738-39; *id.* at 49788 (§ 628.10(c)(4)); Regan Opp. Decl. Ex. 29 (Burlage Dep.) 198:18-200:23; 202:4-25, 203:7-204:16; Regan Decl. Ex. 26 ¶¶ 157, 162; Regan Decl. Ex. 23.)  CoBank's receipt of notification that, under the Final Rule, the 2008 Notes shall no longer be eligible for exclusion from Total Liabilities for purposes of calculating the NCR (or the T1LR) constituted a Regulatory Event.

Finally, Plaintiffs' argument that the 2008 Notes are "excluded from the T1LR calculation" (Pl. Br. at 2) is inapposite.  The regulatory benefit (and thus the Regulatory Event language) was not exclusion from "the calculation" — it was exclusion from the denominator of the ratio, *i.e.*, Total Liabilities, the result of which was to increase CoBank's leverage ratio, consistent with the very purpose of the 2008 Notes.

## II.    The Evidence Contravenes Plaintiffs' Claim that the T1LR Is Not a "Comparable" Regulatory Capital Ratio Under a Successor Regulation.

Plaintiffs argue "the T1LR is not 'comparable' to the NCR." (Pl. Br. at 2, 15.)[8]  Plaintiffs ignore the undisputed evidence regarding the circumstances of adding the "comparable" clause to the Regulatory Event definition and adoption of the T1LR.  Instead, Plaintiffs myopically focus on incidental differences between the T1LR and NCR.  But "comparable" does not mean "the same," and the alleged differences do not render the ratios "not comparable."

### A.    The Chronology of Undisputed Facts Regarding the Origin of the Term "Comparable Regulatory Capital Requirement" and the FCA's Adoption of the T1LR as a "Replacement" for the NCR Reinforce that the T1LR Is Squarely Within the Ambit of the Phrase "Comparable Regulatory Capital Requirement Under a Successor Regulation" vis-a-vis the NCR.

The fact that the NCR and T1LR are comparable is demonstrated by the undisputed evidence concerning the origin of the "comparable" clause and the circumstances[9] in which the

---

[8] Plaintiffs do not argue, nor could they, that the Final Rule constitutes a "successor regulation."

[9] It is appropriate for the Court to consider at summary judgment, *as part of discerning the plain meaning* of the Agreement, "the circumstances under which [the Agreement] was executed." *Kass v. Kass*, 91 N.Y.2d 554,



■ Specifically, in June 2007 and again in October 2007, the FCA requested "comment on changes, if any, that should be made to the … NCR … that would make it *more* comparable to the Tier 1 ratio used by the other Federal financial regulatory agencies." (Plaintiffs' 56.1 Stmt., Dkt. No. 121 ("Pl. 56.1") ¶ 160 (emphasis added).)

(Pl. 56.1 ¶ 65 (asserting

, and citing McPhillips Dep. at 105:15-106:17, 275:6-276:2); *see also* CoBank 56.1 ¶¶ 21-23.)

(*Id.* ¶¶ 24-28, 30.) And, in adopting the Final Rule eight years later, the FCA specified that, among the various ratios being adopted, it was the T1LR that "replaces"

---

566 (1988); *Thompson v. Gjivoje*, 896 F.2d 716, 721 (2d Cir. 1990) ("[A] court should accord [contractual] language its plain meaning *giving due consideration to the 'surrounding circumstances [and] apparent purpose* which the parties sought to accomplish.'") (emphasis added); *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 405 (2d Cir. 2009) (stating court is to "examine the entire contract and consider the relation of the parties *and circumstances under which it was executed*") (emphasis added) (Sack, J., concurring) (quoting *Kass*).

the NCR. (*Id.* ¶ 49.) The NCR and T1LR are comparable regulatory capital ratios in the most salient respect – each is the sole non-risk-weighted leverage ratio within its regime. (*Id.* ¶¶ 54, 56-57.)

> **B.** There Is No Reasonable Basis to Conclude that Differences from the NCR
> Render the T1LR Not a "Comparable Ratio Under a Successor Regulation."

Faced with this evidence and these circumstances, Plaintiffs beseech the Court to focus on five alleged differences between the NCR and T1LR. (Pl. Br. at 17-19.) Plaintiffs' five alleged differences are based entirely on the opinion of Ozgur Kan, an alleged expert witness retained by Plaintiffs who, prior to this engagement, had (i) no experience with the Farm Credit System or the FCA, (ii) no experience working for or advising any member institution of the System, (iii) no experience whatsoever with the NCR, (iv) not heard of the NCR, and (v) never used or applied the NCR in his career. (CoBank's Response to Plaintiffs' 56.1 Statement of Undisputed Material Facts ("CoBank Resp. to Pl. 56.1.") ¶ 261; Regan Opp. Decl. Ex. 35 (Kan Dep.) 92:16-93:4, 96:17-97:23.) No reasonable jury could conclude that Dr. Kan's opinion on these five alleged differences is material, let alone authoritative.

Plaintiffs' assertion that the T1LR and NCR have "divergent purposes" (Pl. Br. at 17) is untenable. The FCA consistently described the NCR as "a type of leverage ratio" and explained that the NCR "functions as a leverage ratio." (RJN Ex. 6 at 39407, n.92 (citing 60 Fed. Reg. 38521 (RJN Ex. 1)); *id.* at 39409.) Moreover, the T1LR and the NCR are each the sole non-risk-weighted ratio under their respective framework. (CoBank Resp. to Pl. 56.1 ¶ 260; *see* Novod Decl. Ex. 73 at 12 (describing NCR as "similar to the Tier 1 leverage ratio ...").) The purpose of both of these non-risk-weighted leverage ratios is to "constrain[] the buildup of leverage in the System, which the risk-based regime is not designed to do." (RJN Ex. 7 at 52821; *see also* RJN

Ex. 2 at 42098 (observing NCR is designed to ensure safety and soundness); RJN Ex. 1 at 38524.)

