UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

AMCO INSURANCE COMPANY, *et al.*,

            Plaintiffs,

        v.                                          No. 16-cv-4422-LTS-HBP

COBANK, ACB,

            Defendant.

---

## PLAINTIFFS'[1] REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AS TO LIABILITY

---

[1]   Plaintiffs are AMCO Insurance Company, American Family Life Assurance Company of Columbus, Americo Financial Life and Annuity Insurance Company, Athene Annuity and Life Company, Bank of Utica Investment Subsidiary, Ltd., Beaumont Health, Bio-Rad Laboratories, Inc., Continental Casualty Company, Crestbrook Insurance Company, Dedham Institution for Savings, Ephrata National Bank, Erie Family Life Insurance Company, Federated Life Insurance Company, Great Southern Life Insurance Company, Health Care Service Corporation, Metropolitan Life Insurance Company, Mutual of America Life Insurance Company, Nationwide Life and Annuity Insurance Company, Nationwide Life Insurance Company, Nationwide Mutual Insurance Company, The Northwestern Mutual Life Insurance Company, Ohio National Life Assurance Corporation, The Ohio National Life Insurance Company, Scottsdale Insurance Company, Scottsdale Surplus Lines Insurance Company, Tauck, Inc., Thrivent Financial for Lutherans, Veterinary Pet Insurance Company, Victoria Fire & Casualty Company, and Waukesha State Bank.

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ......................................................................................... 1

ARGUMENT .................................................................................................................... 2

I.     COBANK CANNOT ESTABLISH THAT A REGULATORY EVENT OCCURRED ....................................................................................................... 2

     A.    CoBank Does Not Dispute that No Regulatory Event Occurred Under the Plain Terms of the Security .................................................................. 2

     B.    CoBank Has Not Established that a Regulatory Event Occurred Under Its Own Rewrite of the Security ........................................................................ 3

II.    THE NCR AND T1LR ARE NOT COMPARABLE .................................................. 3

     A.    The "Circumstances" of Adding the "Comparable" Clause Are Irrelevant .......... 4

     B.    The Doctrine of *Contra Proferentem* Applies ................................................ 4

     C.    That the Two Ratios Are Both Non-Risk Weighted Leverage Ratios Is Not Dispositive of Comparability .................................................................. 7

     D.    The "Comparable" Text Is Not a Nullity ........................................................ 9

     E.    CoBank's Failure to Disclose the FCA's Mandate to Include the "Comparable" Text Is Fatal to Its Argument .................................................. 10

III.   AT A MINIMUM, COBANK CONDUCTED THE REDEMPTION PREMATURELY, WHICH CONSTITUTES A BREACH ........................................... 11

     A.    The Lack of Detail in the Fact Sheet Is Relevant to Understanding that No Regulatory Event Occurred Until the Final Rule Issued ...................................... 11

     B.    Under the Regulatory Event Text, No Redemption Could Occur Until the Final Rule Became Effective .................................................................... 12

IV.   COBANK BREACHED THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING ........................................................................................ 15

CONCLUSION ................................................................................................................ 16

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Aircraft Servs. Resales LLC v. Oceanic Capital Co., Ltd.,
2013 WL 4400453 (S.D.N.Y. Aug. 14, 2013, *aff'd*, 586 F. App'x 761 (2d. Cir.
2014) ..............................................................................................................6

D'Amato v. Five Star Reporting, Inc.,
80 F. Supp. 3d 395 (E.D.N.Y. 2015) .............................................................6

Harris v. Union Elec. Co.,
685 S.W.2d 607 (Mo. Ct. App. 1985) ............................................................6

Harris v. Union Elec. Co.,
787 F.2d 355 (8th Cir. 1986) .........................................................................6

James L. Turkle Trust v. Wells Fargo & Co.,
2012 WL 2568208 (N.D. Cal. July 2, 2012) ..........................................13, 14

James L. Turkle Trust v. Wells Fargo & Co.,
602 Fed. App'x 360 (9th Cir. 2015) .............................................................14

Kaiser Aluminum Corp. v. Matheson,
681 A.2d 392 (Del. 1996) ..........................................................................4, 6

Mercury Partners LLC v. Pac. Med. Bldgs., L.P.,
2007 WL 2197830 (S.D.N.Y. July 31, 2007) .................................................6

Morgan Stanley Grp. Inc. v. New England Ins. Co.,
225 F.3d 270 (2d Cir. 2000) ....................................................................5, 14

Prescott, Ball & Turben v. LTV Corp.,
531 F. Supp. 213 (S.D.N.Y. 1981) ................................................................6

Shadlich v. Rongrant Assocs., LLC,
66 A.D.3d 759 (2d Dep't 2009) .....................................................................6

U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Local Union Number 3,
2006 WL 2136249 (S.D.N.Y. Aug. 1, 2006) ..................................................2

Zimmerman v. Crothall,
62 A.3d 676 (Del. Ch. 2013) .........................................................................6

**Other Authorities**

12 C.F.R. § 615.5301 (2016) .........................................................................16

12 C.F.R. § 615.5335 (2016) .........................................................................16

Fed. R. Civ. P. 56...........................................................................................1

Local Civil Rule 56.1......................................................................................2

Restatement (Second) of Contracts, § 206 (1981)......................................4, 5

11 James Wm. Moore et al., Moore's Federal Practice §56.14[4][a] ............2

Plaintiffs respectfully submit this reply memorandum of law in further support of their motion pursuant to Fed. R. Civ. P. 56 for summary judgment as to Defendant CoBank, ACB's ("CoBank") liability. For the following reasons, Plaintiffs' motion should be granted.

