UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

AMCO INSURANCE COMPANY et al.,

        Plaintiffs,

    -v-                            No.   1:16-CV-04422-LTS-SLC

COBANK, ACB,

        Defendant.

--------------------------------------------------------x

AMENDED MEMORANDUM OPINION AND ORDER*

        Plaintiffs AMCO Insurance Company ("AMCO") et al. ("Plaintiffs")[1] bring this

action, asserting claims for breach of contract and breach of the implied covenant of good faith

and fair dealing, against defendant CoBank, ACB ("CoBank" or "Defendant").  Plaintiffs' claims

arise from CoBank's April 15, 2016, redemption of $241,081,000-worth of 10-year Subordinated

---

*      This Amended Memorandum Opinion and Order reflects corrections of clerical errors in
the party names listed in footnote 1 of the Memorandum Opinion and Order entered on
September 14, 2021.  It supersedes the September 14, 2021, version of the Memorandum
Opinion and Order.

[1]      "Plaintiffs" comprise: AMCO Insurance Company, American Family Life Assurance
Company of Columbus, Americo Financial Life and Annuity Insurance Company,
Athene Annuity and Life Company, Bank of Utica Investment Subsidiary, Ltd.,
Beaumont Health, Bio-Rad Laboratories, Inc., Continental Casualty Company,
Crestbrook Insurance Company, Dedham Institution for Savings, Ephrata National Bank,
Erie Family Life Insurance Company, Federated Life Insurance Company, Great
Southern Life Insurance Company, , Health Care Service Corporation, Metropolitan Life
Insurance Company, Mutual of America Life Insurance Company, Nationwide Life and
Annuity Insurance Company, Nationwide Life Insurance Company, Nationwide Mutual
Insurance Company, The Northwestern Mutual Life Insurance Company, Ohio National
Life Assurance Corporation, The Ohio National Life Insurance Company, Scottsdale
Insurance Company, Scottsdale Surplus Lines Insurance Company, Tauck, Inc., Thrivent
Financial for Lutherans, Veterinary Pet Insurance Company, Victoria Fire & Casualty
Company, and Waukesha State Bank.  (See docket entry no. 55.)

Debt Notes, which had not been due to mature for another two years.  The Court has jurisdiction

of this action pursuant to 28 U.S.C. § 1332.  The Agreement is governed by New York law.

The parties have cross-moved for summary judgment.  Plaintiffs seek summary

judgment in their favor on both of their claims, and as to the proper parameters for calculating

damages.  (See docket entry no. 99.)  CoBank seeks summary judgment in its favor dismissing

Plaintiffs' claims and, in the event the Court finds in Plaintiffs' favor as to liability, a

determination as to the date of initial accrual of prejudgment interest.  (See docket entry no.

104.)  CoBank asserts that the question of the basis of calculation of damages, should the Court

reach it, is one of fact to be determined at trial.

Plaintiffs also move on three other matters.  First, Plaintiffs move to strike in part

Defendant's response to their S.D.N.Y. Local Civil Rule 56.1 ("Rule 56.1") Statement on

various grounds.  (See docket entry no. 138.)  Second, Plaintiffs tender a limited objection to

Defendants' Request for Judicial Notice of certain exhibits.  (See docket entry no. 127.)  Third,

Plaintiffs object to a footnote included in Defendant's Reply Memorandum of Law in Support of

Defendant's Motion for Summary Judgment.

The Court has carefully considered all the parties' submissions.  For the reasons

explained below, the Court has reached the following decisions.  Plaintiffs' summary judgment

motion is granted as to liability on Count I (Plaintiff's claim for breach of contract), is denied as

to liability on Count II (Plaintiff's claim for breach of the implied covenant of good faith and fair

dealing), and is denied as to Plaintiff's proposed damages computation methodology.

Defendant's summary judgment motion is denied as to liability on Count I, granted insofar as it

seeks dismissal of Count II, and is denied as to the initial date of accrual for prejudgment

interest.

Plaintiffs' motion to strike in part Defendant's Response to Plaintiff's Rule 56.1 Statement is granted in part and denied in part.  Plaintiffs' Objection to Defendant's Request for Judicial Notice is overruled as moot.  Plaintiffs' limited objection, to the inclusion of footnote 9 in Defendant's Reply Memorandum of Law, is overruled as moot.