As to Plaintiffs' claim that the NCR and T1LR had different "intended audiences" (Pl. Br. at 2-3), the "audiences" for each plainly were the FCA, other System institutions (given the joint-and-several liability aspects of the System), ratings agencies and securities investors. The fact that the FCA observed, when adopting the NCR, that "transparency" to the investment community was "not a significant consideration" because most capital in the System was held by members (*id.* at 17) does not suggest the intended audiences are different and render the ratios not comparable. Indeed, when CoBank issued the 2008 Notes, the fact that the investment community was an audience interested in CoBank's NCR (and other ratios) is plainly reflected by the detailed disclosure relating to the ratios (including the NCR) throughout the Offering Circular and oral and powerpoint presentations to potential investors. (*See, e.g.*, Novod Decl. Ex. 40 at 7665; Novod Decl. Ex. 58 at 2062, 2083-2084).) Plaintiffs' other "differences" similarly fail.[10]

---

[10] As to Plaintiffs' third alleged difference (that the ratios differ in terms of "quality of components" (Pl. Br. at 2), it is of no consequence, and hardly surprising, that successor regulations may treat different types of capital differently from the predecessor regime. That is often the point of new rules. If the ratios were required to have the "same quality of components" in order to be deemed "comparable," the "comparable" clause would be remarkably narrowed. And there is no basis in the voluminous FCA materials to suggest that ratios must share the same "quality of components" to be "comparable." To the extent Plaintiffs are asserting that the NCR measured only "the quantity of assets …, with no regard for the quality of those assets" (Novod Decl. Ex. 80 at 10), in adopting the NCR, the FCA expressly stated that "[a]s is clear from the list of assets that may count as collateral [in the numerator of the NCR], *only highly liquid investments qualify*," (Novod Decl. Ex. 92 at 39222 (emphasis added)) and such eligible assets in that calculation were required to be reduced "less an amount equal to the portion of affiliated associations' investments in the bank that is not counted in the bank's permanent capital." (RJN Ex. 6 at 39409; *see* repealed 12 C.F.R. § 615.5050.)

There is no competent evidentiary basis to conclude that Plaintiffs' fourth alleged difference (that the ratios use "different time periods of measurement") is relevant to a determination of whether two ratios are comparable as that term was directed by the FCA for use in the Regulatory Event definition.

And there is no competent evidentiary basis for Plaintiffs' fifth "difference" (that the "FCA modified the NCR for particular System banks" but lacks the ability to do so under the T1LR). (Pl. Br. at 2-3.) Indeed, there is no competent evidence, from the FCA materials or otherwise, to suggest that any of the five characteristics Plaintiffs reference are material to determining whether the T1LR is a "comparable" ratio under a successor regulation.

C.   Plaintiffs' Argument that the Term "Comparable" Should Be Construed Against CoBank Is Wrong on the Law and the Facts.

Plaintiffs assert that the term comparable "should be construed against CoBank" on the theory that "there was no discussion or negotiation regarding the term 'comparable,' or the clause including it" and CoBank "never disclosed the reason for its inclusion." (Pl. Br. at 19-20.) Plaintiffs suggest that any evidence offered by CoBank concerning the term thus must be deemed "irrelevant" on the ground it constitutes "uncommunicated subjective intent." (*Id.* at 20.) Plaintiffs' argument is untenable as a matter of fact and law.

First, Plaintiffs' assertion that the term should be construed against CoBank because CoBank was "the drafter" (*id.* at 16) is belied by the *only* evidence adduced as to the drafting of the "comparable" clause, as set forth in *Plaintiffs'* own 56.1 Statement, at paragraph 65:



(Pl. 56.1 ¶ 65 (citing Novod Decl. Ex. 33 at 105:15-106:17, 275:6-276:2); *accord* Regan Opp. Decl. Ex. 29 (Burlage Dep.) 94:18-22 ██████████████████ ███████████████████████████████ ████████████ Plaintiffs have adduced no evidence otherwise.

Second, even if CoBank were deemed "the drafter" of the Notes and Fiscal Agency Agreement, the doctrine of *contra proferentem* is inapplicable where the drafter's counterparties were represented by sophisticated counsel and "had meaningful opportunities to negotiate the contractual terms" irrespective of the fact that counterparties "did not make changes to the contractual language at issue." *Aircraft Servs. Resales LLC v. Oceanic Capital Co.*, 2013 WL

4400453, at *4 (S.D.N.Y. Aug. 14, 2013), *aff'd*, 586 F. App'x 761 (2d Cir. 2014); *D'Amato v. Five Star Reporting, Inc.*, 80 F. Supp. 3d 395, 412 (E.D.N.Y. 2015) ("[C]*ontra proferentem* does not apply in situations where, as here, both parties are represented by counsel and have meaningful opportunities to negotiate contractual terms."); *accord Mercury Partners LLC v. Pac. Med. Bldgs., L.P.*, 2007 WL 2197830, at *9 (S.D.N.Y. Jul. 31, 2007) (Pitman, M.J.); *Shadlich v. Rongrant Assocs., LLC*, 66 A.D.3d 759, 760 (2d Dep't 2009) ("[T]he rule that ambiguous language in a contract will be construed against the drafter is not applicable, because the subject lease resulted from negotiations between commercially sophisticated entities.") (citations omitted).