## PRELIMINARY STATEMENT

Entirely missing from CoBank's opposition is any argument about the plain language of the Regulatory Event definition.[2] This is because CoBank's position disregards the plain language of the Security in favor of what CoBank *wishes* the contract stated: that a Regulatory Event occurs when the Notes no longer increase CoBank's leverage ratio. *See* CoBank's Memorandum of Law in Opposition to Plaintiffs' Motion for Summary Judgment, ECF 128 ("Def. Opp.") at 5, 6, 14. But the Regulatory Event definition makes no mention of increasing a leverage ratio, or favorable capital treatment of the Notes, or CoBank's purported "purpose" for issuing the Notes. CoBank's contractual revisions must be rejected. Applying the plain language of the Security, the obvious conclusion is that CoBank breached that agreement.

To distract from this, CoBank portrays Plaintiffs' position as boiling down to two alleged misstatements, one regarding the portion of the Regulatory Event definition[3] pertaining to *when* a Regulatory Event occurs, and the other regarding the FCA's March 10, 2016 issuance of the News Release and Fact Sheet. *See* Def. Opp. at 2-3. These attacks fail because Plaintiffs have shown that no Regulatory Event occurred under the contract's *plain terms*.

In any event, CoBank's position vis-à-vis those two issues is incorrect. As explained *infra* § I.A, a plain reading of the contract supports Plaintiffs' conclusion that a Regulatory Event could not precede the T1LR taking effect; it *does not* require inserting the word "when." Further, Plaintiffs do not mischaracterize the News Release and Fact Sheet. CoBank does not dispute that

---

[2]   Capitalized terms not defined herein have the meaning given to them in Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment as to Liability, ECF 119 ("Pl. Br.").

[3]   Plaintiffs, in fact, accurately quote this entire provision in their brief. *See* Pl. Br. at 7.

these documents were not the Final Rule, and that it redeemed the Notes before the Final Rule

became effective *and before its text was even final*.

Finally, CoBank takes issue with the *number* of material facts Plaintiffs set forth, *see* Def.

Opp. at 1, yet it disputes only 8.5% of them. *See* CoBank's Response to Plaintiffs' Statement of

Undisputed Material Facts Pursuant to Local Rule 56.1, ECF 130 ("R-SUMF") (disputing 35 of

410 facts).[4] CoBank's primary response to Plaintiffs' facts is to argue (improperly)[5] that they are

immaterial. Thus, CoBank's claim that a jury would have to find in Plaintiffs' favor on 410 facts,

Def. Opp. at 1, is clearly wrong, as CoBank purports to dispute only 35 of them.

## ARGUMENT

### I.   COBANK CANNOT ESTABLISH THAT A REGULATORY EVENT OCCURRED

#### A.   CoBank Does Not Dispute that No Regulatory Event Occurred Under the Plain Terms of the Security

CoBank's summary judgment briefing entirely avoids the plain terms of the Regulatory

Event definition. Its whole argument hinges on the Court accepting its view that, under the Final

Rule, the Notes decreased its T1LR, and thus the purported "regulatory benefits" CoBank

derived from the Notes were lost, causing a Regulatory Event. However, the "Regulatory Event"

---

[4]   CoBank also makes the baseless argument that the number of Plaintiffs' facts is reason to deny Plaintiffs' motion. Def. Opp. at 1. While Local Rule 56.1 calls for a "short" and "concise" statement of "material facts," it does not create an arbitrary ceiling on their number. Further, CoBank asserts that Plaintiffs set forth facts that are not "material." Def. Opp. at 1. That, however, is for the Court to decide, and thus CoBank's lengthy arguments regarding materiality, *see* R-SUMF, are improper and should be stricken. *See* Memorandum of Law in Support of Plaintiffs' Motion to Strike in Part Defendant's Response to Plaintiffs' Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 (the "Motion to Strike") filed contemporaneously herewith. For clarification purposes, Plaintiffs note that the SUMF contains three paragraphs stating "intentionally omitted" (*see* SUMF ¶¶ 185, 300, 327) reducing the total number of factual paragraphs to 410.

[5]   As discussed more fully in the Motion to Strike, Plaintiffs' believe that CoBank improperly disputes 21 of the 35 factual paragraphs. *See* Motion to Strike, Sections V and VI concerning R-SUMF ¶¶ 43, 44, 57-58, 61-62, 75, 96, 107-08, 112-13, 118, 129-30, 250-51, 258, 359, 397, 413. A "motion to strike is appropriate vehicle to challenge admissibility of summary judgment materials." *U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Local Union Number 3*, 2006 WL 2136249, *4 (S.D.N.Y. Aug. 1, 2006) (citing and summarizing *Glynn v. Bankers Life and Casualty Co.*, 2005 WL 2028698, at *1 (D. Conn. Aug. 23, 2005)); *see also* 11 James Wm. Moore et al., Moore's Federal Practice §56.14[4][a] (same)).

definition is quite specific, and does not speak generally about increasing or decreasing ratios, "regulatory benefit[s]," "beneficial effects," "change[s] in regulatory treatment," or the supposed "purpose[s] of the Regulatory Event option and clause." Def. Opp. at 5, 6, 14. CoBank is seeking to rewrite the Regulatory Event definition entirely. *See* Pl. Br. at 7-9 and cases cited therein.