<u>BACKGROUND</u>

Unless otherwise indicated, the following facts are undisputed.[2]  CoBank is one of four banks of the Farm Credit System ("FCS"), a network of borrower-owned cooperative institutions chartered to support the borrowing needs of U.S. agriculture and the nation's rural economy.  (Docket entry no. 100 ("Pl. 56.1 St.") ¶ 1.)  As a member institution of the FCS, CoBank is subject to regulation by the Farm Credit Administration ("FCA"), an independent executive agency.  (Docket entry no. 107 ("Def. 56.1 St.") ¶¶ 1, 5.)  Among the FCA's regulatory responsibilities is the promulgation of rules mandating that System institutions maintain minimum levels of capital.  (<u>Id.</u> ¶¶ 8, 9.)  Until January 1, 2017, one such capital requirement was the maintenance of a minimum Net Collateral Ratio ("NCR"), which was calculated by dividing an institution's Net Collateral by its Total Liabilities.  (<u>Id.</u> ¶¶ 12, 13.)

Pursuant to FCA Regulations in effect at the time of the Notes' issuance, CoBank was permitted to exclude the Notes from its calculation of Total Liabilities in the NCR computation.  (Def. 56.1 St. ¶ 58.)  Due to this exclusion, the proceeds of the Notes could be

---

[2]    Facts characterized as undisputed are identified as such in the parties' statements pursuant to S.D.N.Y. Local Civil Rule 56.1 or drawn from evidence as to where there has been no contrary, non-conclusory proffer.  Citations to the parties' respective Local Civil Rule 56.1 Statements incorporate by reference the parties' citations to underlying evidentiary submissions.

included in the NCR numerator (Net Collateral) and excluded from the NCR denominator (Total Liabilities), thus potentially increasing CoBank's NCR.  (Id. ¶ 58).

On April 18, 2008, CoBank issued the Notes pursuant to a Fiscal Agency Agreement (docket entry no. 1, Ex. 1, the "Agreement") between CoBank and The Bank of New York Trust Company, N.A., as Fiscal Agent.  (Def. 56.1 St. ¶ 28.)  Attached as Exhibit A to this Fiscal Agency Agreement was a Form of the Security (Agreement at Exhibit A, the "Security"). (Id.)  Under the Agreement, Defendant had the option to redeem all Securities upon the occurrence of a "Regulatory Event."  A Regulatory Event was defined in the Security as:

> [R]eceipt by the Bank of a notification from the Farm Credit Administration, or other primary regulator at the time, to the effect that, whether as a result of a change in applicable law or regulation or otherwise, none of the [Notes] shall any longer be eligible for . . . (ii) exclusion from total liabilities for purposes of calculating the Bank's net collateral ratio or any comparable regulatory capital requirements under any successor regulations.

(Security § 6(a).)  Upon the occurrence of a Regulatory Event, Defendant was entitled to redeem the Notes at a Redemption Price of 100% of the principal plus any accrued and unpaid interest to, but excluding, the Redemption Date.  (Id.)

Also attached to the Fiscal Agency Agreement, as Exhibit C, was an Accredited Investor Letter (the "Accredited Investor Letter".) (See docket entry no. 1, Exhibit 1, at Exhibit C).  Paragraph 3 of the Accredited Investor Letter required each Accredited Investor to confirm it had received the Offering Circular (the "Offering Circular") and was relying on the Offering Circular in making its investment decision with respect to the Notes.  Id. ¶ 3.

The Regulatory Change and CoBank's Involvement

In 2007, the FCA issued two Advanced Notices of Proposed Rulemaking soliciting comment on the possibility of replacing or supplementing the Net Collateral Ratio with

another capital ratio, called a Tier 1 Leverage Ratio ("T1LR").  (Pl. 56.1 St. ¶¶ 153-60.)  In response to this solicitation, an FCS organization known as the Capital ANPR Workgroup, made up of representatives from various System institutions, including CoBank, wrote a letter in support of this change, noting that it would bring the capital regulations governing the FCS into closer alignment with those mandated for commercial banks and, in doing so, facilitate FCS access to capital markets.  (Id. ¶¶ 161, 163-64.)  This remained the System's official position throughout the nine years leading up to the 2016 Note Redemption, as shown by various written and spoken communications over that period from similarly constituted System Workgroups and CoBank officials endorsing the proposed changes.  (See, e.g., id. ¶¶ 169, 226.)