Here, the evidence of negotiation is overwhelming and there can be no genuine question that the entire Fiscal Agency Agreement, including the Regulatory Event provision, was negotiated by the parties thereto, all of whom were sophisticated and represented by sophisticated counsel. The 2008 Notes were initially purchased and underwritten by Lehman Brothers and Merrill Lynch & Co., represented by Sullivan & Cromwell LLP ("S&C"). (Pl. 56.1 ¶¶ 86-89; Regan Decl. Ex. 15 at 2407; Regan Opp. Decl. Ex. 29 (Burlage Dep.) 65:3-20; Regan Opp. Decl. Ex. 31 (McPhillips Dep.) 80:13-16, 119:21-120:6.) The Fiscal Agent, Bank of New York Mellon, was represented by Emmet, Marvin & Martin LLP ("EMM"). (Pl. 56.1 ¶¶ 90-91; Regan Decl. Ex. 10 at 17362; Regan Decl. Ex. 14 at 3; Regan Opp. Decl. Ex. 39 at 2155.) Each of S&C and EMM reviewed and commented on the transaction documents, including the Fiscal Agency Agreement. (*See* Pl. 56.1 ¶ 92; CoBank Resp. to Pl. 56.1 ¶¶ 92-93; *see also infra* note 12.) David Burlage, CoBank's 30(b)(6) witness, testified:

> I know that these documents were negotiated and – with a lot of drafts going back and forth and comments being made throughout…. There was a lot of review and discussion with underwriter counsel, with our counsel, even with the FCA. And so I know that there were

11

a number of drafts and documents and edits being made throughout
the document.

(CoBank Resp. to Pl. 56.1 ¶¶ 96-97; Regan Opp. Decl. Ex. 29 (Burlage Dep.) 36:3-37:5.)  Lest

there be any doubt, Mr. Burlage further testified: "I was personally aware that the entire

document was negotiated, *including the regulatory event language*.  So it was reviewed by all

those parties that you mentioned, and the comments were provided." (Regan Opp. Decl. Ex. 29

(Burlage Dep.) 77:19-23 (emphasis added).)[11]  He explained that "the document would have

been reviewed and discussed with all of those parties that you mentioned, *including [the*

*redemption right] paragraph*." (*Id.* at 87:18-88:18 (emphasis added).)  He again testified that

"the entire document was reviewed and discussed with outside counsel, underwriters' counsel,

[and] the FCA." (*Id.* at 91:4-7; 82:20-87:6.)[12]  Indeed, Mr. Burlage testified that ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (CoBank Resp. to Pl. 56.1 ¶ 85; *see also* Regan Opp. Decl. Ex. 29

---

[11] When asked, "Do you know if any – we've covered this already.  But do you personally know of any specific negotiation of this provision itself removed from the remainder of the contract?", after an objection by his counsel, Mr. Burlage responded "I have personal knowledge of the entire document being negotiated." (Regan Opp. Decl. Ex. 29 (Burlage Dep.) 77:25-78-8.)

[12] Susan McPhillips, CoBank's primary in-house counsel on the 2008 Notes issuance, similarly testified that the negotiation process was "a very kind of robust back-and-forth iterative process, where all the players and their counsel have an opportunity to review and comment on all of the documents and then, ultimately, sign off on the final versions…." (Regan Opp. Decl. Ex. 31 (McPhillips Dep.) 97:13-21.)  She also testified that while she did not "recall specific comments or discussions on [the] regulatory event language" other that the FCA's prior comments, "all the players and their counsel [had] an opportunity to review and comment on all of the documents and then, ultimately, sign off on the final versions", "this provision was a part of that overall negotiation" and "all the documents were subject to that negotiation process." *Id.* 98:4-5, 13-14; *see also id.* 69:6-70:4, 71:21-72:15 (testifying as to receipt of comments from S&C and EMM as reflected in Novod Decl. Exs. 64, 65).)  CoBank's then-CEO, Robert Engel similarly testified: "I do know from my conversations with Brian Jackson, who I empowered to lead the work on this, that there was discussion of a number of these items, certainly including the regulatory event redemption." (Regan Opp. Decl. Ex. 28 (Engel Dep.) 33:3-22.)  Plaintiffs present assertions, but no actual *evidence* to the contrary.

(Burlage Dep.) 94:18-22.)[13]  Moreover, at least one investor, Nationwide, "had a chance and

opportunity to review a preliminary offering circular for the 2008 [N]otes" before the 2008 Notes

were offered.  Regan Opp. Decl. Ex. 29 (Burlage Dep.) 92:13-93:8; *see also* Regan Opp. Decl.

Ex. 32 (Piper Dep.) 51:18-52:10, 62:8-17 (Nationwide credit analyst testifying that he received

"red version" of 2008 Offering Circular, which is "first version which gets to the street" and had

some "blank spots," and reviewed it prior to recommending Nationwide purchase the 2008

Notes); Regan Opp. Decl. Ex. 33 (Cunningham Dep.) 27:7-19 (Nationwide's corporate

representative testifying that a preliminary version of the 2008 Offering Circular was shared with

and reviewed by Nationwide).  (CoBank Resp. to Pl. 56.1 ¶ 106.)

> D.   Mr. Burlage's Statement that the New Rules Reflect a "Sea-Change" *in*
>      *Regulatory Capital Treatment of the 2008 Notes* Does Not Mean the T1LR Is Not
>      a "Comparable Regulatory Capital Requirement" Under the Successor
>      Regulation.