### B.   CoBank Has Not Established that a Regulatory Event Occurred Under Its Own Rewrite of the Security

CoBank has proffered no evidence that under the Final Rule, the Notes decrease its T1LR. For that to be true, CoBank would have to prove that "in calculating the T1LR, the proceeds of the [] Notes issuance [are] included in the ratio denominator (Total Assets)." Def. Opp. at 5. However, there is no evidence that the cash proceeds of the Notes, received by CoBank in 2008, remained in its coffers in 2016. Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment, ECF 124 ("Pl. Opp.") at 13-14. Thus, such proceeds could not have been included in "the ratio denominator (Total Assets)," *see* Def. Opp. at 5, and there was no "regulatory benefit," *see id.* at 6, the loss of which, CoBank argues, constituted a Regulatory Event. Therefore, even assuming *arguendo* the validity of CoBank's *post hoc* revision of the Regulatory Event provision, CoBank *still* cannot justify the Redemption, because it has not demonstrated with evidence that the Notes decrease its T1LR or that the adoption of the T1LR eviscerated any purported "benefit" that it enjoyed as of 2016.

## II.   THE NCR AND T1LR ARE NOT COMPARABLE

Even if CoBank's contractual revision is proper (which it is not), and even if the Notes decreased CoBank's T1LR (of which there is no evidence), CoBank must prove that the T1LR is "comparable" to the NCR. The undisputed facts show, however, that the T1LR is unlike the "unique capital ratios," such as the NCR, that preceded it. SUMF ¶ 181; *see also* Pl. Br. at 16-20.

## A.    The "Circumstances" of Adding the "Comparable" Clause Are Irrelevant

CoBank falls back on its position that the FCA purportedly asked it to add the "comparable" text to the Regulatory Event provision *in 2007*, when the FCA was "considering . . . supplement[ing] [its] risk-based capital rules with a minimum capital leverage ratio," SUMF ¶ 153, and thus the FCA must believe that the T1LR adopted *in 2016* was comparable to the NCR. Def. Opp. at 7-8. CoBank's argument fails for two reasons. *First*, as a non-party to the agreement, the FCA's purported beliefs are irrelevant to interpreting the Security. *Second*, there is no evidence that the FCA considered the NCR and the T1LR to be comparable in 2007, when the FCA allegedly instructed CoBank to add the "comparable" text (with respect to *different* securities), or in 2008, when the Notes were issued.

## B.    The Doctrine of *Contra Proferentem* Applies

CoBank asserts that the doctrine of *contra proferentem* is not applicable when interpreting the "comparable" clause because the FCA told CoBank to include it, and thus CoBank was not "the drafter." Def. Opp. at 10. CoBank does not, however, assert that the FCA was "the drafter," nor could it, as such a role cannot be imputed to a non-party to the contract. CoBank does not dispute that it added the "comparable" clause; it merely disclaims responsibility for that choice. Of the parties to the contract, it was only CoBank that allegedly discussed this text with the FCA and that chose to employ such text for the Notes, yet did not disclose its reason for doing so. CoBank, therefore, was "the party choosing the terms of the contract," and was "more likely than the other party to have reason to know of uncertainties of meaning." *See* Restatement (Second) of Contracts ("Restatement"), § 206 (1981). It is clear that CoBank "[was] better able to clarify unclear bond contract terms in advance . . . and therefore should bear the drafting burden that the *contra proferentem* principle would impose upon it." *See Kaiser Aluminum Corp. v. Matheson*, 681 A.2d 392, 398-99 (Del. 1996) (citation and internal

quotations omitted); *see also* Restatement, § 206 (noting that a drafter "may leave meaning deliberately obscure, intending to decide at a later date what meaning to assert"). The rationale of *contra proferentem* thus applies with full force.

CoBank also argues that the doctrine does not apply because the "drafter's counterparties were represented by sophisticated counsel" and had an opportunity to negotiate contractual terms. Def. Opp. at 10-11. CoBank's argument fails for three reasons. *First*, "there is no general rule in New York denying sophisticated businesses the benefit of *contra proferentem*." *Morgan Stanley Grp. Inc. v. New England Ins. Co.*, 225 F.3d 270, 279 (2d Cir. 2000) (citations omitted).

*Second*, CoBank offers no evidence that the "comparable" text was negotiated. CoBank's evidence shows only that the contract was generally negotiated. Def. Opp. at 11-12 (citing testimony that "the entire document was negotiated," and that "the document *would have* been reviewed and discussed") (emphasis added).[6] CoBank expects the Court to infer that the "comparable" text must have been negotiated, too. But CoBank's emphatic observation that "*the FCA commented on the Regulatory Event Definition*," Def. Opp. at 12 (emphasis in original)—the *only* comment on this provision that CoBank identifies[7]—underscores that the *parties* (as opposed to the FCA) did *not* negotiate this point. Indeed, under CoBank's view that the text was mandated by the FCA—which CoBank did not disclose at the time, and which has not been confirmed by any other party—the text was non-negotiable.