On May 8, 2014, the FCA approved a proposed rule that would apply to all FCS institutions, including CoBank.  (Id. ¶ 216.)  Under the terms of the proposed rule, the Net Collateral Ratio metric would be eliminated and a new capital framework, including a T1LR, would be adopted.  (Id. ¶ 218.)  The T1LR is the ratio of an institution's Tier 1 Capital to the institution's Total Assets.  (Def. 56.1 St. ¶ 41.)  Under the terms of the proposed rule, the Notes did not qualify as Tier 1 Capital, and so would not be included in the ratio numerator (Tier 1 Capital), but the proceeds of the Notes, if held by CoBank, would be included in the ratio denominator (Total Assets), thus potentially decreasing CoBank's T1LR.  (Id. ¶ 59.)  Total Liabilities are not considered in computing the T1LR.  (Id. ¶ 41.)  In 2015, the Farm Credit Council, a lobbying arm of the FCS, sent a letter to the FCA in support of the 2014 proposed rule.  (Pl. 56.1 St. ¶ 228.)  This letter stated that the Council's comments were developed after soliciting input from all System institutions, including CoBank.  (Id. ¶ 227.)

The Regulatory Change and Redemption of the Notes

On March 10, 2016, the FCA issued a fact sheet (the "Fact Sheet") and news release (the "News Release") (together, the "FCA Announcement"). (Pl. 56.1 St. ¶ 244.) The News Release stated that the FCA had "adopted the Tier 1/Tier 2 Regulatory Capital Framework final rule, which modifies the regulatory capital requirements for Farm Credit System banks and associations." (Def. 56.1 St. ¶ 48.) In the Fact Sheet, the FCA stated that the "final rule also adds a tier 1 leverage ratio for all System institutions, which replaces the existing collateral ratio (NCR) for System banks." (Id. ¶ 49.) The Fact Sheet stated that the Final Rule would become effective on January 1, 2017. (Pl. 56.1 St. ¶ 246.)

The Fact Sheet made no reference to changes to the Net Collateral Ratio, but noted that the NCR would be replaced by the T1LR on the new rule's effective date. (Pl. 56.1 St. ¶ 250.) The Fact Sheet specified that subordinated debt would be considered "Tier 2 capital" and therefore would not be part of the Tier 1 Leverage Ratio numerator. (Docket entry no. 130 ¶ 255.) No reference was made to any changes to the calculation of Total Liabilities in connection with either ratio. (Pl. 56.1 St. ¶ 251.)

Based upon the FCA's Announcement, CoBank announced on March 11, 2016, that it would redeem all of the Notes on April 15, 2016. (Def. 56.1 St. ¶ 60.) On April 15, 2016, CoBank redeemed the Notes. (Id. ¶ 63.) Plaintiffs filed the instant action on June 13, 2016.

DISCUSSION

Summary judgment is to be granted in favor of a moving party if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is considered material if it "might affect the outcome of the suit under the governing law," and an issue of fact is a genuine one

where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Holtz v. Rockefeller & Co. Inc., 258 F.3d 62, 69 (2d Cir. 2001) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  To defeat a summary judgment motion, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  Caladora v. Calabrese, 298 F.3d 156, 160 (2d Cir. 2002) (citation omitted). The nonmoving party "may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." Golden Pac. Bancorp v. FDIC, 375 F.3d 196, 200 (2d Cir. 2004) (citation omitted).

The same legal standards apply when analyzing cross-motions for summary judgment.  Schultz v. Stoner, 308 F. Supp. 2d 289, 298 (S.D.N.Y. 2004).  "Each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration."  Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001) (citation omitted).

Motion to Strike Portions of Defendant's Response to Local Rule 56.1 Statement

Plaintiffs move to strike several portions of Defendant's response to Plaintiff's Rule 56.1 statement.  "The purpose of a Rule 56.1 Statement is to streamline consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties."  Holtz, 258 F.3d at 74.  Rule 56.1(a) requires that a motion for summary judgment be accompanied by a "short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." Local Civil Rule 56.1(a).  The non-moving party must respond with a "correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party [citing to admissible evidence], and if necessary, additional paragraphs

containing a separate, short, and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried." Local Civil Rule 56.1(b). Each statement of material facts that is not specifically controverted by the non-moving party is deemed admitted. Local Civil Rule 56.1(c). Plaintiffs identify seventeen different grounds upon which Defendant's response allegedly violates Rule 56.1, including improper assertions of immateriality of Plaintiffs' proffered facts, improper inclusion of legal arguments and conclusions, failure to support some responses with citations to admissible evidence, and "improperly disput[ing] factual statements to further [Defendant's] legal and factual arguments." (Docket entry no. 139 at i.)