Plaintiffs argue that CoBank's CFO David Burlage "refer[red] to the adoption of a T1LR

as a 'sea-change' in the FCA's regulatory capital requirements" (Pl. Br. at 17) and claim that his

description of "the new regulations as a 'sea-change' ... undermines any argument that the two

ratios [are] 'comparable.'"  (*Id.* at 19; *see also id.* at 2.)  But Mr. Burlage's use of the word "sea-

---

[13] Insofar as Plaintiffs cite pages and lines 78:23-79:8 of Mr. Burlage's testimony (Regan Opp. Decl. Ex. 29), it does not support Plaintiffs' assertion.  The testimony was as follows:

| | |
|---|---|
| Q: | In your answer you said you're aware of the document as a whole being negotiated including this provision.  But do you have any *specific* knowledge of this provision itself being negotiated? |
| Mr. Regan: | Objection.  You can answer. |
| A: | Based on my personal knowledge? |
| Q: | Yes. |
| A: | I do not. |

Mr. Burlage's testimony merely reflects that – beyond what he had testified to – he did not have more "specific" "personal knowledge" of negotiations concerning the Regulatory Event definition.  And the fact that Mr. Burlage did not have more specific testimony is not evidence that bears on an element of Plaintiffs' claims.  Nor is it even remarkable.  Although Mr. Burlage was part of the deal team, (i) he was not CFO at the time the 2008 Notes were issued (*id.* at 18:7-10), (ii) he was "not responsible for corporate finance activities" at the time (*id.* 19:4-11), (iii) he "did not have primary responsibility for issuing third-party capital" (*id.* at 20:9-18), and (iv) negotiations of such terms were handled, unsurprisingly, by CoBank's outside and internal counsel.  (Regan Opp. Decl. Ex. 31 (McPhillips Dep.) 25:4-26:9.)

change" in responding to investors was not some admission that the NCR and T1LR are not comparable.

Mr. Burlage's letter stated that "[t]he new rules reflect a sea-change, substantive difference *in that subordinated debt no longer receives favorable regulatory capital treatment to allow CoBank to lever against the Note proceeds as capital.*" (*Id.* at 13 (emphasis added).) The sea-change was that favorable regulatory capital treatment of the 2008 Notes was lost under the new rules. (*See* CoBank 56.1 ¶¶ 35, 59; Novod Decl. Ex. 40 at 7654 (explaining CoBank issued the 2008 Notes "to increase its regulatory capital ratios …").) When asked by Plaintiffs' counsel at his deposition, "[W]hat do you mean by [a sea-change]?", Mr. Burlage explained "the sea-change refers to the difference in the way … subordinated debt would be treated …." (Pl. 56.1 ¶ 310; Regan Opp. Decl. Ex. 29 (Burlage Dep.) 340:6-341:2.) There is no evidence otherwise.

Indeed, the thrust of Mr. Burlage's letter was that a Regulatory Event *had* occurred and the ratios *are* comparable. (*See* Novod Decl. Ex. 79 at 26 (stating "The offering circular and Notes define Regulatory Event … to include 'receipt by us of a notification from the FCA, … to the effect that … none of the Notes shall any longer be eligible for … exclusion from total liabilities for purposes of calculating our net collateral ratio or any comparable regulatory capital requirements under any successor regulations' … [and] [a] Regulatory Event occurred on March 10, 2016, when we received notification from the FCA that it had adopted … the 'tier 1 leverage ratio' … [to] 'replace[] the existing net collateral ratio ….'") If Plaintiffs' theory were correct – such that a change in regulatory treatment would render the new ratio not comparable – the "comparable" clause that CoBank added at the request of the FCA would be a nullity. Permitting redemption in the event of a change in regulatory treatment was plainly the purpose of the Regulatory Event redemption option and clause.

14

E.    Plaintiffs' Argument that CoBank Did Not Disclose "the Reason for Inclusion of the 'Comparable' Term" Is Inapposite to Their Causes of Action.

Finally, Plaintiffs assert that CoBank "never disclosed the reason for … inclusion" of the "comparable" term. (Pl. Br. at 19.) As a threshold matter, this is a breach-of-contract case; the adequacy of CoBank's disclosures does not bear on whether a Regulatory Event occurred. Even assuming *arguendo* that CoBank's disclosures are somehow material to Plaintiffs' contract-based claims, the undisputed evidence shows CoBank disclosed to investors the entirety of the Regulatory Event redemption option, including the context for its inclusion, and the rules and procedures relevant to regulatory capital treatment changes. The statements included:

- That CoBank's purpose in issuing the 2008 Notes was to "use the net proceeds from the sale of the Notes to increase its regulatory capital ratios pursuant to FCA Regulations ...." (CoBank 56.1 ¶ 35; Regan Decl. Ex. 15 at 2416, 2426; Regan Decl. Ex. 26, ¶ 65.)

- That "CoBank may, at its option, redeem the Notes, in whole, following the occurrence of certain regulatory events as described herein ...." (Novod Decl. Ex. 40 at 7645; *see also id.* at 7654, 7659.)

- In the section entitled "Cautionary Statement Regarding Projections and Other Information about Future Events" (*id.* at 7647), a warning of:
  - "the effect of banking and financial services reforms" and
  - "possible amendments to, and interpretations of, risk-based capital guidelines and reporting instructions."

- In the "Summary" section, the terms that would constitute a Regulatory Event under the 2008 Notes (*id.* at 7654), which paragraph is repeated in the "Risk Factors" section (*id.* at 7659).

- In the "Risk Factors" section, the fact that CoBank is "subject to regulation under the Farm Credit Act", a description of the "rules and regulations" with respect to capital ratios (*id.* at 7660), and, in a section entitled "Minimum Regulatory Capital Ratios", a definition and description of the elements of each ratio and a warning that "[t]he FCA may, in the future, make adjustments to our Minimum Regulatory Capital Ratios" (*id.* at 7665).

### III.    **CoBank Did Not "Jump the Gun."**

A.    Plaintiffs' Theory that CoBank Lacked Information Sufficient to Conclude a
      Regulatory Event Occurred Is Belied by the Undisputed Facts.

In an effort to recover at least the proverbial half-a-loaf, Plaintiffs argue alternatively that

CoBank "jumped the gun" (Pl. Br. at 4) because it lacked the information necessary to know

whether a Regulatory Event occurred given "[t]he Fact Sheet did not set forth the entirety of the

final rule" but rather merely "provided a summary of the Final Rule ...." (Pl. Br. at 10, 11;

*accord id.* at 11 (asserting "[t]he Fact Sheet ... *did not* refer to the Notes[14], leaving the effect of

the final rule on their treatment unaddressed") (emphasis in original).)