*Third*, it is undisputed that Plaintiffs had no role whatsoever in the negotiations of the Notes. By contrast, in all of the cases cited by CoBank, the *plaintiff* negotiated the instrument

---

[6]   CoBank cites testimony demonstrating only that Mr. Burlage was an evasive deponent, such as when he was asked directly if ████████████████████████████████ Mr. Burlage responded that ███████████████████████████████████████████ " Def. Opp. at 12, n.11. The takeaway from that testimony is that Mr. Burlage ████████████████████████████████████████████████████████████ .

[7]   The purported telephone call between the FCA and CoBank during which this comment was made was, moreover, in reference to a *wholly distinct* securities issuance. SUMF ¶ 65.

giving rise to its claims; none of those cases involve negotiations between a securities issuer and an underwriter that would merely resell the securities immediately, nor even a party asserting rights under a contract it was excluded from negotiating.[8] Here, the negotiations of the underwriters and fiscal agent cannot be imputed to Plaintiffs: the fiscal agent, of course, was an agent of *CoBank's* under the Fiscal Agency Agreement, and CoBank identifies no evidence that the underwriters were negotiating on behalf of investors with respect to the "comparable" clause. CoBank did not disclose critical information underlying its drafting of that text, and neither the fiscal agent nor the underwriters sought to change (or even inquired about) it. Indeed, because the underwriters planned to resell the Notes immediately, "[w]hether these parties can legitimately be viewed as 'negotiating' . . . provisions is a subject of some dispute." *See Kaiser*, 681 A.2d at 398 (citations omitted). Thus, courts are apt to construe terms strictly in favor of investors against securities issuers. *See Prescott, Ball & Turben v. LTV Corp.*, 531 F. Supp. 213, 217 (S.D.N.Y. 1981) (holding that *contra proferentem* rule required defendant issuer to show that bond indenture "unambiguously" supported its position); *Harris v. Union Elec. Co.*, 787 F.2d 355, 365 n.7 (8th Cir. 1986) (in light of omitted facts regarding "the call protection of the bonds," the prospectus, "having been drafted by [the issuer], should be interpreted and construed liberally in favor of the investors, and strictly against [the issuer]");[9] *Zimmerman v. Crothall*, 62 A.3d 676, 699 (Del. Ch. 2013) (interpreting instrument against issuer and "in favor of the meaning a reasonable investor would" perceive).

---

[8]   *See Aircraft Servs. Resales LLC v. Oceanic Capital Co., Ltd.*, 2013 WL 4400453 (S.D.N.Y. Aug. 14, 2013), *aff'd*, 586 F. App'x 761 (2d. Cir. 2014) (purchase agreement negotiated between seller and purchaser of helicopters); *D'Amato v. Five Star Reporting, Inc.*, 80 F. Supp. 3d 395, 412 (E.D.N.Y. 2015) (employer and employee negotiated employment agreement); *Mercury Partners LLC v. Pac. Med. Bldgs., L.P.*, 2007 WL 2197830 (S.D.N.Y. July 31, 2007) (retainer agreement negotiated between company and financial advisor); *Shadlich v. Rongrant Assocs., LLC*, 66 A.D.3d 759, 760 (2d Dep't 2009) (lease agreement negotiated between commercial tenant and landlord).

[9]   Related proceedings make clear that this case concerned an underwritten securities offering. *Harris v. Union Elec. Co.*, 685 S.W.2d 607, 608 (Mo. Ct. App. 1985).

Further, evidence that one Plaintiff, Nationwide, had the "opportunity to review a preliminary offering circular for the . . . [N]otes," Def. Opp. at 13, does not negate the fact that *CoBank* drafted the "comparable" text. Nationwide was merely a purchaser of the Notes, and CoBank does not even attempt to establish that Nationwide or any other Plaintiff did, or could, play a role in drafting or negotiating the Security.

### C.   That the Two Ratios Are Both Non-Risk Weighted Leverage Ratios Is Not Dispositive of Comparability

Plaintiffs and their expert explained in detail the many characteristics of the T1LR that render it non-comparable to the NCR.[10] Pl. Br. at 16-20; Novod Decl., Ex. 80. CoBank offers only half-hearted, simplistic responses.[11]

*First*, as explained by Dr. Kan, and shown by FCA regulations, the intended audiences for the NCR and the T1LR are different. Pl. Br. at 17-18; Novod Decl., Ex. 80 at 4, 9-11, 12, 17, 19-20. CoBank contends otherwise. Def. Opp. at 9. Oddly, CoBank claims (without evidence) that the FCA (which imposed the regulations) and other System institutions (on which the regulations were imposed) are themselves audiences for each of these regulatory capital requirements. This, of course, sheds no light on the substance of the requirements. Moreover, it ignores the FCA's clear intention, as urged by System members (including CoBank), to discard