The Court agrees that many of Defendant's responses improperly include arguments as to the materiality of Plaintiffs' proffered facts or legal arguments as to the Defendant's purpose in drafting the Agreement. Plaintiffs' motion to strike, however, takes little care to specify which portions of Defendants' responses Plaintiffs wish to be stricken, requesting instead, for example, that the Court strike even Defendants' single-word characterization of whether particular facts are disputed or not. The Court also notes that Plaintiffs' 413-paragraph 56.1 statement may itself be violative of the requirement that a Local Civil Rule 56.1(a) Statement be "short and concise." Local Civil Rule 56.1(a).

In light of the foregoing issues pertaining to both sides' Rule 56.1 submissions, the Court finds it prudent to examine Defendants' Rule 56.1 responses in the context of specific issues that are relevant to the legal questions that are material to the disposition of these summary judgment motions, rather than to rule separately on every element of Plaintiffs' motion to strike. See Obeid on behalf of Gemini Real Estate Advisors LLC v. La Mack, No. 14-CV-6498-LTS-HBP, 2018 WL 2059653, at *15 (S.D.N.Y. May 1, 2018). In so doing, the Court has

disregarded any legal or materiality arguments made by Defendant in its responses to Plaintiffs'

Rule 56.1(a) statements.  Where there are no citations in Defendants' Rule 56.1 responses or

where the cited materials do not support the factual assertions made in those responses, the Court

has exercised its authority to disregard those assertions.  See Holtz, 258 F.3d at 73.

<u>Objection to Request for Judicial Notice of Content of Certain Exhibits & Reply Memo Footnote</u>

Plaintiffs next object to certain aspects of Defendant's Request for Judicial Notice

and to the inclusion of a footnote in Defendant's Reply in Support of Defendant's Memorandum

of Law regarding liability.  Both objections are overruled as moot. [3]

Plaintiffs' objection to Defendant's Request for Judicial Notice requests that the

Court not take judicial notice of certain exhibits "to establish the truth of any matters contained

therein that Plaintiffs have not asserted or admitted as facts."  Plaintiffs "do not object to the

Court taking judicial notice of the exhibits to the Request only 'for the fact that the statements

were made,'" but urge the Court not to take notice of them "for their truth . . . [or] for the

purpose of establishing the truth of facts Plaintiffs have not asserted or admitted."  (Docket entry

no. 127 at 3.)  In reaching its conclusions, the Court has not needed to refer to the exhibits in the

Request for Judicial Notice for the purposes objected to by Plaintiffs.  Plaintiffs' objection is

therefore overruled as moot.   The Court now turns to the merits of the parties' motions for

summary judgment.

---

[3]     Plaintiffs object to the inclusion of the footnote on the basis that its contents constitute hearsay evidence that cannot be used to support a motion for summary judgment.  In reaching its decision, the Court has not considered the contents of the footnote for the truth of the matter asserted.  The objection is therefore overruled as moot.

Motions for Summary Judgment

Breach of Contract

Plaintiff's first cause of action is for breach of contract.  Plaintiff seeks summary judgment holding Defendant liable for breach of the redemption term of the Agreement; Defendant seeks summary judgment dismissing the claim.  Under New York law, "if a contract is straightforward and unambiguous, its interpretation presents a question of law for the court to be made without resort to extrinsic evidence."  Spinelli v. Nat'l Football League, 903 F.3d 185, 200 (2d Cir. 2018).  If, however, "'the intent of the parties can[not] be ascertained from the face of the agreement,' the contract is ambiguous and its interpretation presents a question of fact." Id. (citation omitted).

Plaintiffs argue that the regulatory change described in the FCA Announcement Sheet did not constitute a Regulatory Event, and that CoBank's subsequent early redemption of the Notes, based on the alleged occurrence of a Regulatory Event, was a breach of the Agreement.  The parties emphasize various facets of the Regulatory Event provision in support of their motions for summary judgment.

Under the plain text of the Regulatory Event provision, there are two scenarios in which a Regulatory Event can occur.  Each requires a notification from the FCA to the effect that "none of the Notes shall any longer" be eligible for exclusion from Total Liabilities for a given purpose—either (i) "for the purposes of calculating the Bank's Net Collateral Ratio"; or (ii) "for the purposes of calculating comparable regulatory requirements under any successor regulations."  (Security § 6(a).)  As noted above, the FCA Announcement declares no change of any kind to the calculation of the Net Collateral Ratio, let alone a change specifying that the exclusion from Total Liabilities in the NCR computation for which the Notes were eligible has

been withdrawn.  The only reference to the Net Collateral Ratio made in either document was the

FCA's notification that "the final rule also adds a tier 1 leverage ratio for all System institutions,

which replaces the existing net collateral ratio for System banks."  (Docket entry no. 106, Ex. 18,

Fact Sheet at 1.)