Plaintiffs' assertion is unsustainable.  There can be no genuine dispute that, at the time

CoBank announced the redemption, it was clear how the 2008 Notes were to be treated under the

new capital regulations.  The 2014 Proposed Rule had stated that "a tier 1 leverage ratio ...

would replace the net collateral ratio." (CoBank 56.1 ¶ 40; RJN Ex. 7 at 52821.)  Thus, under

the Proposed Rule, the 2008 Notes would no longer be excluded from Total Liabilities for

purposes of calculating CoBank's NCR.  (RJN Ex. 7 at 52862.)  The T1LR was to be calculated

as Tier 1 Capital divided by Total Assets.  (CoBank 56.1 ¶ 41; RJN Ex. 7 at 52884.)  Thus, nor

would the 2008 Notes be excluded from Total Liabilities for purposes of calculating CoBank's

T1LR.  (*Id.*)  The Proposed Rule further made clear that the 2008 Notes would not qualify as

Tier 1 Capital (the numerator of the T1LR) because they were subordinated debt instruments,

which were classified as Tier 2 Capital.  (CoBank 56.1 ¶ 42; RJN Ex. 7 at 52862; Regan Decl.

Ex. 26 at ¶ 157.)  In sum, it was clear that in calculating the T1LR, the proceeds of the 2008

---

[14] That the Fact Sheet did not refer specifically to the 2008 Notes, by name or CUSIP number, plainly is immaterial.  It is absurd to posit that the FCA's publicly distributed Fact Sheet or News Release would for some reason refer to a particular institution's securities that had been issued nearly eight years prior.  These were widely disseminated documents from a federal governmental agency, directed to a diverse audience, including anyone who might be interested in the adoption of the new regulatory scheme.  There is no reason to expect that these documents might refer to the 2008 Notes in any manner beyond what was done.

Notes issuance would be included in the ratio denominator (Total Assets), while the 2008 Notes

obligation would not be included in the ratio numerator (Tier 1 Capital).  (CoBank 56.1 ¶¶ 42,

43; RJN Ex. 7 at 52821; *id.* at 52884 (§§ 628.10(c)(4)); Regan Decl. Ex. 26 ¶ 157; Regan Decl.

Ex. 16 at 2681-89; Regan Decl. Ex. 9 (Burlage Dep.) 202:4-18.)  The result was that the 2008

Notes would have the adverse effect of decreasing the new leverage ratio.

On March 10, 2016, the FCA issued the News Release stating that the FCA Board had

"adopted the Tier 1/Tier 2 Regulatory Capital Framework final rule," (RJN Ex. 17; Regan Decl.

Ex. 26 ¶ 92), along with the Fact Sheet.  (Regan Decl. Ex. 26 ¶¶ 82-94; Regan Decl. Ex. 16 at

2683, 2685.)  The Fact Sheet stated plainly that, under the Final Rule (as under the Proposed

Rule), subordinated debt, *i.e.*, the 2008 Notes, was classified as Tier 2 Capital, not Tier 1 Capital:

> §628.20 – Capital Components and Eligibility Criteria for
> Regulatory Capital Instruments:
>
> This provision sets forth the criteria ... to include capital
> instruments in CET1 capital, additional tier 1 capital, and tier 2
> capital.  The criteria are as follows: ...
>
> ▪ Tier 2 Capital consists of equities, which may be either common
> cooperative equities or equities held by third parties, that do not
> meet the tier 1 capital criteria, as well as qualifying subordinated
> debt and limited-life preferred stock.
>
> *These equities are unchanged from the proposed rule ....*

(RJN Ex. 18 at 2-3 (emphasis added); *see also* Regan Decl. Ex. 26 ¶ 87 (setting forth criteria and

treatment of various categories of capital under § 628.20 of new rules).)  And later that day,

CoBank's CFO, David Burlage, confirmed on a call with the FCA that ██████████████████

████████████████████████████████████████████████████████████████████

(CoBank 56.1 ¶ 52; Regan Decl. Ex. 18 at 2186-87.)

Based on all of this information, it was clear how the 2008 Notes were to be treated under

the new regulatory capital framework (the Final Rule) – they would no longer be "eligible for ...

exclusion from total liabilities for purposes of calculating [CoBank's] net collateral ratio." Nor would they be eligible for exclusion from Total Liabilities for purposes of calculating the comparable ratio under the successor regulation (the T1LR). To the contrary, in calculating the T1LR, the proceeds of the 2008 Notes issuance would be *included in the ratio denominator* (Total Assets), while the 2008 Notes obligation would *not be included in the ratio numerator* (Tier 1 Capital). (CoBank 56.1 ¶¶ 43, 59.)[15] The 2008 Notes thus would have the adverse effect of *decreasing* CoBank's leverage ratio (the T1LR), counter to their purpose. (RJN Ex. 9 at 49788 (§ 628.10(c)(4)); Regan Opp. Decl. Ex. 29 (Burlage Dep.) 198:18-200:23; 202:4-25, 203:7-204:16; Regan Decl. Ex. 26 ¶¶ 157, 162.)

Given these facts, it is irrelevant that the full text of the Final Rule had not been published in the Federal Register at the time CoBank announced the redemption.

B.   Plaintiffs' Theory that the Word "Shall" Means "Has a Duty To"
Would Render the Regulatory Event Provision Nonsensical.

Plaintiffs argue that the Regulatory Event provision's "inclusion of the word 'shall' in the phrase 'none of the [2008 Notes] shall any longer be eligible for ...', connotes a mandatory obligation." (Pl. Br. at 21.) Plaintiffs assert the word "shall" "is a mandatory term" and must be read to mean "[h]as a duty to" or "is required to." (Pl. Br. at 22.) But Plaintiffs never actually test or set forth how their "mandatory obligation" theory would read in application, and reading the Regulatory Event provision with the word "shall" defined as Plaintiffs advocate demonstrates the implausibility of their theory.