---

[10]   CoBank asserts that Dr. Kan's opinion is not material or authoritative. Def. Opp. at 8. However, CoBank made no motion to exclude Dr. Kan's testimony, and thus it is admissible. Moreover, Kan's experience with the NCR and the FCA does not render his opinion immaterial. It simply results from the fact that prior to the regulatory change, *most* of the investing community was not familiar with the NCR. *See* Declaration of Shawn Patrick Regan in Opposition to Plaintiffs' Motion for Summary Judgment (ECF 131), Ex. 35 (Kan Dep.) 96:22-97:2 (regarding the NCR: "Nobody knows about it in the commercial banking or in the institutional investment space."). This was a primary reason for the adoption of the T1LR. Indeed, Dr. Kan's qualifications concerning, and work experience with, *better known* leverage ratios (including tier 1 leverage ratios), renders his opinion highly material. *See* Declaration of Gordon Z. Novod in Support of Plaintiffs' Motion for Summary Judgment (ECF 103) ("Novod Decl."), Ex. 80 (Expert Report of Ozgur B. Kan, PhD, CFA, FRM) at 2-3, app. A).

[11]   CoBank's description of Plaintiffs' reliance on a myriad of differences between the NCR and T1LR as "myopic," Def. Opp. at 6, is puzzling, especially considering that CoBank relentlessly relies upon the ***sole*** similarity between the two ratios—that they are non-risk weighted leverage ratios—to support its argument that they are comparable. Def. Opp. at 8-9; Memorandum of Law in Support of CoBank's Motion for Summary Judgment, ECF 109, at 1, 4, 11, 16-17.

its old regulatory capital regime in favor of entirely different one that would be intelligible to "ratings agencies and investors," *see* SUMF ¶ 166, that is, entities *external* to the System community. To that point, CoBank notes "the detailed disclosure relating to the ratios (including the NCR)" it made when issuing the Notes. Def. Opp. at 9. Despite this "detail[]," however, CoBank and other System institutions pushed for "definitions of capital and regulatory ratios . . . consistent with regulations of other regulators," as "[o]btaining capital at competitive terms, conditions and rates requires [rating agencies and investors to] understand the System's and individual institution's financial position." SUMF ¶ 166; *see also id.* ¶ 181 (Burlage stated in 2012 that "[m]uch time is spent today educating investors and rating agency analysts about our unique capital ratios").

*Second*, Plaintiffs explained that the "quality" of the components of the NCR and T1LR differs. Pl. Br. at 18-19. CoBank does not dispute this; rather, CoBank concedes that this was the "point" of the Final Rule, Def. Opp. at 9 n.10, thus leading to the logical conclusion that the T1LR and NCR are *not comparable.* That a new regulation was necessary to modify the quality of components included in its calculation makes the substantial differences between the two ratios clear. CoBank asserts that if the quality of the components comprising the NCR and T1LR had been held constant, the "comparability" clause would have been "remarkably narrowed." Def. Opp. at 9, n.10. However, CoBank offers no evidence that the "comparability" clause should not be narrowly construed. In fact, because CoBank drafted the text, a narrow construction is proper. *See* Pl. Br. at 19-20.

*Third*, Plaintiffs identified the different purposes of the T1LR and NCR. Pl. Br. at 17-18. CoBank does not dispute the facts supporting Plaintiffs' argument, which hinge on the FCA's own statements. *See* R-SUMF ¶¶ 217-224, 247, 263, 266-269. CoBank counters that because

both ratios are non-risk weighted leverage ratios, they must serve the same purpose. Def. Opp. at 8-9. However, as Plaintiffs showed, this one similarity does not render the ratios comparable, particularly because the *components* that are not risk-weighted are quite different. Pl. Opp. at 14-15. Moreover, there is no evidence regarding the FCA's decision to retain a non-risk weighted measure, so no conclusions regarding comparability can be drawn from the fact that the T1LR is not risk-weighted. *Id.* at 15. Plaintiffs also demonstrated that the two ratios have different temporal characters, Pl. Br. at 18, and that the FCA could modify the NCR, but not the T1LR. *Id.* at 19. CoBank does not dispute these facts, but claims they are irrelevant. Def. Opp. at 9, n.10. This is puzzling, as CoBank adduces no evidence to establish that the sole similarity it identifies—the lack of risk weighting—is relevant to determining comparability.

### D.     The "Comparable" Text Is Not a Nullity

CoBank claims that if that the T1LR is not "comparable" to the NCR, nothing could be. Def. Opp. at 14. This is risible given the essential differences identified by CoBank's own management. In any event, one can easily envision a regulatory capital requirement that (unlike the T1LR) actually accounted for "total liabilities;" it would be "comparable" to the NCR at least in that respect, and would relate clearly to the contractual text at issue.

Likewise, CoBank's attempt to explain away Mr. Burlage's description of the Final Rule as a "sea-change" fails. Def. Opp. at 14. Mr. Burlage described a "sea-change, substantive difference" between the NCR and the T1LR in terms of a loss of "favorable regulatory capital treatment." SUMF ¶ 309. This ignores the plain language of the Regulatory Event definition, which only permits CoBank to redeem the Notes if its regulatory capital requirements are changed in *specified* ways—not simply if a change is not "favorable." The preceding sentence of Mr. Burlage's letter makes clear that the T1LR is entirely distinct from the NCR: he conceded that the regulatory change "is not merely a function of different nomenclature between the

9

regimes (*i.e.*, that the new regime does not speak to liabilities)." *Id*. CoBank's justification for redeeming the Notes relies entirely on the treatment of liabilities, yet Mr. Burlage acknowledged that "the new regime," that is, the T1LR, "*does not speak to liabilities*." *Id.* (emphasis added). Mr. Burlage's defense of the Redemption thus contains its own undoing: he makes clear that the T1LR is *not* comparable to the NCR (as the T1LR *does not even address liabilities*, which is "not merely a function of different nomenclature") and that, for the same reason, the T1LR does *not* impose the sort of regulatory treatment set forth in the Regulatory Event provision. He also reveals CoBank's *post hoc* understanding of the provision (as relating to "favorable capital treatment"), which is untethered from the specific text thereof.