        Although the FCA Announcement did not mention any change in the Net

Collateral Ratio computation and Total Liabilities are not a factor in the replacement T1LR

computation, Defendant argues that a Regulatory Event occurred because the effect of the

announced change to the T1LR would deprive it of the leverage ratio advantage it derived from

the exclusion of the Notes from the NCR's Total Liabilities computation.

        According to Defendant, despite the absence of an explicit congruence between

the Fact Sheet's declarations and the Regulatory Event definition, the effect of the Fact Sheet

was such that the definition was satisfied:

> It is the 'effect' of the changes announced in the notification that is
> relevant. And here, the effect of the changes adopted by the FCA Board
> was that, under the Final Rule, none of the 2008 Notes shall any longer be
> eligible for exclusion from Total Liabilities for purposes of calculating
> CoBank's NCR.

(Docket entry no. 109 ("Def. Mem. re Liab.") at 16.)  Defendant does not parse the Fact Sheet to

explain how its text meets the specifications of the Regulatory Event definition, but relies instead

upon a conclusory repetition of the provision's text.  CoBank's argument is insufficient to defeat

Plaintiffs' motion for summary judgment.   Its reading of the use of "to the effect" in describing

the general content of the contemplated notice to signify, instead, a description of the projected

result of implementation of the change announced is both ungrammatical and fanciful.

"'Conclusory allegations, conjecture and speculation' do not establish a genuine issue of fact,

and thus will not provide a sufficient basis for a nonmoving party to resist summary judgment."

Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998).  The Regulatory Event redemption provision of the Agreement is, under the plain terms of the Agreement, one that is triggered by an announcement that the Notes would not be taken into account for a particular calculation for a particular purpose.  The FCA Announcement mentioned neither the calculation nor the purpose. The Court therefore concludes that the contents of the FCA Announcement did not, even when construed in the light most favorable to Defendant, satisfy the first scenario triggering a Regulatory Event.

With respect to the second scenario—"a notification . . . to the effect that . . . none of the Notes shall any longer be eligible for . . . exclusion from total liabilities for purposes of calculating the Bank's . . . comparable regulatory requirements under any successor regulations" (Security § 6(a)) —Defendant again offers a conclusory assertion that the FCA's announced rule change meets the requirements of the provision, arguing: "Nor would the 2008 Notes be 'eligible for exclusion from Total Liabilities for purposes of calculating' the T1LR, the System's new non-risk-weighted leverage ratio under the successor regulations."  (Def. Mem. re Liab. at 16.) Defendant proffers no textual or evidentiary support for its assertion that Total Liabilities play a role in the T1LR computation, instead repeating the language of the provision and asserting that it has been met by the FCA Announcement.  The Court finds no proper legal basis for Defendant's argument that the redemption of the Notes was authorized under the second possible scenario for a Regulatory Event.   The Fact Sheet and News Release make no mention of any eligibility for exclusion from a relevant computation.  It is undisputed that Total Liabilities are not part of the T1LR calculation.  (Def. 56.1 St. ¶ 41.)

The Court also rejects Defendant's alternative argument that the fact of the NCR's replacement by the T1LR, rather than any change to the makeup of either metric, constitutes a

Regulatory Event.  Defendant stresses the alleged purpose of the Notes' issuance, which Defendant claims was to enable CoBank "to increase its regulatory capital ratios pursuant to FCA regulations."  (Def. Mem. re Liab. at 16.)  Defendant draws this language from a section of the Notes' Offering Circular titled "Use of Proceeds," which states: "CoBank will use the net proceeds from the sale of the Notes to increase its regulatory capital ratios pursuant to FCA Regulations and for general corporate purposes."  Offering Circular at 6.  Elaborating on this reference to purpose, Defendant proffers that, due to the different compositions of the two ratios, the Notes had a beneficial effect on CoBank's NCR and an injurious effect on CoBank's T1LR,[4] and that the transition to the T1LR therefore deprived CoBank of the Notes' regulatory benefit and, in doing so, frustrated the purpose of the Agreement.  In defendant's reading, this loss of regulatory favor underlies the significance of the phrase "none of the Notes shall any longer be eligible for exclusion for Total Liabilities," and the announced change therefore constitutes a Regulatory Event.  Defendant posits that "[t]he regulatory benefit (and thus the Regulatory Event language) was not exclusion from 'the calculation'—it was exclusion from the denominator of the ratio, i.e., Total Liabilities, the result of which was to increase CoBank's leverage ratio, consistent with the very purpose of the 2008 Notes."  (Docket entry no. 128 at 6 (emphasis added).)