Under Plaintiffs' theory, the Regulatory Event provision would read as follows (the replacement term in bold-underlined):

"Regulatory Event" means the receipt by the Bank of a notification

---

[15] The leverage ratio is calculated under the T1LR by dividing Tier 1 Capital by Total Assets (T1LR = Tier 1 Capital / Total Assets). (CoBank 56.1 ¶ 41; RJN Ex. 9 at 49788 (§ 628.10).)

> from the [FCA] ... to the effect that, whether as a result of a change in applicable law or regulation or otherwise, none of the Securities **are required to** any longer be eligible for ... (ii) exclusion from total liabilities for purposes of calculating the Bank's net collateral ratio or any comparable regulatory capital requirements under any successor regulations.

Plaintiffs' reading would render the provision nonsensical.  Under the NCR, CoBank could exclude the 2008 Notes from its calculation of Total Liabilities (the denominator of the NCR), which increased CoBank's NCR.  It would be illogical for CoBank to have reserved an option to redeem in the event it received notification to the effect that "none of the securities *are required to any longer be eligible for*" exclusion.  CoBank was never "obligated" or "required" to exclude the 2008 Notes from Total Liabilities.  The exclusion beneficially increased CoBank's NCR.  It would be senseless to read the provision to have secured an option to redeem in the event CoBank was "no longer required to" exclude the 2008 Notes.[16]

Indeed, perhaps for this reason, Plaintiffs jump to a wholly different point — that "'shall any longer be eligible' simply means 'is no longer eligible.'" (Pl. Br. at 22, n. 10; *see also* Pl. Br. at 15 (asserting shall "indicates a present mandate").)  But there is no basis in any dictionary, or otherwise, for reading the word "shall" to mean "is."  Plaintiffs' unexplained and unsupported leap in logic from "shall means mandatory or must" to "shall means is or the opposite of futurity" reveals their argument for what it is — a hope that if Plaintiffs string together enough words and say them emphatically, perhaps the Court will believe "shall" means "the opposite of what CoBank says."  There is no basis in evidence or logic to support Plaintiffs' theory on this issue, and it must be rejected.

Plaintiffs also argue that, because the choice-of-law provision in the forty-five page Fiscal Agency Agreement provides that it "shall be construed" under New York law and

---

[16] The flaws and outcome are the same if one substitutes the word "must" rather than "are required to."

"connote[s] a mandatory action," it must hold the same meaning in the Regulatory Event

redemption provision.  It is unreasonable to assume that because the word "shall" serves one

purpose in the 2008 Notes' choice-of-law provision (Pl. Br. at 23), where "must" is a sensible

interpretation, that it should automatically be given the same meaning in some other, unrelated

section of the contract where having that meaning would render the provision nonsensical.[17]  For

the reasons presented in CoBank's motion for summary judgment, the use of "shall" in the

Regulatory Event provision is forward looking.[18]

> C.     Plaintiffs' Theory that the Word "Applicable" Means the 2008 Notes
>        Could Not Be Redeemed Until the T1LR Was "Effective" Is Baseless.

Plaintiffs argue that a Regulatory Event requires a change to an "applicable" regulation,

that "to give meaning to the word 'applicable,' the Security must be construed to require an

actual, effective change" (Pl. Br. at 21) and the regulation that "applied" on April 15, 2016 was

the NCR.  (*See id.* at 15 (arguing the word "applicable" "requires that the regulations must

change *first*, before the Notes may be redeemed") (emphasis in original); *see also id.* at 20-21.)

First, Plaintiffs entirely overlook the words "or otherwise."  (*See supra* p. 1.)  That

expansive term renders academic Plaintiffs' claims that there was no change in the "applicable

regulation."

---

[17] The cases upon which Plaintiffs rely in support of this notion are unavailing.  *Imation v. Koninklijke Philips Elec. N.V.*, actually supports CoBank's interpretation of the Regulatory Event redemption provision.  In that case, the court interpreted the definition of the word "subsidiaries" to include both subsidiaries existing at the time of the agreement, as well as future subsidiaries that might not yet be in existence.  586 F.3d 980, 988 (Fed. Cir. 2009).  This conclusion was reached because the contract contained, in related sections, the language "now or hereafter."  *Id.*  Similarly here, the forward-looking Regulatory Event language contemplates both regulatory changes that may occur in real-time, as well as those that might occur in the future.  *Finest Invs. v. Sec. Trust Co. of Rochester* is inapposite because the term applied with "consistent usage" throughout the agreement was the word "securing".  96 A.D.2d 227, 230 (4th Dep't 1983).  This is entirely reasonable because the agreement at issue was a mortgage, and the notion of "securing" in the context of a mortgage is a term of art.  In contrast, the word "shall", as used here, is not a term of art and cannot be construed so narrowly within a single document.

[18] Insofar as Plaintiffs' brief cites the Black's Law Dictionary definition of "shall" (Pl. Br. at 22) and the writings of Bryan Garner regarding use of the word "shall" (Pl. Br. at 22, n.10), they conspicuously omit that Black's recognizes that a common use of "shall" is to mean "[w]ill (as a future-tense verb)" (*see* Pl. 56.1 ¶ 320) and that Garner plainly states "*Shall* is commonly used as a future-tense modal verb." (*id.* ¶ 328-29) (italics in original).

Second, there is no basis in evidence or logic to conclude that "to give meaning to 'applicable,' the Security must be construed to require an actual, effective change ...." (Pl. Br. at 21.) Plaintiffs are reading new words into the Fiscal Agency Agreement. While Plaintiffs are correct that the old regulatory capital framework (including the NCR) "applied" on April 15, 2016, the question is whether CoBank had received notification regarding a change to that applicable regulation. The answer is obviously yes.