CoBank does not dispute that its Chief Regulatory, Legislative and Compliance Officer, Andrew Jacob (a former director of the FCA's Office of Regulatory Policy, spoke at length regarding the "very unique differences" between the NCR and the T1LR, testifying that the T1LR manifested a "philosophical change" by the FCA. Pl. Br. at 17, 19; SUMF ¶ 311.

### E.   CoBank's Failure to Disclose the FCA's Mandate to Include the "Comparable" Text Is Fatal to Its Argument

Plaintiffs established that "CoBank never disclosed the reason" it included the "comparable" component of the Regulatory Event definition, and that undisclosed intentions are not germane to interpreting a contract. Pl. Br at 14-15, 19. Citing no law to the contrary, CoBank claims that it *did* disclose why it included the "comparability" text, Def. Opp.at 15, but there is no evidence of this. CoBank selectively quotes its own disclosure regarding its intended use of the Notes offering proceeds, omitting that they would be used "for general corporate purposes." *See* Def. Opp. at 15; Pl. Opp. at 10. CoBank also relies on warnings that a redemption could occur, which does not shed light on the prerequisites for such. Def. Opp. at 15. CoBank never disclosed what it now claims: that the FCA told it to add the "comparable" clause.

10

III.     **AT A MINIMUM, COBANK CONDUCTED THE REDEMPTION PREMATURELY, WHICH CONSTITUTES A BREACH**

CoBank, suggesting that Plaintiffs are seeking to recover "the proverbial half-a-loaf," Def. Opp. at 16, misconstrues the import of a ruling that it redeemed the Notes prematurely. It would not matter if CoBank *could have* redeemed the Notes later (which it could not)—CoBank breached the contract on April 15, 2016, and on that date Plaintiffs were entitled to recover the entirety of their resulting damages, which relate to the period from the Redemption to the Notes' maturity date. *See* Pl. Br. at 20. CoBank's contrary position would practically reward it for its breach.

A.     **The Lack of Detail in the Fact Sheet Is Relevant to Understanding that No Regulatory Event Occurred Until the Final Rule Issued**

CoBank claims there can be "no genuine dispute that, at the time CoBank announced the Redemption, it was clear how the [] Notes were to be treated under the new capital regulations." Def. Opp. at 16-18. This misses the point of Plaintiffs' temporal argument, which is that the Fact Sheet—a mere summary—did not constitute "notification of a change in an applicable rule." Pl. Br. at 20-22. *The Fact Sheet was not the Final Rule*, and its publication was not notification that a new "applicable" rule had issued. *Id.*[12] Thus, it is not "irrelevant" that the Final Rule had not been published anywhere when CoBank announced the Redemption. Def. Opp. at 18.

CoBank also claims that "under the [2014] Proposed Rule, the [] Notes would no longer be excluded from Total Liabilities for purposes of calculating CoBank's NCR." Def. Opp. at 16. This is clearly false. The 2014 Proposed Rule did not discuss how to calculate the NCR. SUMF ¶¶ 216-24. That calculation did not change at all. Pl. Br. at 15-16; Pl. Opp. at 9. And the NCR

---

[12]   Furthermore, CoBank's lengthy explanation of the treatment of the Notes under the new T1LR, Def. Opp. at 16-18, simply reiterates their wish that the Security provided, which it does not, that a Regulatory Event occurs when the Notes "would have the adverse effect of decreasing CoBank's leverage ratio (the T1LR), counter to their purpose." Def. Opp. at 18.

never became obsolete: CoBank reported its NCR for the quarter ended March 31, 2016, SUMF ¶¶ 317-318, and is *still* required to report its NCR for 2012-2016. Defendant's Request for Judicial Notice in Support of its Motion for Summary Judgment, ECF 106 ("RJN"), Ex. 9 at 49778. *The NCR calculation has not changed.*

### B. Under the Regulatory Event Text, No Redemption Could Occur Until the Final Rule Became Effective

Plaintiffs demonstrated that under the plain terms of the Regulatory Event provision—in particular the use of "shall" and "applicable" (as in, "whether as a result of a change in applicable law or regulation or otherwise, none of the [Notes] shall any longer be eligible for…"), a redemption could not precede the effective date of the Final Rule. Pl. Br. at 7, 21-24. This is not, as CoBank argues, because Plaintiffs are attempting to read "when the Notes are no longer eligible" into the contract. Def. Opp. at 4. Contrary to CoBank's suggestion, Plaintiffs quoted the Regulatory Event provision accurately and completely. Pl. Br. at 7.