        This argument fails for two reasons.  First, the Offering Circular is not part of the Agreement; rather, it constitutes extrinsic evidence that might properly be considered if the

---

[4]     Under the NCR regime, the Notes had the beneficial effect of increasing CoBank's Net Collateral Ratio because proceeds from the Notes' issuance were included in the calculation of Net Collateral (the ratio numerator), while the bank's obligation under the Notes was excluded from Total Liabilities (the ratio denominator).  Under the T1LR regime, this beneficial effect is reversed—the Notes obligation is excluded from Tier 1 Capital (the ratio numerator), but proceeds are included in the ratio denominator (Total Assets).

Agreement were ambiguous.  In the absence of ambiguity, courts may only "consider governing documents to an agreement when interpreting the meaning of a contract." <u>U.S. Bank National Association as Trustee of Triaxx Prime CDO 2006-1, Ltd. V. XXX</u>, 72 Misc.3d 1205(A), 147 N.Y.S.3d 891 (Sup. Ct. New York Cty. 2021).  In this case, the governing agreement is the Fiscal Agency Agreement and its attached exhibits, which do not include the Offering Circular. Nor can the Offering Circular be considered part of a single set of transaction documents, to be read and interpreted together with the Fiscal Agency Agreement.  Under New York law, "instruments executed at the same time, by the same parties, for the same purpose, in the course of the same transaction will be read and interpreted together, it being said that they are, in the eye of the law, one instrument." <u>Oak Hill Capital Partners, L.P. v. Cuti</u>, 148 A.D.3d 504, 504 (N.Y. App. Div. 2017) (citation omitted).  The Offering Circular is neither an executed instrument nor otherwise incorporated into the parties' Agreement.  As such, it constitutes extrinsic evidence outside the proper scope of material for the Court's consideration in construing the unambiguous Agreement.  <u>Greenfield v. Philles Records, Inc.</u>, 98 N.Y.2d 562, 569 (2002).

When interpreting a contract, "[the Court's] primary objective . . . is to give effect to the intent of the parties <u>as revealed by the language of their agreement</u>." <u>Chesapeake Energy Corp. v. Bank of New York Mellon Trust Co., N.A.</u> 773 F.3d 110, 113-14 (2d Cir. 2014) (citation omitted, emphasis added).  Defendant can point to nothing within the four corners of the Agreement to support its contention that the redemption provision was meant to be triggered by any regulatory change that was disadvantageous to CoBank from the point of view of regulatory ratios.  "When the terms of a written contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract . . ." <u>Id.</u> at 114 (quoting <u>Howard v. Howard</u>, 292 A.D.2d 345, 740 N.Y.S.2d 71, 71 (App. Div. 2002)) (citations omitted in original).

Defendant's failure to proffer evidence from within the four corners of the Agreement renders futile its attempt to overcome the plain text of the Regulatory Event definition.

While it is true that "a court should accord [contractual] language its plain meaning giving due consideration to 'the surrounding circumstances [and] apparent purpose which the parties sought to accomplish,'" <u>Thompson v. Gjivoje</u>, 896 F.2d 716, 721 (2d Cir. 1990) (citation omitted), a court cannot interpret a contract so as to "strain [] the contract language beyond its reasonable and ordinary meaning." <u>Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.</u>, 595 F.3d 458, 467 (2d Cir. 2010) (citing <u>Bethlehem Steel Co. v. Turner Construction Co.</u>, 2 N.Y.2d 456, 459 (N.Y. 1957)).  There are circumstances in which the plain text of a contract cannot be interpreted to give effect to the contract's general purpose.  "A written contract will be read as a whole, and every part will be interpreted with reference to the whole; and <u>if possible</u> it will be so interpreted as to give effect to the general purpose." <u>Adams v. Suozzi</u>, 433 F.3d 220, 228 (2d Cir. 2005) (citing <u>Westmoreland Coal Co. v. Entech, Inc.</u>, 100 N.Y.2d 352, 358 (2003)) (emphasis added).  However, "[i]t is well settled that a court may not, under the guise of interpretation, fashion a new contract for the parties by adding or excising terms and conditions that would contradict the clearly expressed language of the contract." <u>Republic Nat'l Bank of New York v. Olshin Woolen Co. Inc.</u>, 304 A.D.2d 401, 402 (App. Div. 2003) (citation omitted).