Third, akin to the disconnect between Plaintiffs' dictionary definition and their conclusion with respect to the word "shall", Plaintiffs' own cited definition of "applicable" does not support their conclusion. Black's Law Dictionary does not define "applicable" as "then-applying." As Plaintiffs note, it defines "applicable" as "capable of or suitable for being applied." (Pl. 56.1 ¶ 326.) There is no doubt that, in approving the new rules, the FCA Board manifested that the T1LR was "capable of or suitable for being applied" to CoBank.

## IV.   Plaintiffs Are Not Entitled to Summary Judgment on Their Claim for Breach of an Implied Covenant of Good Faith and Fair Dealing.

As a last-ditch effort, Plaintiffs conjure a theory that CoBank breached an implied good faith and fair dealing covenant because CoBank "actively participated" in and "encouraged" the eight-year public rulemaking process through which the FCA revised its regulatory capital framework and which culminated in a Regulatory Event. (Pl. Br. at 4, 5, 9, 25-26.) Plaintiffs' summary judgment motion on this claim must be denied for a variety of reasons.

"The covenant of good faith and fair dealing cannot be construed so broadly as to ... create independent contractual rights." *National Union Fire Ins. Co. v. Xerox Corp.*, 25 A.D.3d 309, 310 (1st Dep't 2006); *Warner Theatre Assocs. Ltd. P'ship v. Metro. Life Ins. Co.*, 1997 WL 685334, *6 (S.D.N.Y. Nov. 4, 1997) ("The duty of good faith cannot add to, detract from, or alter the terms of the contract itself."). Rather, the implied covenant encompasses only

21

"promises which a reasonable person in the position of the promisee would be justified in understanding were included." *Moran v. Erk*, 11 N.Y.3d 452, 457 (2008) (quotation omitted). [19]

> A.   As a Matter of Law and Fact, There Was No Implied Covenant to Refrain from Participation in the FCA's Regulatory Capital Rulemaking.

First, Plaintiffs do not cite any authority holding an implied covenant claim to be viable when predicated on one party's participation in a regulatory rulemaking by its primary regulator. Nor does it appear any such authority exists.[20]

Second, no "reasonable person ... would be justified in" believing CoBank impliedly agreed to not participate in rulemaking by the FCA, its "primary regulator" (Regan Decl. Ex. 14 at A-9), concerning its regulatory capital rules or that CoBank was obligated to refrain from taking positions that could eventually result in a Regulatory Event. This is especially so given that: (i) numerous "Federal financial regulatory agencies", including the FCA, had issued public Notices of Proposed Rulemaking with respect to new regulatory capital rules in the years and months preceding issuance of the 2008 Notes (Novod Decl. Ex. 44 at 61568-69); and (ii) as the 2008 Notes Offering Circular stated, CoBank is "subject to regulatory oversight by the FCA

---

[19] The three cases cited by Plaintiffs do not support their claim at all. In *M/A-COM Sec. Corp. v. Galesi*, 1989 WL 115953 (S.D.N.Y. Sept. 27, 1989), the Court granted summary judgment and dismissed the implied covenant claim on the ground that "the implied covenant of good faith principle does not give a party to a contract an absolute entitlement to be free from harm which stems from actions of the other party. Courts must also consider the other party's freedom to act on its own interests." *Id.* at *2, *aff'd*, 904 F.2d 134 (2d Cir. 1990). The other two cases are factually inapposite. In *JP Morgan Chase Bank, N.A. v. IDW Group, LLC*, 2009 WL 321222 (S.D.N.Y. Feb. 9, 2009), the Court found that an implied covenant claim could withstand a 12(b) motion where the defendant search firm had been retained expressly to help plaintiff add employees to its business and plaintiff alleged defendant had an implied obligation to inform plaintiff that it had been hired by another company to poach a department head away from plaintiff's business. *Id.* at *1, 7. In *Empresas Cablevision, S.A.B. de C.V. v. JP Morgan Chase Bank, N.A.*, 680 F. Supp. 2d 625 (S.D.N.Y. 2010), the Court granted a preliminary injunction based on an implied covenant where the plaintiff had an express contractual veto right over assignment of the parties' loan agreement and, after the plaintiff expressly declined to consent to assignment, the defendant "used the guise of a purported 'participation' to effectuate what is in substance a forbidden assignment ... to give [the assignee] exactly what the assignment veto ... was designed to prevent." *Id.* at 631.

[20] It is doubtful that an *implied* covenant claim could ever be viable when premised on exercise of a Constitutional right, *i.e.,* petitioning a regulator in a rulemaking process. *Cf. Davis v. Elec. Arts Inc.*, 2011 WL 2621626, at *7 (N.D. Cal. Jul. 5, 2011) ("[A] defendant who in fact has validly contracted not to speak or petition has in effect 'waived' the right ...[h]owever, the Supreme Court has held that 'a waiver of constitutional rights in any context must, at the very least, be clear. ... In other words, a contract must show waiver of a constitutional right on its face.") (citing *Fuentes v. Shevin*, 407 U.S. 67, 95 (1972)). Here there was no such "clear waiver."

22

under the Farm Credit Act" (Novod Decl. Ex. 40 at 7660), CoBank warned "[t]he FCA may, in the future, make adjustments" to its regulatory capital rules (*id.* at 7665), and CoBank reserved the option to redeem the 2008 Notes should there occur a change in such rules constituting a Regulatory Event (*id.* at 7645 (cover page)). *See M/A-COM Sec. Corp.*, 1989 WL 115953, at *3 (granting summary judgment against implied covenant claim and observing "if … such [constraints were in the parties'] contemplation … such a provision relating thereto should have been incorporated into the … Agreement").