As Plaintiffs point out, "shall" in this context does not connote futurity; instead, it indicates that the stated condition is mandatory. Pl. Br. at 22-24. To rebut this argument, CoBank engages in grammatical gymnastics, inserting the ***meaning*** of the word "shall," *i.e.*, "is required to," into the Regulatory Event definition. Def. Opp. at 18-19. Because a simplistic replacement of "shall" with "is required to" renders the sentence nonsensical, CoBank argues that "shall" cannot possibly assume its *primary* definition of "mandatory." Def. Opp. at 19. CoBank makes the same argument about replacing "shall" with "must," which Bryan Garner's *A Dictionary of Modern Legal Usage*, 2nd ed. (1995), instructs one to use when "shall" means "has a duty to" and the subject is an inanimate object (such as the Notes). Since inserting "must" renders the

sentence awkward, as in "none of the [Notes] must any longer be eligible for" exclusion,[13] CoBank claims victory. This is nonsense. CoBank, as drafter, selected the word "shall" and crafted the provision around this word. Had it selected a synonym of "shall," it presumably would have written a grammatically sound sentence around it. CoBank did just that elsewhere in the contract. Pl. Br. at 22-23.

CoBank's reliance on *James L. Turkle Trust v. Wells Fargo & Co.*, 2012 WL 2568208 (N.D. Cal. July 2, 2012) ("*Turkle*"), to claim that the phrase "shall no longer be eligible" is forward-looking, Def. Opp. at 2, is wildly misplaced. The contract in *Turkle* defined a "capital treatment event" as, in part, the "*reasonable determination by the Company* that, as a result of the occurrence of any amendment to, or change (*including any announced prospective change*) in, the laws (or any rules or regulations thereunder)[,] . . . there is more than an insubstantial *risk* that the Company *will* not be entitled to treat" a certain amount of the relevant securities as "tier 1 capital." 2012 WL 2568208 at *1 (emphasis added).

The Regulatory Event definition here differs dramatically: it does not reference a "prospective change" or CoBank's "reasonable determination" regarding a "more than . . . insubstantial risk." The *Turkle* contract explicitly gave discretionary authority to one party (entirely unlike the Security), is predicated upon an "announced prospective change," and "used *the future-looking word 'will,'*" *id.* at *5 (emphasis added), not "shall." *Turkle* thus supports Plaintiffs: when a drafter intends to connote a future event, it will include specific language confirming that temporal meaning, such as "prospective."[14] CoBank used none of the "forward-

---

[13] CoBank argues that insertion of "must" leads to "flaws" in the outcome, Def. Opp. at 19 n.16, but in actuality, it is just an awkward sentence. In any event, CoBank could have used "may" to convey the same meaning, as in "none of the [Notes] **may** any longer be eligible for" exclusion, or written that "**all of the Notes must** no longer be eligible" for exclusion.

[14] CoBank makes much of Garner's observation that "shall is commonly used as a future-tense modal verb," Def. Opp. at 20 n.18, but Garner was merely providing an example of poor draftsmanship using a secondary

looking language" on which the *Turkle* court relied, *see id.* at *6,[15] and CoBank's attempt to find support in that case is telling.

Finally, Plaintiffs demonstrated that the word "applicable" required a change to a regulation that "applied." Pl. Br. at 21. CoBank's attempts to avoid the term "applicable" are unavailing. CoBank Br. at 20-21. *First*, CoBank argues that by using the word "or otherwise," "applicable" should be read expansively. But "or otherwise" simply refers to the fact that the treatment of the Notes could change for reasons other than an official law or regulation. Given that the FCA permitted CoBank's special treatment of the Notes—not based on any codified rule—"or otherwise" perhaps accounted for the possible revocation of that permission.

*Second*, CoBank admits that the NCR—and not the T1LR—applied as of April 15, 2016. Def. Opp. at 21. CoBank asserts that this is irrelevant because it received notification "regarding a change to that applicable regulation." *Id.* That is false. CoBank received notification there *would* be a new regulation that *would* replace the NCR. As the undisputed facts demonstrate, **nothing about the NCR changed**. Pl. Br. at 15-16; *supra* § III.A. It is possible that there could have been a change **to the NCR** that could have triggered a Regulatory Event.

CoBank's arguments are belied by its own disclosure that the "Tier 1 Capital Ratio" (another requirement imposed by the Final Rule) would become effective on January 1, 2017, and "was **not applicable** for periods ending prior to this date." SUMF ¶ 412 (emphasis added).

---

definition. CoBank's bad drafting cannot be held against Plaintiffs. If CoBank had intended futurity, it could have used "the future-looking word 'will,'" as in the preexisting *Turkle* contract. 2012 WL 2568208, at *1.

[15] Affirming, the Ninth Circuit emphasized that the reference to "'any announced prospective change' that creates a 'more than . . . insubstantial risk' of the loss of" capital status was inconsistent with interpreting the provision to "permit[] redemption . . . only upon actual, as opposed to prospective, status change." *James L. Turkle Trust v. Wells Fargo & Co.*, 602 Fed. App'x 360, 362 (9th Cir. 2015).