CoBank's proposed interpretation, which would have the Court excise the phrase "Total Liabilities" from the Regulatory Event provision and replace it with "the denominator" of a successor ratio, would impermissibly rewrite the terms of the Agreement.  The Regulatory Event provision refers explicitly to a specific change in the treatment of the Notes (eligibility for exclusion from the Total Liabilities calculation) for purposes of calculating either the NCR or a

successor regulator requirement.  Nothing in the plain text provides the Bank with a redemption

option upon the occurrence of a regulatory change that removes Total Liabilities from the

relevant ratio's calculation altogether, or one that simply renders unfavorable the Notes' impact

on CoBank's balance sheet.  Even construing all undisputed facts in the light most favorable to

CoBank, no reasonable jury could so interpret the Regulatory Event provision.  Plaintiffs are

therefore entitled to judgment as a matter of law on Count I and Defendant's motion for

summary judgment as to Count I is denied.

### Breach of the Implied Covenant of Good Faith and Fair Dealing

The parties also cross-move for summary judgment on Plaintiffs' claim that

CoBank's repeated communications to the FCA in support of changes to the FCA's regulatory

requirements—changes that served as the predicate for CoBank's claimed Regulatory Event and

early redemption of the Notes—breached the covenant of good faith and fair dealing, which is

implicit in all contracts under New York law.  See Dalton v. Educational Testing Service, 87

N.Y.2d 384, 389 (1995).  "A party's actions may implicate the implied covenant of good faith

when it acts so directly to impair the value of a contract for another party that it may be assumed

that [its actions] are inconsistent with the intent of the parties."  Bank of China v. Chan, 937 F.2d

780, 789 (2d Cir. 1991).  However, the implied covenant of good faith principle does not extend

so far as to undermine a party's "'general right to act on its own interests in a way that may

incidentally lessen' the other party's anticipated fruits from the contract."  M/A-Com Sec. Corp.

v. Galesi, 904 F.2d 134 (2d Cir. 1990) (quoting Van Valkenburgh, Nooger & Neville, Inc. v.

Hayden Publishing Co., 30 N.Y.2d 34, 46 (N.Y. 1972), cert. denied, 409 U.S. 875 (1972)).  "The

covenant of good faith and fair dealing cannot add to, detract from, or alter the terms of the

contract itself."  CDO Plus Master Fund Ltd. V. Wachovia Bank, N.A., No. 07-CV-11078-LTS-

AJP, 2010 WL 3239416, at *3 (S.D.N.Y. 2010) (quoting <u>Warner Theatre Assoc. Ltd. P'ship</u>, No. 97-CV-4914-SS, 1997 WL 685334, at *6 (S.D.N.Y. 1997)).  This covenant is enforced at a high standard.  "In general, courts enforce the implied covenant where an implied promise was 'so interwoven in the whole writing' of a contract as to be necessary for effectuation of the purposes of the contract.  <u>Galesi</u>, 904 F.2d at 137.

Here, the record, even construed in the light most favorable to Plaintiff, could not support a finding that CoBank breached the covenant of good faith and fair dealing by pursuing the regulatory change.  First, the Agreement assigns no obligation to CoBank limiting the terms of its engagement in the FCA's rulemaking process, and the covenant of good faith and fair dealing "cannot add to, detract from, or alter the terms of the contract itself."  <u>Warner Theatre Assoc. Ltd. P'ship</u>, No. 97-CV-4915-SS,1997 WL 685334, at *6.  Second, CoBank had a legitimate interest in supporting the FCA's proposed change to a new regulatory framework for System institutions, as CoBank believed that the unique nature of the NCR framework impeded equitable comparisons between System institutions and commercial banks and hindered CoBank's access to capital markets.  (Pl. 56.1 St. ¶¶ 163-64.)  That CoBank's pursuit of these interests may incidentally have caused harm to the holders of the Notes does not amount to a breach of the implied covenant of good faith and fair dealing.  <u>Galesi,</u> 904 F.2d at 136.  Defendant is therefore entitled to judgment as a matter of law dismissing Count II.  For the same reasons, Plaintiffs' motion for summary judgment as to Count II is denied.

<u>Damages</u>

The parties cross-move for summary judgment regarding two distinct issues pertaining to damages.  Plaintiffs move for summary judgment as to the proper components of the interest rate calculation that should be applied to determine the rate of return of an alternate

investment that Plaintiffs could have made to reasonably mitigate their damages.  Defendant

moves for summary judgment as to the date on which prejudgment interest begins to accrue.

Both motions require resolution of disputed questions of fact and are therefore denied.

Plaintiffs fail to meet their burden of showing that there is no dispute of material

fact as to the proper calculation of a benchmark for mitigation of Plaintiffs' damages.  "[A] party

seeking summary judgment always bears the initial responsibility of . . . demonstrat[ing] the

absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

As part of the damages calculation in this case, the factfinder must identify an alternate

investment that Plaintiffs would be deemed to have made to reasonably mitigate their damages.