Third, Plaintiffs' theory lacks credulity because it amounts to a claim that, roughly concurrent to its decision to issue the 2008 Notes, CoBank and the rest of the System initiated or drove a massive, nearly decade-long rulemaking process so CoBank could redeem those 2008 Notes. Said simply, it makes no sense. (*See* Regan Opp. Decl. Ex. 30 (Jackson Dep.) 180:21-23 ("[W]e had regular liquid and very efficient, from a price perspective, access to the agency debt markets through the funding corporation . . . .").) Moreover, there is no evidentiary basis to suggest that CoBank somehow could have, or did, control not only the other member institutions of the Farm Credit System but also its regulator, all in order to be able to redeem its 2008 Notes. Plaintiffs' conjecture and gossamer-thread conspiracy theory ignores the plain reality that adoption of the Final Rule was driven by interests far beyond the 2008 Notes, and the treatment of subordinated debt was but one very small aspect of the rulemaking. *Id.* (observing lack of "causality" in granting summary judgment against implied covenant claim). No reasonable fact-finder could accept such an absurd tale.[21]

---

[21] Indeed, Plaintiffs' theory is further belied by the fact that, given the FCA's ███████████████████████████████ ██████████████ (Regan Decl. Ex. 10 at 17970), had it been CoBank's goal to cause a Regulatory Event, a far simpler means would have been to seek to have the FCA "change its mind" on that issue.

Fourth, in direct contravention of any suggestion or inference that CoBank was keen to drive forward the new rules to trigger a Regulatory Event, the undisputed evidence shows that CoBank and the System institutions repeatedly advocated for the FCA to suspend, slow down or delay a rule change.  For example, on May 30, 2013, the FCS Capital Workgroup highlighted its position that the "FCA should not get ahead of other regulators' capital rulemakings", and to that end "[t]he workgroup has encouraged the FCA staff to *slow down and await the commercial bank regulators* and European regulators before submitting a proposed capital rule to their board." (CoBank Resp. to Pl. 56.1, at Cntrstmnt. ¶ 1; Novod Decl. Ex. 66 at 3 (emphasis added).)  On June 18, 2013, CoBank's CFO, Mr. Burlage, on behalf of the FCS Capital Workgroup and the President's Planning Committee, submitted a letter requesting the FCA Board delay even considering a proposed rule until later in 2013 or early 2014, providing time to gather and digest information and analyze potential impacts.  (CoBank Resp. to Pl. 56.1, at Cntrstmnt ¶ 2; Novod Decl. Ex. 47 at 15682 (email from Burlage to Workgroup discussing letter).)  And, in a March 30, 2015 letter, the Farm Credit Council requested that the FCA reopen the comment period on the Proposed Rule, which the FCA did.  (CoBank Resp. to Pl. 56.1, at Cntrstmnt ¶ 3; RJN Ex. 8 at 35888-89.)

B.    Plaintiffs Cannot Maintain an Implied Covenant Claim on the Theory that
      <u>CoBank Failed to Request Continued Favorable Treatment of the 2008 Notes.</u>

Plaintiffs alternatively posit that CoBank breached an implied covenant because it "never requested that the FCA grant the Notes regulatory capital treatment akin to that which it had requested when it issued the Notes." (Pl. Br. at 26; *id.* at 5 ("CoBank never sought a similar accommodation for the Notes under the *TILR*") (emphasis in original); *id.* at 9 ("CoBank never asked ...").)

24

First, Plaintiffs cannot have it both ways.  It cannot be that CoBank was prohibited from participating in the rulemaking process or, if that theory fails, CoBank was required to participate and ask for specific treatment of the 2008 Notes under the new rules.

Second, Plaintiffs' theory is based on a false premise that CoBank originally obtained "special treatment" or "special dispensation" from the FCA to exclude the 2008 Notes from total liabilities for purposes of calculating the NCR (and thus should have sought "special treatment" under the Final Rule).  (Pl. Br. at 5, 7, 9, 24-25, 26.)  The documents show CoBank "request[ed] that the FCA review the enclosed materials and *confirm* the following regulatory treatment for the Sub Debt: … (iii) exclusion of the Sub Debt from total liabilities for purposes of calculating our net collateral ratio under §615.5301 and §615.5335 of the FCA Regulations."  (Novod Decl. Ex. 71 at 18860) (emphasis added); Regan Opp. Decl. Ex. 40 (Jacob Dep.) 42:9-25.)

Finally, as Plaintiffs' own 56.1 Statement acknowledges, in an August 2013 meeting with the FCA, Mr. Burlage in fact "████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████" (Pl. 56.1 ¶ 207.)  Thus, it appears Plaintiffs (who never bothered to participate in the public rulemaking process themselves) mean CoBank didn't ask "enough."  A theory that an implied covenant required CoBank to have "asked more" is not viable.

*   *   *

To grant Plaintiffs' motion would require the Court to ignore the full plain language of the 2008 Notes, the undisputed facts regarding the circumstances in which the 2008 Notes were issued and the Regulatory Event language was drafted, and the stated purpose of the 2008 Notes, which was to increase CoBank's leverage ratios.

25

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion.

Dated: New York, New York
       April 30, 2018

                                    Respectfully submitted,

                                    By: */s/ Shawn Patrick Regan*
                                        Shawn Patrick Regan
                                        Joseph J. Saltarelli
                                        Peter Mustalish
                                        Jennifer L. Bloom
                                        Silvia N. Ostrower
                                        HUNTON ANDREWS KURTH LLP
                                        200 Park Avenue, 52nd Floor
                                        New York, New York 10166
                                        (212) 309-1000

                                        *Attorneys for Defendant CoBank, ACB*

26

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on April 30, 2018, I served the foregoing on all counsel of record registered with the Court's ECF system, by electronic service via the Court's ECF transmission facilities, and by electronic mail.


<u>/s/ Shawn Patrick Regan</u>
Shawn Patrick Regan