## IV.   COBANK BREACHED THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

CoBank misrepresents the scope of Plaintiffs' claim for violation of the implied covenant of good faith and fair dealing. Plaintiffs do not claim that CoBank could not at all, in any way, on any issue, "participate in rulemaking by the FCA." *Cf.* Def. Opp. at 22. Rather, Plaintiffs have shown that, by publicly issuing securities to investors whose rights could be impaired by regulatory change, CoBank circumscribed its discretion to lobby for the very change that would (CoBank claims) eviscerate those rights, while declining to seek the same special dispensation that the Notes enjoyed under the NCR regime.[16] CoBank did not simply take positions that could eventually result in a Regulatory Event. Over several years, it pressured the FCA to adopt the T1LR—and declined to request "favorable" treatment of the Notes, purportedly so important to CoBank—which, CoBank asserts, constituted a Regulatory Event.[17]

Plaintiffs need not establish that CoBank "control[led]" other System institutions or the FCA, *see* Def. Opp. at 23; that would be inconsistent with the preponderance standard governing Plaintiffs' claims. CoBank is the largest System bank (RJN, Ex. 13 at 16 of 72, tbl.2), and the evidence shows that, with respect to the FCA's rulemaking process resulting in the T1LR, CoBank had outsized influence on other System institutions, including through intra-System workgroups. *See, e.g.*, SUMF ¶¶ 176, 181-82, 186-88, 225. Moreover, CoBank appears to have a very close relationship with the FCA, underscored by CoBank's hiring of Andrew Jacob (a former director of the FCA's Office of Regulatory Policy). SUMF ¶ 193.

---

[16]  CoBank's Constitutional defense is thus beside the point, as its obligation to act in good faith merely limited the terms of its petitioning, not the right to petition. Moreover, a waiver of rights need not be explicitly stated in a contract. Even criminal defendants can impliedly waive Constitutional rights through their conduct. *See, e.g., U.S. v. Allen*, 788 F.3d 61, 75 (2d Cir. 2015).

[17]  CoBank's protestation that it would not issue Notes simply to later redeem them is unconvincing, as it issued the Notes during a recession (when it needed capital) and redeemed them during a time of low interest rates (when it could replace that capital more cheaply).

CoBank elides this issue by noting its disclosures regarding the FCA's regulation of CoBank, but this merely throws into relief the fact that, when it issued the Notes, CoBank did *not* disclose that the Notes were subject to ad hoc regulatory treatment about which the FCA could "change its mind," *see* Def. Opp. at 23 n.21, nor that CoBank would lobby the FCA to overhaul its regulatory capital rules to make it easier for CoBank to access capital markets and, CoBank claims, to redeem the Notes. This surely would have surprised a reasonable investor in 2008.

Finally, there is no tension between the fact that CoBank *urged* the FCA[18] to adopt the T1LR, yet *declined* to request special dispensation for the Notes akin to what it secured in 2008. Rather, these two facts clearly evidence CoBank's failure to act in good faith. It is not that CoBank did not ask too much or not enough—Plaintiffs' claim arises from the *substance* of what CoBank (successfully) sought and chose not to seek. CoBank disagrees that it requested "special dispensation" from the FCA to exclude the Notes from total liabilities when calculating its NCR. Def. Opp. at 25. CoBank further claims that it asked the FCA to "confirm," rather than "permit," such treatment. R-SUMF ¶ 43. But CoBank has never identified in any regulation the basis of the treatment it wanted "confirmed." It was not set forth in the then-current rules. *See* 12 C.F.R. §§ 615.5301, 615.5335 (2016). Clearly, the "favorable" treatment, supposedly a prerequisite to issuing the Notes, was ad hoc and not grounded in any published regulation.

## CONCLUSION

For the foregoing reasons, Plaintiffs are entitled to the requested summary judgment.

---

[18] CoBank's desire that the FCA "not get ahead of other regulators' capital rulemakings," Def. Opp. at 24, or that the FCA reopen the comment period on the Proposed Rule, *id.*, does not undermine this point. Rather, it merely shows that CoBank was aware that consistency of regulatory capital requirements between the FCA and other regulators would benefit CoBank, and that a reopened comment period would give CoBank more opportunity to sway the FCA. That the FCA granted these requests is strong evidence of CoBank's influence. CoBank's unexplained reference to "transition rules," Def. Opp. at 25, does not contradict the weight of the evidence.

Dated: New York, New York      GRANT & EISENHOFER P.A.
May 24, 2018

By:  *Gordon Z. Novod*

    Jay W. Eisenhofer
    Gordon Z. Novod
    Caitlin M. Moyna
    Jonathan D. Park

485 Lexington Avenue, 29th Floor
New York, New York 10017
(646) 722-8500

*Attorneys for Plaintiffs*

17

## CERTIFICATE OF SERVICE

I, Gordon Z. Novod, hereby certify that on May 24, 2018, I caused a redacted copy of the foregoing to be served via CM/ECF, and an unredacted copy to be served via e-mail, on the following counsel:

Shawn Patrick Regan
Patrick L. Robson
Joseph J. Saltarelli
Jennifer L. Bloom
Peter M. Mustalish
HUNTON ANDREWS KURTH LLP
200 Park Avenue
New York, NY 10166
sregan@huntonak.com
probson@huntonak.com
jsaltarelli@huntonak.com
jbloom@huntonak.com
pmustalish@huntonak.com

*/s/ Gordon Z. Novod*
Gordon Z. Novod