See Teachers Ins. and Annuity Ass'n of America v. Ormesa Geothermal, 791 F. Supp. 401, 416

(S.D.N.Y. 1991).  Both parties recognize the Ormesa decision as setting forth the relevant

damages standard:

> the lost interest income is measured as the difference between (a) the
> interest income [plaintiff] would have earned had the contract
> been performed, and (b) the interest income [plaintiff] would
> be deemed to have earned by timely mitigating its damages
> —i.e., by making an investment with similar characteristics
> at the time of the breach.

Id.

The parties proffer competing experts who differ as to the what considerations

and features should be taken into account in determining whether investments have "similar

characteristics, " and thus argue for different reinvestment rates based on assessments of whether

objective or subjective standards should be applied in determining the choices that a plaintiff

would make in mitigation, what constitutes a "similar" investment quality, and the appropriate

term of a benchmark investment for the mitigation computation.  (Docket entry no. 102 at 1-2.)

Each argues that its methodology produces results consistent with those in Ormesa, which was a

decision rendered upon findings after a fifteen-day trial and consideration of the relevant economic conditions as well as expert testimony.  See Ormesa, 791 F. Supp. at 404, 416-17. Given this competing competent evidence, determination of the appropriate alternative investment rate requires resolution of disputed issues of fact.  Plaintiffs' motion for summary judgment as to "damages methodology" is therefore denied.

Defendant's motion for summary judgment as to the date at which damages were incurred also fails because Plaintiffs, as the nonmoving party, have met their burden of demonstrating that there is a triable issue of fact as to that issue.  The governing state statutory provision instructs that "[i]nterest shall be computed from the earliest ascertainable date the cause of action existed, except that interest upon damages incurred thereafter shall be computed from the date incurred."  N.Y. C.P.L.R. § 5001(b) (McKinney).  "The award of statutory pre-verdict interest under N.Y. C.P.L.R. § 5001 is founded on the fact that the aggrieved party has been damage[d] by a loss of the use of money or its equivalent and that unless interest is added the party aggrieved is not made whole."  Bulk Oil (U.S.A.), Inc. v. Sun Oil Trading Co., 697 F.2d 481, 484-85 (2d Cir. 1983) (citation omitted).  Defendant argues that the early return of the Notes' principal left Plaintiffs with more money available for use than they could otherwise have been entitled to until the Notes' date of maturity, such that pre-judgment interest on unpaid post-redemption interest installments should be calculated from the maturity date only.  (Docket entry no. 108 at 3-6.)  However, Plaintiffs have proffered, and Defendants do not dispute, that the Notes were trading above par shortly before the time of redemption.  (Pl. 56.1 St. ¶ 399.) Plaintiffs thus argue that the redemption and cancellation of the Notes deprived them of an opportunity to obtain a return at or after the date of redemption that would have been higher than the par-value redemption payment, so that they suffered the requisite deprivation prior to the

maturity date.  Plaintiffs' proffer frames a genuine issue of fact as to the date at which Plaintiffs were first deprived of the use of money or its equivalent, to which they would otherwise have been entitled under the Agreement, due to Defendant's breach of contract.  Defendant's motion for summary judgment on the question of when prejudgment interest should begin to accrue is therefore denied.

Conclusion

For the foregoing reasons, Plaintiffs' motion for summary judgment (docket entry no. 99) is granted as to Count I, is denied as to Count II, and is denied as to damages. Defendant's motion for summary judgment (docket entry no. 104) is denied as to Count I, is granted as to Count II, and is denied as to damages.

Plaintiffs' motion to strike in part Defendant's Local Civil Rule 56.1 responses (docket entry no. 138) is granted in part and denied in part. Plaintiffs' Objection to Defendant's Request for Judicial Notice and Limited Objection to Defendant's Reply Brief are overruled as moot.

This Memorandum Opinion and Order resolves docket entry nos. 99, 104, and 138. This case remains referred to Magistrate Judge Cave for general pretrial management. The parties must promptly contact Judge Cave's chambers to request a settlement conference and to address what, if any, pretrial matters remain outstanding if settlement of all outstanding issues cannot be achieved. The control date for the final pretrial conference is currently December 3, 2021, at 11:00 a.m.

SO ORDERED.

Dated: September 22, 2021
      New York, New York

/s/ Laura Taylor Swain
LAURA TAYLOR SWAIN
Chief United States District Judge